Raymond P. Boucher, State Bar No. 115364
  *ray@boucher.la*
Maria L. Weitz, State Bar No. 268100
  *weitz@boucher.la*
Hermez Moreno, State Bar No. 72009
  *moreno@boucher.la*
Milin Chun, State Bar No. 262674
  *chun@boucher.la*
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903
Tel:    (818) 340-5400
Fax:    (818) 340-5401

Gavriel Mairone, Esq. (*pro hac vice* pending)
  *ctlaw@mm-law.com*
Bena M. Ochs, Esq. (*pro hac vice* pending)
  *bena@mm-law.com*
MM-LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, Illinois 60611
Tel:    (312) 253-7444
Fax:    (312) 275-8590

Mark J. Geragos, State Bar No. 108325
  *mark@geragos.com*
Ben Meiselas, State Bar No. 277412
  *ben@geragos.com*
GERAGOS & GERAGOS
644 S. Figueroa Street
Los Angeles, California 90017
Tel:    (213) 625-3900
Fax:    (213) 625-1600

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

(1) BARUCH YEHUDA ZIV BRILL, an individual; (2) CHAYA BEILI, an individual; (3) SHABTAI BRILL, an individual; (4) YOSSEF COHEN, an individual; (5) ASAEL ANICCA, also known as ASAEL FRIEDMAN-ANICCA and ASAEL FRIEDMAN, an individual; (6) YISSACHAR ZVI LEBOWITZ, an individual; (7) SHIFRA MARKOWITZ, an individual; (8) DEVORA ESTHER MARKOWITZ, an individual; (9) GERALD MARKOWITZ, an individual; (10) SARAH MORDECHAI, an individual; (11) SHIRIN MORDECHAI, an individual; (12) SHIMON MORDECHAI, an individual; (13) ORA RUBINOFF, an individual; (14) AVIVA RUBINOFF, an individual; (15) MITCHELL JAY RUBINOFF, an individual; (16) YOSEF RUBINOFF, an individual; (17) HANANEL RUBINOFF, an individual; (18) GILA SCHNALL, an individual; (19) FRANCES SCHNALL, an individual; (20) IRA SCHNALL, an individual; (21) ESTATE OF SHOSHANA RIS; (22) TUVIA RIS, an individual; (23) TZVIA RIS, an individual; (24) ANAT RIS, an individual; (25) SABINE RIS,

Case No.  4:15-cv-04916

**COMPLAINT FOR DAMAGES:**

(1) Providing Material Support to Terrorists (18 U.S.C. § 2339A);
(2) Engaging in Financial Transactions With a Known State Sponsor of Terrorism (18 U.S.C. § 2332D);
(3) Financing Terrorist Organizations (18 U.S.C.§ 2339C);
(4) Financing Terrorism in Violation of the Law of Nations;
(5) Crimes Against Humanity in Violation of the Law of Nations; and
(6) Extrajudicial Killings in Violation of the Law of Nations.

**DEMAND FOR JURY TRIAL**

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  an individual; (26) ESTATE OF HANA
   SEGAL; (27) PNINA ALTEROVICH, an
2  individual; (28) MICHAL GANON, an
   individual; (29) VIVIANE ASRAF, an
3  individual; (30) GETAUN AZANU, an
   individual; (31) HABASTA AZANU, an
4  individual; (32) SIMCHA AZANU, an
   individual; (33) AVITAL AZANU, an
5  individual; (34) EDEN AZANU, an individual;
   (35) AMIR AZANU, an individual; (36)
6  ZEHAVA HERSHKOVITZ, an individual;
   (37) SAPIR HERSHKOVITZ, an individual;
7  (38) DOR HERSHKOVITZ, an individual; (39)
   SHIMON HERSHKOVITZ, an individual; (40)
8  YAFFA VAX, an individual; (41)
   ELIMELECH BERKOVITZ, an individual;
9  (42) MARCELA BERKOVITZ, an individual;
   (43) BARUCH PERACH, an individual; (44)
10 NAIMA SHIMON BARUCH, an individual;
   (45) NOURIT GARBE, an individual; (46)
11 GUY BARUCH, an individual; (47)
   MAAYAN FURMAN, an individual; (48)
12 ORIT FURMAN, an individual; (49) BOSMAT
   GLAM, an individual; (50) DAVID GLAM, an
13 individual; (51) RACHEL GLAM, an
   individual; (52) ARIEL MAHFUD, an
14 individual; (53) SARAH MAHFUD, an
   individual; (54) DEBORA MAHFUD, an
15 individual; (55) ROY MAHFUD, an individual;
   (56) YAIR MAHFUD, an individual; (57)
16 MAZAL ALEVI, an individual; (58)
   YONATAN ALEVI, an individual; (59)
17 ORTAL ALEVI, an individual; (60) EYAL
   ALEVI, an individual; (61) SHMUEL
18 SHFAIM, an individual; (62) IRIS SHFAIM,
   an individual; (63) ROY SHFAIM, an
19 individual; (64) DAN SHFAIM, an individual;
   (65) MATAN SHFAIM, an individual; (66)
20 INBAL SHFAIM, an individual; (67) NETA
   SHFAIM, an individual; (68) ESTATE OF
21 NAFTALI LANZKRON; (69) MEIR
   LANZKRON, an individual; (70) HAVA
22 LANZKRON, an individual; (71) BRAKHA
   HERSHKOVITZ, an individual; (72) ORIA
23 LANZKRON, an individual; (73) YEKHIEL
   LANZKRON, an individual; (74) ELISHEVA
24 LANZKRON, an individual; (75) NETANEL
   LANZKRON, an individual; (76) YEDIDIA
25 LANZKRON, an individual; (77) YEHUDA
   LANZKRON, an individual; (78) SHOSHANA
26 ROTENBERG, an individual; (79) MERAV
   SHAMIR, an individual; (80) ESTATE OF
27 ELIRAN ROZENBERG; (81) MICHAL
   ZAYAT ROZENERG, an individual; (82)
28 HILA ZAYAT, an individual; (83) SHIRIN

00031314.16

Case No.

COMPLAINT FOR DAMAGES

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   ZAYAT, an individual; (84) NOAM ZAYAT,
    an individual; (85) NOGA ZAYAT, an
2   individual; (86) ZIV ZAYAT, an individual;
    (87) RAFAEL SOMMER, an individual; (88)
3   RACHEL SOMMER, an individual; (89)
    ISRAEL SOMMER, an individual; (90)
4   HANNANEL TOUITOU, an individual; (91)
    ESTER TOUITOU, an individual; (92)
5   HARON TOUITOU, an individual; (93)
    ESTATE OF VLADISLAV SOROKIN; (94)
6   OLESYA SOROKIN , an individual; (95)
    ALEXANDER SOROKIN, an individual; (96)
7   HILA CHEN, an individual; (97) MORAN
    ROKACH, an individual; (98) LIAT
8   ROKACH, an individual; (99) JOSEPH
    ROKACH, an individual; (100) YAFFA
9   ROKACH, an individual; (101) YAHALOMIT
    ROKACH, an individual; (102) ROSI
10  ROKACH, an individual; (103) HADAD
    DIKLA, an individual; (104) HADAS
11  HADAD, an individual; (105) HAIM HADAD,
    an individual; (106) YOGEV HADAD, an
12  individual; (107) NEAMA HADAD, an
    individual; (108) INA SEGAL, an individual;
13  (109) DIANA SEGAL, an individual; (110)
    CHRISTINA SEGAL, an individual; (111)
14  SHARON SEGAL, an individual; (112)
    SOLANGE AZRAN, an individual; (113)
15  MAXIM AZULAI, an individual; (114) ELI
    SARUSI, an individual; (115) ESTATE OF
16  LILIAN PERETZ; (116) MEIR PERETZ, an
    individual; (117) DALYA PERETZ, an
17  individual; (118) OREN PERETZ, an
    individual; (119) ELY PERETZ, an individual;
18  (120) MOSHE PERETZ, an individual; (121)
    MEITAL MAYMONY, an individual; (122)
19  GUY MAYMONY, an individual;  (123)
    KLUDIN MAYMONY , an individual; (124)
20  YURI ABRAMOV, an individual; (125) SHAY
    AMAR, an individual; (126) TZACHI AMAR,
21  an individual; (127) SHIR AMAR, an
    individual; (128) NEGBA AMAR, an
22  individual; (129) BINYAMIN AMAR, an
    individual; (130) CARMELA
23  LITMANOWITZ, an individual; (131) STELA-
    MARIS DOSSANTOS, an individual; (132)
24  ESTATE OF SIMONA RUDIN; (133) MARK
    RUDIN, an individual; (134) MARGARITA
25  ABRAMOV, an individual; (135) KATERINA
    PELINE, an individual; (136) VICTOR
26  PELINE, an individual; (137) GALINA
    PELINE, an individual; (138) ALEXANDER
27  PELINE, an individual; (139) ALEXANDRA
    PLOTKIN, an individual; (140) ELENA
28  PLOTKIN, an individual; (141) ANDREY

TAILAKOV, an individual; (142) SIMONA KAUFMAN, an individual; (143) IGOR KAUFMAN, an individual; (144) BENTZION AVDAEV, an individual; (145) OVADIA AVDAEV, an individual; (146) AVIGAIL AVDAEV, an individual; (147) ARIEL AVDAEV, an individual; (148) BORIS AVDAEV, an individual; (149) SONIA AVDAEV, an individual; (150) ANAT AMAR, an individual; (151) ELIAD AMAR, an individual; (152) CHAGAI AMAR, an individual; (153) NOAM AMAR, an individual; (154) GAFNIT AMAR, an individual; (155) DAVID MICHEL AMAR, an individual; (156) ESTATE OF HAIM BEN EZRA; (157) SOL BEN EZRA, an individual; (158) YOSSEF BEN EZRA, an individual; (159) MOSHE BEN EZRA, an individual; (160) MORDECHAI BEN EZRA, an individual; (161) AMRAM BEN EZRA, an individual; (162) ESTATE OF LEA BEN EZRA; (163) ESTATE OF MENASHE REGEV; (164) GIDON REGEV, an individual; (165) ODELIA ABECASSIS, an individual; (166) SIMI ABECASSIS, an individual; (167) AVRAHAM ABECASSIS, an individual; (168) TZURIA AMOSI, an individual; (169) RACHEL AMOSI, an individual; (170) YAAKOV AMOSI, an individual; (171) OSHRA AVITZUR, an individual; (172) JUDITH AVITZUR, an individual; (173) CHAIM AVITZUR, an individual; (174) TZVI YEHUDA GOLDENBERG, an individual; (175) DAVID MALCOLM MORDECHAI GOLDENBERG, an individual; (176) AVITAL GOLDENBERG, an individual; (177) MIRIAM ISHAKI, an individual; (178) MOSHE ISHAKI, an individual; (179) SHIMCHA ISHAKI, an individual; (180) NAOMI KALFA, an individual; (181) HESKI KALFA, an individual; (182) RICKY KLEINMAN, an individual; (183) PNINA KLEINMAN, an individual; (184) AVIVIT KLEINMAN-CHEN, an individual; (185) NAOMI KLEINMAN-BRENING, an individual; (186) ESTI KLEINMAN-LIBERMAN, an individual; (187) TAMAR LEVENSON, an individual; (188) BRENDA LEVENSON, an individual; (189) STEPHEN LEVENSON, an individual; (190) TAMAR OZIEL, an individual; (191) MIRIAM OZIEL, an individual; (192) JACQUEZ OZIEL, an individual; (193) MORIA RABI, an individual; (194) IRIS RABI, an individual; (195) MOSHE RABI, an individual; (196) DIMITRY

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

00031314.16

Case No.

COMPLAINT FOR DAMAGES

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

GANTOVNIK, an individual; (197) SHULA GAON, an individual; (198) SHMUEL GAON, an individual; (199) EZRA SHARABI, an individual; (200) SOSHANA SIMON, an individual; (201) ESTATE OF YOSSI ELEZRA; (202) MORDECHAI ELEZRA, an individual;  (203) YAEL ELEZRA, an individual; (204) SHIRLY ELEZRA, an individual; (205) OMER ELEZRA, an individual; (206) ESTATE OF GOLAN TURGEMAN; (207) EDNA TURGEMAN, an individual; (208) ESTER IFAT SULTAN, an individual; (209) AMIRA TURGEMAN, an individual; (210) MOSHE TURGEMAN, an individual; (211) AVI TURGEMAN, an individual; (212) ORLY TURGEMAN GOLDSHMIT, an individual; (213) EFRAIM AROAS, an individual; (214) IZAK AROAS, an individual; (215) YAFFA AROAS, an individual; (216) YOSSI AROAS, an individual; (217) AVI AROAS, an individual; (218) NETANEL AROAS, an individual; (219) BEN-ISRAEL AROAS, an individual; (220) OR AROAS, an individual; (221) ZEHAVA LEVI, an individual; (222) OMER ELIAV, an individual; (223) ORTAL GANON, an individual; (224) ROBERT GANON, an individual; (225) LIHI GANON, an individual; (226) BEN GANON, an individual; (227) SHARON GILI HEFETZ, an individual; (228) VARDA HEFETZ, an individual; (229) AVRAHAM HEFETZ, an individual; (230) OR-LIEL HEFETZ, an individual; (231) ADI HOJA, an individual; (232) MALKA NISIM, an individual; (233) MORAN HOJA, an individual; (234) HILA LEVI, an individual; (235) SHIMON LEVI, an individual; (236) AVIVA LEVI, an individual; (237) HAYIM LEVI, an individual; (238) ITZHAK LEVI, an individual; (239) YOTAM LEVI, an individual; (240) DANA MIZRACHI, an individual; (241) LIA LIHI MIZRACHI, an individual; (242) MICHAEL YSAIA, an individual; (243) AVI ZINO, an individual; (244) VIKI ZINO, an individual; (245) YOSEF ZINO, an individual; (246) MEIR ZINO, an individual; (247) ISRAEL ZINO, an individual; (248) MOSHE ZINO, an individual; (249) YINON ZINO, an individual; (250) YOHI ZINO, an individual; (251) ALIZA ZINO, an individual; (252) SARAH ZINO, an individual; (253) RUHAMA ZINO, an individual; (254) CHEN NECHMAD, an individual; (255) YAAKOV NECHMAD, an individual; (256) SIGALIT NECHMAD, an individual; (257) ELIOR

NECHMAD, an individual; (258) YEHIEL BORNSTEIN, an individual; (259) NECHAMA BORNSTEIN, an individual; (260) YARDEN BORNSTEIN, an individual; (261) NACHMAN MORDECHAI BORNSTEIN, an individual; (262) NATAN BORNSTEIN, an individual; (263) NAFTALI BORNSTEIN, an individual; (264) DAVID ELISHA-SHERF, an individual; (265) ZIVA ELISHA-SHERF, an individual; (266) MICHAL ELISHA-SHERF, an individual; (267) MAOR ELISHA-SHERF, an individual; (268) ZEEVIK ELISHA-SHERF, an individual; (269) EFRAT BAR DAGAN, individually and as successor-in-interest to NETHANEL KOCHAVI, deceased; (270) ESTATE OF NIR BOROCOV; (271) MORDECHAI BOROCOV, an individual; (272) KOCHAVA BOROCOV, an individual; (273) DORIT YADID, an individual; (274) DORON BOROCOV, an individual; (275) YOCHEVED BOROCOV, an individual; (276) MAIMON AMSALEM, an individual; (277) FANNY AMSALEM, an individual; (278) SHLOMO AMSALEM, an individual; (279) GALIT DROR, an individual; (280) MEIR HAREL, an individual; (281) ILANA HAYAT, an individual; (282) ROY GORDON, an individual; (283) ROI BITON, an individual; (284) MATI LEV, an individual; (285) ETTI FRENCHI LEV, an individual; (286) ZIV LEV, an individual; (287) KINERET LEV, an individual; (288) ASSAF MYARA, an individual; (289) SINAI ZAKEN, an individual; (290) LISA MYARA, an individual; (291) MELODY MYARA, an individual; (292) ESTATE OF MEIR FAHIMA; (293) SHALOM FAHIMA, an individual; (294) KOKHAVA FAHIMA, an individual; (295) MAZAL FAHIMA, an individual; (296) RACHEL ASRAF FAHIMA, an individual; (297) DANIEL NAVON, an individual; (298) ESTER FAHIMA, an individual; (299) LIDOR FAHIMA, an individual; (300) NATALI FAHIMA, an individual; (301) ORTAL FAHIMA, an individual; (302) YUNIS ZEID, an individual; (303) PAUL DRIMMER, an individual; (304) RAHEL DRIMMER, an individual; (305) BARUCH NAIM, an individual; (306) PNINA DRIMMER, an individual; (307) HANI DRIMMER, an individual; (308) ILLANA DRIMMER, an individual; (309) ASHER DRIMMER, an individual; (310) ESTATE OF ZEEV HANIK; (311) BORIS HANIK, an individual; (312)

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Case No.

COMPLAINT FOR DAMAGES

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  |  LIOR HANIK, an individual; (313) ILANA VAKNIN, an individual; (314) ZILA COHEN, an individual; (315) TIKVA PERES, an individual; (316) ESTATE OF YAAKOV SHFAYM; (317) NAOMI SHFAYM, an individual; (318) YAEL RAVIVA GIDEONI, an individual; (319) YARDENA MALKIEL, an individual; (320) AZRIEL SHFAYM, an individual; (321) YORAM SHFAYM, an individual; (322) ELIYAHU SHFAYM, an individual; (323) RAHMIM HASON, an individual; (324) CARMELA HASON, an individual; (325) KINERET RAHAMIM, an individual; (326) HAIA RAHMIM, an individual; (327) YINON RAHAMIM, an individual; (328) YAIR RAHAMIM, an individual; and, (329) ELIA RAHAMIM, an individual,

Plaintiffs,

v.

CHEVRON CORPORATION, a Delaware Corporation; and DOES 1 through 9, inclusive,

Defendants.

00031314.16

COMPLAINT FOR DAMAGES

Case No.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

# I.

## INTRODUCTION

1.  From his rise to power in the 1970s until his capture by United States' ("U.S.") forces in 2003, Saddam Hussein and his Iraqi regime (collectively "Saddam Hussein") engaged in countless international acts of terrorism involving extrajudicial killings, merciless bombings, and brutal abuses of human rights. In 1990, Saddam Hussein launched an unprovoked military takeover of Kuwait. Saddam Hussein's ruthless attack on the tiny Gulf state was met with unanimous outrage from world leaders. The United Nations ("UN") called for decisive economic action against Iraq by passing a series of resolutions imposing economic sanctions designed "to cripple Iraq totally," chiefly by ensuring the international community "refus[ed] to buy any of [Iraq's] oil." To that end, UN Resolution 661 (1990) imposed a near-total blockade on any trade or transfer of resources to or from Iraq.

2.  The UN's economic sanctions had the desired effect on Saddam Hussein: according to the 1996 Patterns of Global Terrorism report issued by the U.S. State Department, "Iraq's ability to carry out terrorism abroad ha[d] been curbed by UN sanctions."

3.  The sanctions also led to widespread epidemic and famine among the poverty-stricken citizens of Iraq, spurring the UN to establish its Oil-for-Food Program ("OFP") in 1996. Rooted in a compassionate goal to provide basic life necessities to those most in need, the OFP authorized the Iraqi government to export limited quantities of oil so long as *all* proceeds were deposited in an escrow account monitored by the UN and used only to purchase humanitarian goods for the benefit of all Iraqi people.

4.  In conjunction with a number of profit-motivated groups and corporations from around the world, including Defendant Chevron Corporation ("Chevron"), Saddam Hussein manipulated the OFP to illegally funnel resources away from the UN-monitored escrow account and toward re-establishing his global terrorism network, including payments to suicide bombers who engaged in extrajudicial killings.

5.  Despite monitoring of the escrow account, Saddam Hussein retained the power to select the entities to which Iraqi oil would be sold. In August of 2000, Saddam Hussein began

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

conditioning the right to purchase oil under the OFP upon a purchaser's willingness to pay secret surcharge payments to him. The proceeds from the surcharges bypassed the OFP escrow account and were put into a private "slush" fund that Saddam Hussein used to pay for crimes against humanity and acts of terrorism against the U.S. and other foreign nations. The surcharges and payments made thereunder were expressly precluded under the OFP and violated the laws of the United States and the international community.

6.      Chevron was among those who participated in Saddam Hussein's violations of the OFP, U.S. federal law, and International law. Between July 2000 and December 2002, Chevron illegally purchased over 78 million barrels of Iraqi oil and paid millions of dollars in illegal kickbacks that bypassed the OFP escrow account in favor of "secret" bank accounts in Jordan and Lebanon that were controlled by Saddam Hussein. In sum, Chevron paid approximately $20 million into Saddam Hussein's "slush" fund.

7.      Chevron made these additional payments with the specific knowledge that a portion of the inflated purchase price was paid to Saddam Hussein in the form of illegal kickbacks. In blatant violation of UN sanctions and U.S. law, Chevron failed to properly record the nature of its oil payments by falsely designating these illegal kickback payments as "premiums" in its accounting. Saddam Hussein also demanded extra fee payments before allowing Iraq's crude oil onto the cargo ships and chartered vessels docked in the Iraqi ports. Chevron knowingly paid extra port fees, recording these kickbacks as part of the total price for loading the oil onto chartered vessels. These fees, like the surcharges, were illegally paid outside of the OFP and directly into bank accounts used by Saddam Hussein to fund terrorist activities.

8.      Saddam Hussein has long been designated an official state sponsor of international terrorism, and his unapologetic, public practice of directing and authorizing acts of international terror against, among others, Israelis and U.S. nationals was globally known and widely reported at the time Chevron acted to bypass to OFP. Chevron, a multinational oil company constantly engaged with the international business community, knew that Saddam Hussein funded and committed terrorist acts, such as suicide bombings, and other crimes against humanity against the citizens of the U.S. and Israel. As such, Chevron knew that payment of illegal surcharges outside

BOUCHER LLP

21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

the OFP would be used by Saddam Hussein, in part, to finance terrorist acts and other violations of the laws of nations against U.S. and foreign nationals around the world. In fact, these illegal surcharges were the only means Saddam Hussein had to fund his continued acts of terrorism. Yet, Chevron continued making illegal payments into Saddam Hussein's slush fund despite what former U.S. Secretary of Defense Donald Rumsfeld described in April 2002 as Saddam Hussein's proud and publicly made decision "to go out and actively promote and finance human sacrifice."

9.      By participating in the illegal kickback scheme, Chevron knew that it was providing illegal financial and material support to Saddam Hussein, and that such financial and material support would be (and were) used to incite, direct, and finance violent terrorist attacks. When Chevron agreed to pay kickbacks and money "under the table" to Saddam Hussein (money for which he had no legitimate use), it was reasonably foreseeable and anticipated that Saddam Hussein would use this money to engage in acts of terrorism and to help entice and fund the suicide bombers who killed and injured U.S. and foreign nationals, including Plaintiffs herein, as shown in the following table:



SUICIDE TERROR ATTACKS IN ISRAEL

■ While Chevron contributed millions of dollars to Saddam Hussein   ■ Without Chevron's financial support

*Chevron stopped transferring funds to Saddam Hussein in March 2003

10.     Chevron made these payments knowing the inflated premiums were illegally being paid outside the OFP at the demand of Saddam Hussein. Chevron paid the illegal kickbacks demanded by Saddam Hussein so that its supply of Iraqi oil would not be cut off.  As a result, Chevron caused funds to be diverted away from the OFP escrow account and into the personal slush fund of a notorious state sponsor of terrorism. Chevron's illegal payments caused the very thing the UN designed the OFP to prevent: the sale of Iraqi oil to fund deadly acts of terrorism.

11.     Due, in part, to Chevron's substantial assistance, Saddam Hussein had the means to finance and direct over twenty separate acts of violent terrorist attacks inflicting death, disfigurement, and lasting psychological trauma and pain upon plaintiffs, eighteen (18) U.S. nationals and over 300 foreign nationals then living in Israel. Saddam Hussein publicly praised and commended each such act of terrorism as an act of "bravery" and martyrdom. With great fanfare, Saddam Hussein offered the suicide bombers' family members payments amounting to $25,000, often presenting them with a giant check during a televised ceremony. These publicized payments—drawn, in part, from Chevron's kickback payments—played a vital role in recruiting and influencing young Palestinians to "honorably" sacrifice themselves *with their family's blessing*.

12.     In 2007, the Securities and Exchange Commission ("SEC") filed suit against Chevron for its payment of illegal surcharges to Iraq in violation of the OFP. The resulting non-prosecution agreement included an admission by Chevron that it had paid approximately $20 million in illegal surcharges that were not deposited into the OFP escrow account. Chevron agreed to pay a total of $27 million ($25 million in disgorged profits and a $2 million civil penalty) to the Department of Justice, the U.S. Treasury, and the District Attorney's Office of New York County. Now, this lawsuit seeks compensation for the victims of the terrorist attacks that Chevron helped to finance.

## II.

## PARTIES

13.     This complaint is brought on behalf of 18 U.S. nationals and 311 foreign nationals injured in their person, property, or business by reason of the twenty-one separate acts of

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   international terrorism ordered, funded, and executed under the direction of Saddam Hussein and

2   with the material support of Chevron.

3       14.     Because of the substantial assistance Chevron provided to Saddam Hussein,

4   knowingly or with conscious disregard of the fact that money would be used to fund acts of

5   international terrorism, extrajudicial killings, and crimes against humanity by virtue of its material

6   financial support to a notorious sponsor of international terrorism, Chevron is liable to Plaintiffs

7   and members of the proposed Class under the Anti-Terrorism Act of 1990, 18 U.S.C. § 2333,

8   and/or the Alien Tort Statute, 28 U.S.C. § 1350.

9   **A.      Anti-Terrorism Act Plaintiffs**

10      15.     Plaintiffs, as more specifically described below, are United States citizens who

11  suffered substantial injuries as a result of international terrorism, extrajudicial killing, genocidal

12  conduct, and crimes against humanity, or are the estates, survivors, or heirs of United States

13  citizens who suffered such injuries.

14  **1.      December 1, 2001 Ben Yehudah Street Bombing**

15      16.     On December 1, 2001, two suicide bombers, Osama Baher and Nabil Halbiyeh,

16  detonated explosive devices on Ben Yehudah Street in Jerusalem. Minutes later, a car bomb

17  exploded on the crowded street. At least 10 were killed and 150 were wounded in the bombing.

18  On or about January 22, 2002, each of the suicide bombers' families was given a $15,000 check,

19  paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

20  kickbacks in violation of the OFP.

21      17.     Plaintiff (1) Baruch Yehuda Ziv Brill is a United States citizen. As a result of the

22  Ben Yehuda Street bombing, Baruch suffered serious physical and psychological pain, including

23  multiple shrapnel wounds to his arms, back, and legs, a perforated left eardrum, and lacerations to

24  his scalp, neck, and torso. Sharp nails attached to the bomb (so as to maximize injury) penetrated

25  through the skin of Baruch's left wrist and left lower leg. Baruch underwent painful and complex

26  surgery and debridement following his injuries. At the time of the attack, Baruch was seventeen

27  years old, but to this day, he has yet to regain the full utility of his left hand. Baruch's mother,

28

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  Plaintiff (2) Chaya Beili, a United States citizen, and Baruch's father, Plaintiff (3) Shabtai Brill,

2  also bring claims for their suffering relating to the attack and Baruch's serious injuries.

3          **2.**      **March 9, 2002 Café Moment Bombing**

4        18.     On March 9, 2002, a suicide bomber named Fuad Hurani detonated an explosive

5  device at the entrance to Café Moment in Jerusalem. The force of the blast completely destroyed

6  the café, killing eleven and injuring more than fifty people. On or about June 23, 2002, Hurani's

7  mother was given a $25,000 check, paid on behalf of Saddam Hussein with funds acquired, in

8  part, from Chevron's payment of illegal kickbacks in violation of the OFP.

9        19.     Plaintiff (4) Yossef Cohen is a United States citizen. As a result of the Café

10  Moment bombing, Yossef suffered serious physical and psychological injuries including broken

11  bones, a torn spleen, chest and face wounds, a perforated ear drum resulting in permanent hearing

12  loss, torn corneas in both eyes resulting in permanent vision impairments, permanent scarring to

13  his face, and debilitating anxiety.

14        20.     Plaintiff (5) Asael Anicca, also known as Asael Friedman-Anicca and Asael

15  Friedman, is a United States citizen. Friedman was twenty-two years old at the time of the Café

16  Moment bombing. Asael suffered serious psychological injuries in the attack, including the death

17  of a close friend. Asael was diagnosed with post-traumatic stress disorder, which has required and

18  will continue to require medication and psychotherapy. Asael also suffers from anxiety, chronic

19  depression, and other somatic injuries relating to the attack.

20          **3.**      **November 4, 2001 French Hill Shooting**

21        21.     During rush hour on November 4, 2001, gunman Hatem Shweikeh, armed with M-

22  16 automatic rifles, opened fire on Bus No. 25 at the French Hill intersection in Jerusalem. Two

23  teenagers were killed, and forty-five others were injured in the attack. Thereafter, Shweikeh's

24  mother was given a check, paid on behalf of Saddam Hussein with funds acquired, in part, from

25  Chevron's payment of illegal kickbacks in violation of the OFP.

26        22.     Plaintiff (6) Yissachar Zvi Lebowitz is a United States citizen. Yissacher was

27  eleven years old at the time of the November 4, 2001 French Hill Shooting. Yissacher suffered

28  and continues to suffer from psychological injuries as a result of the shooting.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

23.     Plaintiff (7) Shifra Markowitz is a United States citizen. Shifra was sixteen years old at the time of the November 4, 2001 French Hill Shooting. Shifra suffered physical and psychological injuries and emotional trauma as a result of the shooting, including witnessing the violent death of a close friend. Shifra had to have pieces of shattered glass removed from her neck and hands. Shifra's parents, Plaintiffs (8) Devora Esther Markowitz and (9) Gerald Markowitz, also bring claims for their suffering relating to the attack and Shifra's injuries.

24.     Plaintiff (10) Sarah Mordechai is a United States citizen. Sarah was fifteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Sarah suffered physical and psychological injuries, including witnessing the violent death of a close friend, and was required to seek medical attention following the attack to remove shattered pieces of glass from her body. Sarah's mother, Plaintiff (11) Shirin Mordechai, a United States citizen, and Sarah's father, Plaintiff (12) Shimon Mordechai, also bring claims for their suffering relating to the attack and Sarah's injuries.

25.     Plaintiff (13) Ora Rubinoff is a United States citizen. Ora was sixteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Ora suffered serious psychological injuries, including an acute stress reaction. Ora also witnessed the violent death of a close friend. Ora's parents, Plaintiffs (14) Aviva Rubinoff and (15) Mitchell Jay Rubinoff, and her siblings, Plaintiffs (16) Yosef Rubinoff and (17) Hananel Rubinoff, also bring claims for their suffering relating to the attack and Ora's injuries.

26.     Plaintiff (18) Gila Schnall is a United States citizen. Gila was sixteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Gila suffered psychological injuries, including witnessing the violent death of a close friend, and continues to suffer from anxiety stemming from the attack. Gila's parents, Plaintiffs (19) Frances Schnall and (20) Ira Schnall, also bring claims for their suffering relating to the attack and Gila's injuries.

**B.     Alien Tort Statute Plaintiffs**

27.     Plaintiffs (3), (8)-(9), (12), (14)-(17), and (21)-(329), described below in Paragraphs 112 through 148, are foreign national victims of international terrorism, extrajudicial killings, and other crimes against humanity that were financed, in part, by Chevron's illegal

kickbacks to Saddam Hussein. They include persons injured and close family members or representatives of persons killed or injured in suicide bombings and other shockingly egregious acts of international terror, extrajudicial killing, and crimes against humanity. Plaintiffs are citizens of Israel and various other countries.

28.    Plaintiffs' damages were proximately caused by the actions of Chevron, who supported, assisted, conspired with, funded, and aided Saddam Hussein in violation of international law and with full knowledge or reckless disregard of Saddam Hussein's acts of international terrorism, extrajudicial killings, inhumane and degrading treatment, and other crimes against humanity.

**C.    Defendants**

29.    Defendant Chevron Corporation is a multinational corporation incorporated in the state of Delaware. Its headquarters and principal place of business is located in San Ramon, California. Chevron is involved in the production, processing, marketing, and transportation of crude oil and petroleum products, and conducts business in the United States and approximately 180 other countries. Chevron has approximately 61,456 employees worldwide and in 2014, reported $19.241 billion in net income.

30.    Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 9, Inclusive; therefore, Plaintiffs sue these defendants by such fictitious names. Plaintiffs are informed and believe that each of the fictitiously named defendants are legally responsible in some manner for the occurrences herein alleged, assisted in and about the wrongs complained herein by providing financial support, advice, resources, or other assistance. Plaintiffs will seek leave to amend the complaint to allege their true names and capacities when ascertained.

31.    As used herein, the terms "Defendants" and "Chevron," unless otherwise specified, refer collectively to Chevron Corporation and DOES 1 through 9, inclusive.

32.    At all relevant times, each of the Defendants was the agent, servant, employee, co-conspirator and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant was acting within the course and scope of this agency,

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  employment, conspiracy, and/or joint venture, and was acting with the consent, permission and

2  authorization of each of the other Defendants. All actions of each Defendant, as alleged in the

3  causes of action stated herein, were ratified, approved, and/or authorized by every other Defendant

4  with full knowledge of such acts. Defendants are thus jointly and severally liable for such actions.

5  **D.  Statute of Limitations**

6  33.  A ten-year statute of limitations ("SOL") generally applies to claims arising under

7  the Anti-Terrorism Act and the Alien Tort Statute. The statutes of limitations on Plaintiffs' claims

8  alleged herein were tolled because Plaintiffs and members of their class did not know or have

9  reason to know of their potential claims against Chevron until at least October 27, 2005, when the

10  UN-appointed Independent Inquiry Committee issued its report (the "Volcker Report") on Saddam

11  Hussein's manipulation of the Oil for Food Program and the assistance provided to him by various

12  entities, including Chevron. Prior to October 27, 2005, Plaintiffs did not and could not have

13  known or reasonably suspected that Chevron's conduct was a substantial factor in causing the

14  injuries and damages alleged herein because—due to the surreptitious nature of Chevron's

15  conduct—information regarding Chevron's involvement in funding Saddam Hussein's acts of

16  international terrorism was not available to or reasonably discoverable by Plaintiffs.

17  **III.**

18  **JURISDICTION AND VENUE**

19  34.  Jurisdiction. This Court has original subject matter jurisdiction over this action

20  pursuant to the Anti-Terrorism Act of 1990, 18 U.S.C. § 2331, et seq., and specifically 18 U.S.C. §

21  2333(a), and 28 U.S.C. § 1331, and pursuant to 28 U.S.C. § 1350, as an action by non-U.S.

22  citizens for torts committed in violation of the law of nations or a U.S. treaty.

23  35.  Venue. Venue is proper in this District pursuant to 18 U.S.C. § 2334 and 28 U.S.C.

24  § 1391(b) because Chevron maintains its headquarters and principle place of business in San

25  Ramon, California.

26  36.  Intradistrict Assignment. A substantial part of the events or omissions giving rise to

27  this complaint occurred at or were directed from Chevron's San Ramon headquarters, which is

28

within Contra Costa County. Pursuant to Local Rule 3-2(d), this action must be assigned to the San Francisco Division or the Oakland Division.

## IV.

## FACTUAL ALLEGATIONS

37.     This complaint seeks damages and other relief arising out of Chevron's provision of illicit material and financial support to Saddam Hussein and his embattled regime. With funding provided in part by Chevron, Saddam Hussein had the means to fund, direct, and authorize his agents within notorious terrorist organizations, such as the Islamic Resistance Movement ("Hamas"), the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs' Brigade to commit egregious human rights violations and felonious and tortious acts of international terrorism against U.S. and foreign nationals. These acts included attempted murder, murder, maiming, and infliction of psychological pain upon plaintiffs.

38.     Through contracted agents and hired hit men within Hamas, the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs' Brigade, Saddam Hussein was able to engage in a systematic and widespread campaign of suicide bombings and other murderous crimes against humanity and acts of international terrorism. These costly agreements and terrorist attacks were financed, in part, by the illegal kickback payments knowingly made by Chevron in violation of the OFP.

39.     From as early as 1982 through 2003, Saddam Hussein consistently provided command and control, safe havens, training camps, weapons, office space, and financial, operational, and logistical support for individual terrorists and terrorist groups. During the relevant time period, each of these terrorist groups acted with a common and widely-publicized purpose to both eradicate the State of Israel and eject the United States from the Middle East. Saddam Hussein and his allies implemented a common strategy to undermine American influence in Israel and throughout the Middle East through widespread campaigns of international terrorism and extrajudicial, savage killings of Americans and Israelis.

40.     In support and solidarity with these notorious terrorist organizations' objectives, Saddam Hussein provided Hamas, the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs' Brigade with weapons, weaponry training, ammunition, explosives, and even directed or

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   coordinated joint international terrorist attacks that included the numerous suicide bombings

2   directed at and suffered by Plaintiffs and other un-armed and innocent American and Israeli

3   civilians. Funding for these costly and large-scale activities was provided, in part, by the illegal

4   kickback payments made and sanctioned by Chevron.

5       41.     Between 2000 and 2003, Saddam Hussein, through contracted agents within

6   terrorist organizations, systematically and continuously terrorized, injured, and killed unarmed

7   civilians in Israel, which included numerous American citizens, through suicide bombings labeled

8   as "martyrdom" operations. These terrorist attacks were largely incited and incentivized by hefty

9   "financial rewards" from Saddam Hussein, given directly to the families of deceased suicide

10  bombers and terrorists.

11      42.     Under the OFP, the UN loosened trade embargoes against Iraq to allow the sale of

12  Iraqi oil *so long as* all proceeds were deposited into an escrow account monitored by a special UN

13  committee and used only to purchase humanitarian aid for Iraqi citizens. Chevron knowingly

14  disregarded a substantial and unjustifiable risk to the lives of U.S. and foreign nationals by

15  participating in a scheme to provide illegal and material financial support to the Saddam Hussein

16  by paying premiums for Iraqi oil. The injuries Plaintiffs suffered were a reasonably foreseeable

17  consequence of the financial support Chevron provided to Saddam Hussein  through the millions

18  of dollars it paid "off-the-books" into accounts outside the strictures of the OFP.

19      **A.    Chevron's Illegal Kickbacks Provided a Notorious Terrorist with a "Slush
             Fund" to Further his Anti-American, Anti-Israeli Agenda.**

20

21      43.     In or about July 1968, the Ba'ath Party of Iraq seized control of the government of

22  Iraq in a bloody takeover. Saddam Hussein served as the head of intelligence for the army under

23  the new regime before he seized absolute power in or about 1979. Until his capture by Western

24  forces in late 2003, Saddam Hussein was notorious for using international terrorism as a strategic

25  weapon against the United States and Israel.

26      44.     Beginning in 1990 and continuing throughout Chevron's participation in Saddam

27  Hussein's illegal kickback scheme, Iraq was designated a state sponsor of terrorism by the U.S.

28  Department of State. State sponsors of terrorism are countries found to have repeatedly provided

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   support for acts of international terrorism, and federal law places severe restrictions on financial

2   transactions with such countries. The purpose behind this designation, like the sanctions imposed

3   by UN Resolution 661, was to financially isolate Saddam Hussein so that he would be unable to

4   continue using terrorism as a means of political expression.

5       45.     Saddam Hussein financed, directed, and authorized suicide bombings and other

6   murderous attacks involving the use of weapons of mass destruction such as explosives,

7   incendiary weapons, and other lethal devices designed to cause serious bodily injury and death.

8       46.     The suicide bombing and murderous attacks directed by Saddam Hussein involved

9   the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary

10  weapons, and lethal devices in public locations, state and government facilities, and on public

11  transportation systems, including buses commonly used by students, tourists, and Americans

12  visiting or living in Israel. At all relevant times, it was well-known that Americans are frequent

13  visitors to Israel and that many American citizens live in Israel. In fact, in 1999, 184,000

14  American citizens lived in Israel, accounting for 3.1% of its population.

15      47.     Saddam Hussein publicly threatened and vowed to topple and eradicate the State of

16  Israel at any cost. In widely published statements, he vowed to expel and displace all Americans

17  within Israel, to target American entities in Israel, to create terror within the Israeli state, to murder

18  the Jewish people, to forcibly remove all American presence from Israel and the Middle East.

19  Saddam Hussein's stated goal was to "liberate" Israel by imposing an Islamic and/or Palestinian

20  state through the use of suicide bombings and other shockingly egregious terrorist acts.

21      48.     As early as 1986, the U.S. State Department's annual "Patterns of Global

22  Terrorism" report noted that Iraq had offered safe haven to terrorists responsible for attacks

23  against American and Israeli targets. By 1990, the deepening relationship between Iraq and these

24  terrorist organizations was said to pose a great threat to U.S. national security, and Iraq's

25  continued support, financing, and training of anti-American terrorist organizations continued to be

26  reported by the U.S. State Department from 1994 through 2002.

27      49.     On August 21, 1990, the Washington Times reported that Saddam Hussein was

28  creating "an army of terrorist fanatics ready for suicidal attacks against U.S. and Arab targets,"

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    and that Saddam Hussein was the instrument that could bring these terrorists together in "an anti-

2    American frenzy."

3          50.     From January to February of 1991, during the First Gulf War, Saddam Hussein

4    launched thirty-nine Scud missiles carrying military grade explosives against civilian populations

5    in major Israeli cities, including those populated with American citizens. The attacks caused an

6    incalculable number of deaths and injuries, and tens of millions of dollars in property damage.

7    Tens of thousands of Israeli residents, including U.S. nationals, were forced to flee their homes.

8          51.     In July of 1991, the Central Intelligence Agency reported that Saddam Hussein was

9    responsible for the bombing of an Austrian airliner over Thailand that killed three Americans.

10   U.S. media outlets reported heavily on "Iraqi-sponsored terrorist groups" targeting the United

11   States and its citizens living and traveling abroad.

12         52.     Between 1992 and 1994, Saddam Hussein worked with the Arab Liberation Front

13   to shuttle approximately 100 bombs to international terrorist cells located throughout the world.

14   The bombs were intended for attacks against American civilians.

15         53.     In 1993, at the direction of Saddam Hussein, the Iraqi Intelligence Service tried to

16   assassinate U.S. President George H. W. Bush.

17         54.     On June 27, 1993, President Clinton declared that Saddam Hussein "ruled by

18   atrocity, slaughtered [his] own people, invaded two neighbors, attacked others and engaged in

19   chemical and environmental warfare." This Presidential Address was reported on every major

20   news station and newspaper in the United States, coverage of the assassination attempt was also

21   repeatedly reported on and covered in the United States media.

22         55.     On July 29, 1996, Newsday reported that Iraq remained a leading sponsor of

23   international terrorism, "eager to punish the United States for humiliations suffered during the

24   Gulf War."

25         56.     Saddam Hussein made countless public announcements recruiting volunteers to

26   become "martyrs" for the country. His commitment to financing such attacks was equally

27   publicized, and Chevron knew that its illegal kickbacks would be used, at least in part, to fund

28   Saddam Hussein's anti-American, anti-Israeli agenda. For example:

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

a.      On October 8, 2000, Saddam Hussein made a public speech, which was broadcast on Iraqi television, wherein he agreed to "open camps for volunteers for jihad to liberate Palestine so as to allow them to complete their military training;" "to donate 5 million euro for the martyrs of Palestine and in aid to the intifada;" and "to consider the martyrs of the valiant Palestinian intifada as martyrs of the Mother of Battles."

b.      In or about October 2000, Saddam Hussein publicly offered to provide financial rewards for Palestinians killed or wounded during violent confrontations and terrorist campaigns aimed at Israeli and United States citizens. According to a February 2001 Washington Times article, Rakad Salem from Saddam Hussein's Arab Liberation Front reportedly offered a total of $4 million to the families of these "martyrs" over the course of less than one year.

c.      According to a report printed in the official Iraqi newspaper on November 20, 2000, the 48th session of the Iraqi ministers resolved to support the Palestinian intifada in all possible ways. On November 26, 2000, the newspaper quoted Saddam Hussein as calling on the Arab nations to be more cooperative in helping the Palestinians with their armed struggle.

d.      Also in 2000, Saddam Hussein urged "the people's masses to work relentlessly to expel the U.S. embassies and centers from the Arab countries as well as to uproot and expel any Zionist presence in these countries."

e.      Saddam Hussein celebrated anti-American and anti-Israeli suicide bombers in a March 4, 2002 speech: "We are glad about the spirit of the Palestinian people's spirit of self-martyrdom and heroism. . . . By Allah, what the Palestinian people have done surpasses my expectations."

f.      According to the Los Angeles Times, Saddam Hussein ordered a memorial to be erected in one of Baghdad's main squares in honor of the first Palestinian female suicide bomber, who on January 27, 2002, detonated explosives in Jerusalem, killing herself and wounding dozens of people.

57.     In October 2002—*while Chevron was actively engaged in the illegal kickback scheme*—United States President George W. Bush observed: "[Saddam Hussein] has given shelter and support to terrorism and practices terror against [his] own people. The entire world has

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   witnessed Iraq's 11-year history of defiance, deception and bad faith. . . . And we know that Iraq is

2   continuing to finance terror and gives assistance to groups that use terrorism to undermine Middle

3   East peace." Despite this clear message from the President of the United States, despite Saddam

4   Hussein's decades-long and widely known commitment to supporting terrorist activities, and

5   despite clear federal and international laws, Chevron *continued* to funnel illegal kickbacks into

6   Saddam Hussein's terrorist slush fund.

   **B.      The Human Rights Abuses Committed by Saddam Hussein Were Widespread and Systematic, Requiring Significant Levels of Funding.**

   **1.      Until oil purchasers like Chevron began paying illegal kickbacks outside the Oil-for-Food Program, UN sanctions had effectively crippled Saddam Hussein's ability to commit international acts of terrorism.**

11   58.     As Joseph A. Morris, a former Department of Justice Attorney and former General

12   Counsel of the United States Information Agency, testified in 1990: "International terrorism has

13   become, in many respects, an industry. It rests on a foundation of money, Money is often more

14   important to the masters of terrorism than are people."

15   59.     Following Saddam Hussein's unprovoked invasion of Kuwait in 1990, the UN

16   Security Council imposed severe economic sanctions against Saddam Hussein and Iraq. Under the

17   terms of the UN directive, the international community was forbidden from engaging in any trade

18   with Iraq, its government, or its people.

19   60.     Within a few years, it became clear that the UN's near-total trade embargo had

20   accomplished its goal of curtailing Saddam Hussein's terrorist activity by cutting him off from any

21   legitimate sources of revenue or financing. At the same time, the sanctions left Iraq's citizens

22   poverty-stricken and without access to life-sustaining food, medical supplies, and other basic

23   needs. Perceiving an immediate humanitarian crisis in the region, the UN established the Oil-for-

24   Food Program ("OFP"), which authorized Iraq to export limited quantities of oil so long as *all*

25   proceeds were deposited in an escrow account monitored by the UN and used only to purchase

26   humanitarian goods for the benefit of all Iraqi people.

27   61.     Under the OFP, the UN administered the sale of oil, approved all sales contracts,

28   and deposited all sale proceeds into a UN-supervised escrow account at the Banque Nationale de

1   Paris (BNP) in Manhattan. However, Saddam Hussein retained the authority to select which

2   companies would receive rights to purchase allocations of Iraqi oil.

3         62.    The UN sought to set the price for Iraqi oil at the highest rate bearable by the

4   market in order to maximize funds available for Iraq's humanitarian needs, and to minimize the

5   potential for illegal kickbacks to Saddam Hussein.

6         63.    To further minimize the potential for unauthorized payments to Saddam Hussein,

7   the U.S. government required American purchasers to first obtain a license from the Treasury

8   Department's Office of Foreign Assets Control ("OFAC"). OFAC would evaluate license

9   applications and then refer them to the Department of State for further investigation. The

10  Department of State would forward worthy applications to the UN for approval. If approved,

11  OFAC would then issue a license allowing the American entity to purchase Iraqi oil.

12        64.    Anyone purchasing oil under the OFP was required to pay the full contract price by

13  means of a letter of credit in favor of the OFP account. Companies were prohibited from making

14  payments for oil to Saddam Hussein, directly or indirectly, outside of the OFP bank account.

15        65.    The Iraqi government began selling oil pursuant to the OFP in or about December

16  1996. Between December 1996 and December 2002, the UN Security Council adopted a series of

17  resolutions that re-authorized the OFP for approximately thirteen 180-day phases of operation.

18  Throughout each of these phases, the price at which Iraqi oil was sold under the OFP, known as

19  the Official Selling Price ("OSP"), was established by a committee made up of member states of

20  the Security Council in Manhattan. These prices were decided largely based on recommendations

21  from a rotating group of UN oil overseers.

22        66.    Around August 2000, Saddam Hussein began conditioning the sale of oil under the

23  OFP on the purchaser's agreement to pay an illegal surcharge to Saddam Hussein. These

24  kickbacks, which were a calculated percentage of each oil contract's total amount, were paid either

25  to front companies or into bank accounts under Saddam Hussein's control. If a company was

26  unwilling to pay the required surcharge, it would not receive oil allocations from Iraq.

27        67.    At various times relevant to this Complaint, Saddam Hussein also required

28  payments of extra port fees in exchange for allowing crude oil to be loaded onto cargo ships and

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  chartered vessels at Iraqi ports. On May 3, 2000, in blatant violation of UN sanctions and federal

2  law, a Chevron trader with the code name "Phoenix" agreed to pay extra port fees to Saddam

3  Hussein through a third-party chartered-vessel owner. To conceal the nature of the payment, the

4  extra port fee was lumped into the total cost for loading Chevron's oil allocation onto the charter

5  vessel. Like the surcharges, the extra port fees were illegal kickbacks paid into bank accounts

6  controlled by Saddam Hussein, outside of the OFP.

7       68.     This illegal kickback scheme funneled money away from the OFP's escrow

8  account and into the hands of known terrorist Saddam Hussein. Between July 2000 and December

9  2002, Chevron paid at least $20 million in illegal kickbacks that bypassed the OFP escrow account

10  in favor of Saddam Hussein. By participating in the illegal kickback scheme, Chevron provided

11  Saddam Hussein with the means to finance and direct over twenty separate acts of violent terrorist

12  attacks and crimes against humanity inflicting death, disfigurement, and lasting psychological

13  trauma and pain upon Plaintiffs and countless other victims.

14            **2.**    **Chevron knew that the excess premiums and surcharges it paid to**

15                  **third-parties were being funneled to Saddam Hussein's "slush fund" for terrorist activities.**

16       69.     At all times relevant, Chevron was aware that illegal kickbacks were being paid on

17  its behalf to Saddam Hussein outside the OFP. In or around the Fall of 2000, the UN received

18  reports of Saddam Hussein's illegal surcharge demands and sent written warnings to oil traders

19  and companies reminding them that the kickback payments were illegal. Chevron received this

20  warning, as well as a December 2000 notification from oil market participants that Saddam

21  Hussein would only award Iraqi oil allocations if kickbacks were paid.

22       70.     Despite such warnings, Chevron turned a blind eye when records of its Iraqi oil

23  transactions from June 2000 to December 2002 showed that the premiums Chevron paid to third

24  parties increased noticeably when Saddam Hussein began demanding kickbacks in August 2000.

25  Chevron also approved purchase orders that violated federal and international law *on their face*.

26  For example, on February 15, 2001, Chevron purchased 1.8 million barrels of oil from a member

27  of the Turkish-Iraqi Business Council at a stated price of "OSP [Official Selling Price] plus 36

28  cents," a direct violation of the OFP. Chevron routinely purchased oil from unknown entities

1  without conducting any background checks or investigation into potential ties with Saddam

2  Hussein.

3       71.    Chevron knew that the "premiums" it paid to third parties constituted illegal

4  surcharges and kickbacks to Saddam Hussein. Rather than stop the payments, Chevron factored

5  the cost of such illegal kickbacks into its trading decisions, then processed and accounted for the

6  payments in a manner calculated to avoid detection by the UN or the U.S. government. On at least

7  one occasion, Chevron asked if the seller of Iraqi oil could negotiate a lower kickback payment to

8  Saddam Hussein in order to reduce Chevron's costs.

9       72.    In another instance, on November 14, 2001, a Chevron employee e-mailed one of

10  Chevron's traders after receiving a request for a price confirmation on a contract with a third-party

11  seller. The seller wanted confirmation that the kickback due from Chevron on a specific contract

12  would be $0.33 per barrel. The Chevron employee admitted to being confused by the price

13  confirmation request because the parties had *already* agreed in October 2001 that Chevron would

14  pay a premium of $0.41 per barrel. That same day, the trader e-mailed back: "[v]ery

15  interesting…looks to me as though they have inadvertently given us the details of their purchase

16  cost from SOMO [Iraq's State Organization for Marketing Oil]. You can ignore the number. The

17  .41 cents still stands."

18       73.    In early 2001, Chevron purchased Iraqi oil from Samir Vincent, a United States

19  citizen who had agreed to serve as Saddam Hussein's U.S.-agent for payment of illegal kickbacks.

20  In March 2001, Chevron purchased more than 2 million barrels of oil from Vincent, illegally

21  paying a premium of $0.40 per barrel, or $807,204, over the UN's Official Selling Price. Before

22  this period, Chevron had been paying Vincent a premium of between $0.12 and $0.15 per barrel.

23  Chevron knew or deliberately avoided discovering that the increased premium was paid to

24  Saddam Hussein on Chevron's behalf. In 2005, Vincent pled guilty to charges of conspiracy, tax-

25  evasion, and for serving as an unregistered agent of Saddam Hussein.

26       74.    On March 13, 2002, Betoil, a company owned by Italian businessman Fabrizio

27  Loioli, paid $45,000 into one of Saddam Hussein's bank accounts in Jordan. Betoil made the

28  payment on behalf of Chevron, in satisfaction of its kickback obligations for oil loaded onto the

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

tanker Overseas Ann. In a sworn statement to an Italian prosecutor in 2006, Loioli stated that Chevron was aware of Saddam Hussein's demands for payment of illegal surcharges and kickbacks: "In fact, each final beneficiary involved used to add this [kickback] amount to the official price to disguise it as a premium to be paid to the intermediary . . . . [i]n reality, they were perfectly aware that only a part of that would go to the intermediary, while the remaining part was to be paid to the Iraqis."

75.     Michael Dugdale, a Chevron employee in London, was Loioli's primary contact at Chevron. Dugdale kept Chevron's senior management informed regarding his negotiations with Loioli, including the inclusion of the illegal kickbacks. Rather than stop the purchase of oil, Chevron's senior management approved every purchase Dugdale made through Loioli.

76.     Chevron, knowing and having reasonable cause to know that Iraq was a designated state sponsor of terrorism, and knowing that the UN and federal law prohibited any business dealings with Iraq or Saddam Hussein outside the Oil-for-Food Program, knowingly engaged in financial transactions with Saddam Hussein without complying with the licensing and authorization requirements of the Iraqi Sanctions Regulation.

77.     Importantly, federal anti-terrorism laws do not differentiate between the criminal, terrorist activities of persons like Saddam Hussein, and the civil, non-violent activities in which they might also engage, such as selling oil at an additional premium. In legislating this particular dimension of the "material support" ban, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

78.     In addition, the international community has also universally condemned the financing of and material support for terrorism, incorporating the offense into the law of nations, as articulated in, for example, UN General Assembly Resolution 49/60 Declaration on Measures to Eliminate International Terrorism; the International Convention for the Suppression of Terrorist Bombings; the International Convention for the Suppression of the Financing of Terrorism; and UN Security Council Resolution 1373.

79.     Without the millions of dollars provided by Chevron and others who conspired to corrupt the OFP, Saddam Hussein's access to the funds needed to finance his terrorist objectives would have continued to be severely hampered by UN sanctions. Instead, Chevron's participation in the illegal scheme allowed Saddam Hussein to quickly incite and finance a massive wave of suicide bombings and violent acts of international terrorism against Americans and Israelis, including the violent attacks suffered by Plaintiffs.

### 3.    Chevron concealed its role in financing Saddam Hussein's terrorist activity by employing third-party intermediaries to engage in illegal transactions on its behalf.

80.     To avoid detection by the United States, the United Nations, and the international community, Chevron employed clandestine agents to bypass UN scrutiny. These agents' clandestine tasks included, for example, collecting surcharges from Chevron for payment to Saddam Hussein outside of the OFP.

81.     As described in Paragraph 73, above, in early 2001, Samir Vincent assisted Chevron with the payment of illegal kickbacks to Saddam Hussein in connection with the purchase of over 2 million barrels of oil.

82.     Belmetalnergo was a Belarusian trading company owned by the government of Belarus. Trustbank (formerly Infobank) owned 10% of the company and financially supported the company's business activities with Iraq. Trustbank is a private bank based in Minsk, Republic of Belarus with the Belarus government as a principal shareholder of the bank's capital. Belmetalnergo purchased oil from Iraq and had at least twenty written agreements with Iraq to provide illicit surcharge payments in exchange for oil allocations. Both Belmetalnergo's director Vladimir Zhavrid and Trustbank board of directors' chairman Victor Shevtsov acknowledged that illegal kickbacks were part of the contracts made with Iraq.

83.     Belmetalnergo paid nearly $464.2 million into the UN escrow account for Iraqi oil purchases totaling 21.6 million barrels. Chevron financed these oil purchases, made the necessary arrangements, filed the paperwork, and subsequently purchased the oil from Belmetalnergo. Between January 2001 and June 2002, the total sum of illegal surcharges paid to Saddam Hussein

COMPLAINT FOR DAMAGES

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  by Chevron for oil purchases made by Belmetalnergo was $1,879,447, and Chevron was aware or

2  deliberately avoided discovering that such kickbacks were being paid on its behalf.

3       84.     Chevron also knew or deliberately avoided discovering that Belmetalnergo and

4  Trustbank were closely tied to Saddam Hussein and other terrorist organizations. Trustbank, for

5  example, brokered various contracts with Saddam Hussein for the provision of, among other

6  things, military equipment and training for Iraqi armed forces in violation of relevant UN

7  resolutions. In addition, Trustbank's board of directors' chairman, Victor Shevstov, had close ties

8  with Saddam Hussein, and at one point, served as chairman of the Iraqi-Belarus Friendship

9  Society. On August 28, 2004, the United States government designated Trustbank as a primary

10 money laundering concern under Section 311 of the USA Patriot Act for its complicity in

11 laundering funds for Saddam Hussein.

12      85.     As described in Paragraph 74, above, Fabrizio Loioli paid $45,000 into a secret

13 Iraqi bank account in Jordan as a surcharge payment for oil purchased on behalf of Chevron. In a

14 sworn statement to Italian prosecutors, Loioli stated that Chevron knew that illegal surcharge

15 payments to Saddam Hussein were embedded in the "premiums" he charged Chevron.

16      86.     Lada OMC Holding SA ("Lada OMC") is a Russian and Belarusian joint venture

17 that distributes Lada cars in Belarus and operates a network of spare parts dealers. Chevron knew

18 or deliberately avoided discovery that Lada OMC lacked any experience, reputation, or history in

19 the oil trade. Between July and December 2000, Lada OMC purchased oil from Iraq on behalf of

20 Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil

21 purchases made by Lada OMC was $149,980, and Chevron was aware or deliberately avoided

22 discovering that such kickbacks were being paid on its behalf.

23      87.     Zerich GMBH ("Zerich") is a Swiss company with ties to extremist groups.

24 According to a CIA report, Zerich served as a front for various groups that received oil allocations.

25 Between July 2000 and December 2001, Zerich purchased oil from Iraq on behalf of Chevron.

26 Chevron paid over $2,339,251 in illegal surcharges to Saddam Hussein for oil purchases made by

27 Zerich, and Chevron was aware or deliberately avoided discovering that such kickbacks were

28 being paid on its behalf.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

88.     Erdem Holding Co. ("Erdem") is a business broker company owned by Zeynel Abidin Erdem, a Turkish businessman. Based in Istanbul, Turkey, the company purchased oil from Iraq on behalf of Mobil Refining Company for the benefit of Chevron. Between January 2001 and June 2002, Erdem paid $2,687,984 in illegal surcharges to Saddam Hussein on behalf of Chevron for its oil purchases, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

89.     Fal Oil Company Limited ("Fal"), based in Sharjah, United Arab Emirates. Between January 2001 and June 2001, Fal purchased oil on behalf of Chevron in Iraq. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Fal was $1,213,146, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

90.     Between January 2001 and June 2001, H.I.U. Ltd. purchased oil from Iraq on behalf of Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by H.I.U. Ltd. was $1,499,979, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

91.     Between January 2001 and June 2001, Jewen Oil purchased oil from Iraq on behalf of Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Jewen Oil was $1,220,834, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

92.     Naftogaz is a national joint stock company of Ukraine involved in the production, refinery, distribution, and transportation of oil and gas in Ukraine. Between July 2001 and December 2001, Naftogaz purchased oil from Iraq on behalf of Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Naftogaz was $601,266, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

93.     Tatneft is a Russian oil company with over 30 subsidiaries. Between July 2001 and December 2001, Tatneft purchased oil from Iraq on behalf of Chevron. The total sum of surcharges paid to Saddam Hussein by Chevron for oil purchases made by Tatneft was

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    $1,468,281, and Chevron was aware or deliberately avoided discovering that such kickbacks were

2    being paid on its behalf.

3       94.    Machinoimport is a joint stock company and subsidiary of OOO New Resources

4    Ltd. Between July 2001 and December 2002, Machinoimport purchased oil from Iraq on behalf of

5    Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil

6    purchases made by Machinoimport was $4,517,979, and Chevron was aware or deliberately

7    avoided discovering that such kickbacks were being paid on its behalf..

8       95.    Anwar Akkad Sons Group ("AASG") is a Syrian trading company headquartered in

9    Damascus, Syria. Between January 2002 and June 2002, AASG purchased oil from Iraq on behalf

10   of Chevron. The total sum of illegal surcharges paid to Saddam Hussein by Chevron through

11   AASG was $104,990, and Chevron was aware or deliberately avoided discovering that such

12   kickbacks were being paid on its behalf..

13      96.    Sinochem International Oil Co. Ltd. ("Sinochem Ltd.") is a petroleum oil trading

14   company and subsidiary of Sinochem Corporation. Between July 2002 and December 2002,

15   Sinochem Ltd. purchased oil from Iraq on behalf of Chevron. The total sum of illegal surcharges

16   paid by Chevron to Saddam Hussein for oil purchases made by Sinochem was $1,170,573, and

17   Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its

18   behalf.

19      97.    Between January 2002 and June 2002, Kalmyk Oil and Gaz Company

20   ("Kalmeftegaz") purchased oil from Iraq on behalf of Chevron. The total sum of surcharges paid

21   to Saddam Hussein by Chevron for oil purchases made by Kalmeftegaz was $620,296, and

22   Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its

23   behalf.

24      **C.    Aided, in Part, by Chevron's Payment of Illegal Kickbacks, Saddam Hussein
            Joined Forces with Other Terrorist Groups to Attack U.S. and Israeli Citizens.**

25

26      98.    While Chevron was providing material financial support to Saddam Hussein

27   through illegal OFP kickbacks, Saddam Hussein provided safe haven, training camps, office

28   space, ammunition, explosives, weapons, espionage training, suicide bombing training, financial,

1   operational, and logistical support for Palestinian terrorist groups and Palestinian terrorists,

2   including Hamas, the Palestinian Islamic Jihad, the Al-Aqsa Martyrs Brigade, and his own Arab

3   Liberation Front.

4         99.    Until his capture in late 2003, Saddam Hussein called upon an "irregular" arm of

5   his Iraqi army known as the Arab Liberation Front ("ALF"), to carry out numerous acts of

6   international terrorism, including violent terrorist attacks perpetrated against U.S. and Israeli

7   citizens. Saddam Hussein directed the ALF to specifically target civilian populations in its terrorist

8   attacks.

9         100.   In addition to missions carried out by the Arab Liberation Front, Saddam Hussein

10   sought to violently expel the U.S. from the Middle East by openly employing, directing, and

11   supporting numerous "Palestinian Terrorist Groups," including Hamas, the Palestinian Islamic

12   Jihad, and the Al-Aqsa Martyrs Brigade. Based on documents seized by U.S. military forces,

13   Saddam Hussein funneled over $100 million to these terrorist groups for the purpose of planning

14   and carrying out acts of international terrorism, including the suicide bombings and violent attacks

15   that injured Plaintiffs herein.

16         101.   Hamas is a radical Islamist terrorist organization committed to the globalization of

17   Islam through violent "jihad," or holy war. Hamas is formally committed to the destruction of the

18   State of Israel through violent acts of terrorism. Hamas was designated a "Specially Designated

19   Terrorist" entity by the U.S. government in 1995, and then as a Foreign Terrorist Organization in

20   1997.  Since at least 1995, Hamas' status as a designated terrorist organization, and its

21   commitment to the violent destruction of Israel, have been widely known to the public and

22   especially to the international business entities trading oil in the Middle East, like Chevron.

23         102.   The Palestinian Islamic Jihad - Shiqaqi Faction ("PIJ") is an international terrorist

24   organization with "cells" or units located throughout the world. PIJ is also known as "the Islamic

25   Movement in Palestine," "The Movement," and "The Family." Similar to Hamas, PIJ is

26   committed to the globalization of Islam through violent "jihad," or holy war. Like Hamas, PIJ is

27   also formally committed to the destruction of the State of Israel through violent acts of terrorism.

28   PIJ was designated a "Specially Designated Terrorist" entity by the U.S. government in 1995, and

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   then as a Foreign Terrorist Organization in 1997.  Since at least 1995, PIJ's status as a designated

2   terrorist organization, and its commitment to the violent destruction of Israel, have been widely

3   known to the public and especially to the international business entities trading oil in the Middle

4   East, like Chevron.

5          103.    The Al-Aqsa Martyrs Brigade ("AAMB") is a paramilitary offshoot of the

6   Palestinian Fatah movement. The AAMB is committed to the destruction of the State of Israel

7   through violent acts of terrorism.  In March 2002, the U.S. government designated AAMB as a

8   Foreign Terrorist Organization. While AAMB's terrorist acts were widely publicized prior to its

9   designation as a Foreign Terrorist Organization, since at least March 2002, AAMB's status as a

10  designated terrorist organization, and its commitment to the violent destruction of Israel, have

11  been widely known to the public and especially to the international business entities trading oil in

12  the Middle East, like Chevron.

13         104.    From at least 2000 through 2003—while Chevron was providing financial support

14  to Saddam Hussein through illegal OFP kickbacks—Saddam Hussein welcomed members of

15  Hamas, the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs Brigade to an army camp outside

16  of Baghdad, where they were trained in the use of small arms, machine guns, hand grenades, and

17  the use and production of explosives and detonation systems, including electrical, chemical and

18  cellular detonators. During this time, Saddam Hussein also provided the groups with safe haven,

19  training camps, office space, ammunition, explosives, weapons, espionage training, suicide

20  bombing training, financial, operational, and logistical support.

21         105.    From at least 2000 through 2003—while Chevron was providing financial support

22  to Saddam Hussein through illegal OFP kickbacks—Saddam Hussein joined forces with members

23  of Hamas, the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs Brigade for the purpose of

24  jointly launching widespread and systematic attacks against unarmed American and Israeli citizens

25  through suicide bombings and other shockingly egregious acts of international terrorism, including

26  those attacks which injured Plaintiffs herein.

27  / / /

28  / / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1

2

        **1.**      **<u>Saddam Hussein used funds from the illegal kickback scheme to recruit and compensate suicide bombers.</u>**

3        106.    With the increased amount of money illegally paid by companies such as Chevron,

4  Saddam Hussein could once again finance terrorist attacks targeting U.S. and Israeli interests in

5  the Middle East, including the attacks against Plaintiffs herein.

6        107.    Beginning in 2000, Saddam Hussein offered to pay suicide bombers a financial

7  reward in consideration for carrying out his stated goal of displacing American interests in the

8  Middle East and destroying the State of Israel. The contractual terms favored suicide bombing

9  over other types of attacks, with surviving family members receiving $25,000 following a

10  "successful" suicide bombing mission versus a $10,000 reward following other types of attacks.

11  The financial rewards offered by Saddam Hussein played an important role in persuading

12  Palestinians to become suicide bombers.

13        108.    Commonly referred to as a "President Saddam Hussein's Grant," these payments to

14  suicide bombers' families encouraged the frequent and widespread acts of violence and terror

15  against Israeli and U.S. citizens. Despite strict economic sanctions against Iraq, Saddam Hussein's

16  payments to surviving family members far exceeded, for example, the $5,300 typically paid by the

17  Saudis for similar acts of "self-martyrdom." Saddam Hussein was able to distribute such large

18  sums of money to suicide bombers because of the "slush fund" he amassed, in part, from illegal

19  kickbacks paid by Chevron.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

109.   Following a deadly attack, the perpetrator's family would be celebrated in a public ceremony, presented with a substantial financial payment, and awarded certificates of appreciation signed by Saddam Hussein. Participants in the ceremonies would wave Palestinian and Iraqi flags while standing in front of photos of Saddam Hussein, thanking Saddam Hussein for his generous financial aid. These elaborate public ceremonies occurred frequently, sometimes multiple times per month, and were heavily covered by Palestinian, European, American, and Iraqi electronic and print media.



110.   While Saddam Hussein employed a variety of strategies and methods to direct, authorize, and incite Palestinian organizations to commit international terrorist acts, none were more effective that the willingness to pay financial rewards for human sacrifice. Saddam Hussein's ability to pay life-changing sums of money to poverty-stricken families of suicide bombers, and his ability to publicly broadcast their "noble sacrifice" with great fanfare, heavily influenced and motivated susceptible youths to join terrorist organizations and seek martyrdom. Chevron's payment of illegal surcharges and kickbacks provided, in part, the funding used by Saddam Hussein to incentivize and finance these terrorist attacks.

/ / /

/ / /

1

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

2.      **Saddam Hussein's army of surcharge-funded suicide bombers committed countless acts of terrorism against U.S. and Israeli citizens, including the heinous attacks against Plaintiffs.**

111.     The illegal kickbacks paid by Chevron were, in part, used by Saddam Hussein to finance international terrorist attacks and crimes against humanity. Chevron is thus responsible for the following crimes and acts of international terrorism committed by recruited terrorists with the intent to kill or injure American citizens and to destroy the State of Israel by the systematic murder of Jews and other Israelis, including the Plaintiffs.

112.     On November 22, 2000, a suicide bomber named Mahmoud al-Madani detonated an explosive device onboard a bus leaving Hadera bus station in the town of Hadera. The blast killed at least two people, including (21) Shoshana Ris, whose estate brings claims on her behalf. The blast also injured thirty-six others, including (26) Hana Segal, whose estate brings claims on her behalf, Plaintiff (28) Michal Ganon, and Plaintiff (30) Getaun Azanu. On or about April 28, 2001, the suicide bomber's mother received a check for $10,000, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

113.     Family members of the Plaintiffs who were killed or injured in the November 22, 2000 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Shoshana Ris's parents, (22) Tuvia Ris and (23) Tzvia Ris, and sisters (24) Anat Ris and (25) Sabine Ris; Hana Segal's daughter, (27) Pnina Alterovich; Michal Ganon's mother, (29) Viviane Asraf; and Getaun Azanu's wife, (31) Habasta Azanu, and his children, (32) Simcha Azanu, (33) Avital Azanu, (34) Eden Azanu, and (35) Amir Azanu.

114.     On January 1, 2001, a suicide bomber detonated a car bomb on the corner of Herzel and Dizengoff Street in Natanya, Israel. At least thirty-six people were injured, including the Hershkovitz Family: Plaintiff (36) Zehava Hershkovitz and her children, Plaintiffs (37) Sapir Hershkovitz and (38) Dor Hershkovitz, and Plaintiffs (43) Baruch Perach and (47) Maayan Furman.  On or about June 18, 2001, the suicide bomber's mother received a check for $10,000, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

115.   Family members of the Plaintiffs who were killed or injured in the January 1, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Zehava Hershkovitz's husband and father to the Hershkovitz children, (39) Shimon Hershkovitz, her sister, (40) Yaffa Vax, and her parents, (41) Elimelech Berkovitz and (42) Marcela Berkovitz; Baruch Perach's mother, (44) Naima Shimon Baruch, his sister, (45) Nourit Garbe, and his son, (46) Guy Baruch; and Maayan Furman's mother, (48) Orit Furman.

116.   On March 4, 2001, a suicide bomber named Ahmed Alyan detonated an explosive-laden case on the Main Street of Netanya, Israel, killing three people and wounding sixty-five people, including Plaintiffs (49) Bosmat Glam, (52) Ariel Mahfud and (57) Mazal Alevi. On or about March 19, 2001, the suicide bomber's family received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

117.   Family members of the Plaintiffs who were injured in the March 4, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Bosmat Glam's parents, (50) David Glam and (51) Rachel Glam; Ariel Mahfud's mother, (53) Sarah Mahfud, his wife, (54) Debora Mahfud, and his sons, (55) Roy Mahfud and (56) Yair Mahfud; and Mazal Alevi's children, (58) Yonatan Alevi, (59) Ortal Alevi, and (60) Eyal Alevi.

118.   On March 27, 2001, a suicide bomber detonated an explosive device strapped to his body on a Jerusalem bus at the Hagiva Hatzarftit Junction in Jerusalem. The blast wounded twenty-eight people, including Plaintiff (61) Shmuel Shfaim. The suicide bomber's family is believed to have received substantial compensation, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

119.   Shmuel Shfaim's family members also bring claims for their own suffering relating to the March 27, 2001 attack and Shmuel's serious injuries: Shmuel's wife, (62) Iris Shfaim, and his children, (63) Roy Shfaim, (64) Dan Shfaim, (65) Matan Shfaim, (66) Inbal Shfaim, and (67) Neta Shfaim.

120.   On March 28, 2001, a suicide bomber detonated an explosive device strapped to his body near a gas station at the Neveh Yamin/Kfar Saba Junction, killing two people, including

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  Plaintiffs (68) Naftali Lanzkron and (80) Eliran Rozenberg, whose estates bring claims on their

2  behalves. Four people were wounded, including Plaintiffs (87) Rafael Sommer and (90) Hannanel

3  Touitou. On or about May 29, 2001, the suicide bomber's father received a check for $10,000,

4  paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

5  kickbacks in violation of the OFP.

6       121.    Family members of the Plaintiffs who were killed or injured in the March 28, 2001

7  bombing also bring claims for their own suffering relating to the attack and their family member's

8  serious injuries: Naftali Lanzkron's parents, (69) Meir Lanzkron and (70) Hava Lanzkron, and

9  siblings, (71) Brakha Hershkovitz, (72) Oria Lanzkron, (73) Yekhiel Lanzkron, (74) Elisheva

10 Lanzkron, (75) Netanel Lanzkron, (76) Yedidia Lanzkron, (77) Yehuda Lanzkron, (78) Shoshana

11 Rotenberg, and (79) Merav Shamir; Eliran Rozenberg's mother, (81) Michal Zayat Rozenerg, and

12 siblings, (82) Hila Zayat, (83) Shirin Zayat, (84) Noam Zayat, (85) Noga Zayat, and (86) Ziv

13 Zayat; Rafael Sommer's parents, (88) Rachel Sommer and (89) Israel Sommer; and Hannanel

14 Touitou's parents, (91) Ester Touitou and (92) Haron Touitou.

15      122.    On May 18, 2001, a suicide bomber detonated an explosive device strapped to his

16 body at the entrance to the Hasharon Mall in Netanya, killing five people, including Plaintiff (93)

17 Vladislav Sorokin, whose estate brings claims on his behalf. Eighty-six people were wounded,

18 including Plaintiffs (94) Olesya Sorokin (Vladislav's wife) and (95) Alexander Sorokin

19 (Vladislav's son), and Plaintiffs (96) Hila Chen, (97) Moran Rokach, (98) Liat Rokach, (103)

20 Hadad Dikla, (108) Ina Segal, (59) Ortal Alevi, (112) Solange Azran, (113) Maxim Azulai, (114)

21 Eli Sarusi, (115) Lilian Peretz, (121) Meital Maymony, and (124) Yuri Abramov. Thereafter, the

22 suicide bombers' families received checks totaling $15,000, paid on behalf of Saddam Hussein

23 with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

24      123.    Family members of the Plaintiffs who were killed or injured in the May 18, 2001

25 bombing also bring claims for their own suffering relating to the attack and their family member's

26 serious injuries: Moran and Liat Rokach's parents, (99) Joseph Rokach and (100) Yaffa Rokach,

27 and sisters (101) Yahalomit Rokach and (102) Rosi Rokach; Hadad Dikla's parents, (104) Hadas

28 Hadad and (105) Haim Hadad, and siblings, (106) Yogev Hadad and (107) Neama Hadad; Ina

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   Segal's daughters, (109) Diana Segal, (110) Christina Segal, and (111) Sharon Segal; Ortal

2   Alevi's mother, (57) Mazal Alevi, and brothers, (60) Eyal Alevi and (58) Yonatan Alevi; Lilian

3   Peretz's husband, (116) Meir Peretz, and children, (117) Dalya Peretz, (118) Oren Peretz, (119)

4   Ely Peretz, and (120) Moshe Peretz; and Meital Maymony's parents, (122) Guy Maymony and

5   (123) Kludin Maymony.

6       124.    On May 25, 2001, two suicide bombers drove an explosives-laden car into the side

7   of a bus near the central station in Hadera. Sixty-five people were wounded, including siblings

8   Plaintiffs (125) Shay Amar, (126) Tzachi Amar, and (127) Shir Amar, and Plaintiff (130) Carmela

9   Litmanowitz. On or about June 18, 2001, the suicide bombers' families each received a check for

10  $15,000, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment

11  of illegal kickbacks in violation of the OFP.

12      125.    Family members of the Plaintiffs who were injured in the May 25, 2001 bombing

13  also bring claims for their own suffering relating to the attack and their family member's serious

14  injuries: the Amar siblings' parents, (128) Negba Amar and (129) Binyamin Amar; and Carmela

15  Litmanovic's sister, (131) Stela-Maris DosSantos.

16      126.    On June 1, 2001 a suicide bomber named Saeed Hotari detonated an explosive

17  device strapped to his body at the entrance to the Dolphinarium Dance Club in Tel Aviv. The

18  majority of those killed or injured were girls between the ages of fourteen and eighteen celebrating

19  their high school graduation. The blast was so intense that it tore limbs from the victims' bodies

20  and scattered their flesh up to six blocks away. Twenty-two young people were killed, including

21  (132) Simona Rudin, whose estate brings claims on her behalf, and eighty-three others were

22  wounded, including Plaintiffs (134) Margarita Abramov, (135) Katerina Peline, (139) Alexandra

23  Plotkin, and (141) Andrey Tailakov. The suicide bomber's family received a check paid on behalf

24  of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in

25  violation of the OFP.

26      127.    Family members of the Plaintiffs who were killed or injured in the June 1, 2001

27  bombing also bring claims for their own suffering relating to the attack and their family member's

28  serious injuries: Simona Rudin's father, (133) Mark Rudin; Katerina Peline's parents, (136) Victor

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  Peline and (137) Galina Peline, and brother, (138) Alexander Peline; Alexandra Plotkin's mother,

2  (140) Elena Plotkin; and Andrey Tailakov's mother, (142) Simona Kaufman, and brother, (143)

3  Igor Kaufman.

4         128.    On July 16, 2001, a suicide bomber named Nidal Shaduf detonated an explosive

5  device strapped to his body at a bus stop in Binyamina, killing two people and injuring eleven,

6  including Plaintiff (144) Bentzion Avdaev. On or about August 20, 2001, the suicide bomber's

7  father received a check for $15,000, paid on behalf of Saddam Hussein with funds acquired, in

8  part, from Chevron's payment of illegal kickbacks in violation of the OFP.

9         129.    Bentzion Avdaev's family members also bring claims for their own suffering

10  relating to the July 16, 2001 attack and Bentzion's serious injuries: Bentzion's parents, (145)

11  Ovadia Avdaev and (146) Avigail Avdaev, and siblings, (147) Ariel Avdaev, (148) Boris Avdaev,

12  and (149) Sonia Avdaev.

13         130.    On August 9, 2001, a suicide bomber named Izz al-Din Shuheil al-Masri detonated

14  an explosive device strapped to his body at the Sbarro restaurant located on King George and Jaffa

15  Streets in Jerusalem, killing fifteen people and wounding 110 people, including the Amar Family:

16  Plaintiff (150) Anat Amar, and her children, Plaintiffs (151) Eliad Amar, (152) Chagai Amar,

17  (153) Noam Amar, and (154) Gafnit Amar. Anat's wife and the children's father, (155) David

18  Michel Amar, also brings claims for his own suffering relating to the attack and his family's

19  injuries. On or about August 27, 2001, the suicide bomber's father received a check for $15,000,

20  paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

21  kickbacks in violation of the OFP.

22         131.    On October 4, 2001, a gunman named Nazir Hamad opened fire at the central bus

23  station of Afula in north-central Israel, killing three people, including (156) Haim Ben Ezra,

24  whose estate brings claims on his behalf. Haim's wife, (157) Sol Ben Ezra, and his children, (158)

25  Yossef Ben Ezra, (159) Moshe Ben Ezra, (160) Mordechai Ben Ezra, (161) Amram Ben Ezra, and

26  (162) Lea Ben Ezra, also bring claims for their own suffering relating to the attack and Haim's

27  death. On or about November 3, 2001, the gunman's mother received a check for $15,000, paid on

28

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

2    kickbacks in violation of the OFP.

3          132.    During rush hour on November 4, 2001, a gunman named Hatem Shweikeh, armed

4    with M-16 automatic rifles, opened fire on Bus No. 25 at the French Hill intersection in Jerusalem.

5    Two teenagers were killed, and forty-five others were injured in the attack. Among the casualties

6    of the French Hill attack was 14-year-old (163) Menashe Regev, whose estate brings claims on his

7    behalf. Those wounded in the attack included Plaintiffs (165) Odelia Abecassis, (168) Tzuria

8    Amosi, (171) Oshra Avitzur, (174) Tzvi Yehuda Goldenberg, (177) Miriam Ishaki, (180) Naomi

9    Kalfa, (182) Ricky Kleinman, (6) Yissachar Zvi Lebowitz, (187) Tamar Levenson, (7) Shifra

10   Markowitz, (10) Sarah Mordechai, (190) Tamar Oziel, (193) Moria Rabi, (13) Ora Rubinoff and

11   (18) Gila Schnall. Thereafter, the assailant's mother was given a check, paid on behalf of Saddam

12   Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of

13   the OFP.

14         133.    Family members of the Plaintiffs who were killed or injured in the November 4,

15   2001 bombing also bring claims for their own suffering relating to the attack and their family

16   member's serious injuries: Menashe Regev's father, (164) Gidon Regev; Odelia Abecassis's

17   parents, (166) Simi Abecassis and (167) Avraham Abecassis; Tzuria Amosi's parents, (169)

18   Rachel Amosi and (170) Yaakov Amosi; Oshra Avitzur's parents, (172) Judith Avitzur and (173)

19   Chaim Avitzur; Tzvi Yehuda Goldenberg's parents, (175) David Malcolm Mordechai Goldenberg

20   and (176) Avital Goldenberg; Miriam Ishaki's parents, (178) Moshe Ishaki and (179) Shimcha

21   Ishaki; Naomi Kalfa's father, (181) Heski Kalfa; Ricky Kleinman's mother, (183) Pnina

22   Kleinman, and sisters, (184) Avivit Kleinman-Chen, (185) Naomi Kleinman-Brening, and (186)

23   Esti Kleinman-Liberman; Tamar Levenson's parents, (188) Brenda Levenson and (189) Stephen

24   Levenson; Shifra Markowitz's parents, (8) Devorah Esther Markowitz and (9) Gerald Markowitz;

25   Sarah Mordechai's parents, (12) Shimon Mordechai and (11) Shirin Mordechai; Tamar Oziel's

26   parents, (191) Miriam Oziel and (192) Jacquez Oziel; Moria Rabi's parents, (194) Iris Rabi and

27   (195) Moshe Rabi; Ora Rubinoff's parents, (14) Aviva Rubinoff and (15) Mitchell Rubinoff, and

28

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   brothers (16) Yosef Rubinoff and (17) Hananel Rubinoff; and Gila Schnall's parents, (20) Ira

2   Schnall and (19) Frances Schnall.

3       134.    On November 27, 2001, Mustafa Abu Siriyah and Abd al-Karim Abu Na'isa, both

4   armed with Kalashnikov assault rifles, opened fire at the Afula central bus station, killing two

5   people and injuring fifty others, including Plaintiffs (196) Dimitry Gantovnik, (197) Shula Gaon,

6   (199) Ezra Sharabi, and (200) Soshana Simon. On or about June 18, 2002, the gunmen's families

7   received checks paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's

8   payment of illegal kickbacks in violation of the OFP.

9       135.    Shula Gaon's husband, (198) Shmuel Gaon, also brings claims for his own

10   suffering relating to the November 27, 2001 attack and Shula's injuries.

11      136.    On December 1, 2001, two suicide bombers, Osama Baher and Nabil Halbiyeh,

12   detonated explosive devices, which were concealed in bags and strapped to their bodies with belts,

13   on Ben Yehudah Street in Jerusalem. Minutes later, a car bomb exploded on the crowded street. At

14   least 10 were killed and 150 were wounded in the bombing. Among the casualties of the Ben

15   Yehudah Street attack were (201) Yossi Elezra and (206) Golan Turgeman, whose estates bring

16   claims on their behalf. Those wounded in the attack included Plaintiffs (213) Efraim Aroas, (1)

17   Baruch Yehuda Ziv Brill, (222) Omer Eliav, (223) Ortal Ganon, (227) Sharon Gili Hefetz, (231)

18   Adi Hoja, (234) Hila Levi, (240) Dana Mizrachi, (241) Lia Lihi Mizrachi, (242) Michael Ysaia,

19   and (243) Avi Zino. On or about January 22, 2002, each of the suicide bombers' families was

20   given a $15,000 check, paid on behalf of Saddam Hussein with funds acquired, in part, from

21   Chevron's payment of illegal kickbacks in violation of the OFP.

22      137.    Family members of the Plaintiffs who were killed or injured in the December 1,

23   2001 bombing also bring claims for their own suffering relating to the attack and their family

24   member's serious injuries: Yossi Elezra's parents, (202) Mordechai Elezra and (203) Yael Elezra,

25   and siblings, (204) Shirly Elezra and (205) Omer Elezra; Golan Turgeman's mother, (207) Edna

26   Turgeman, and siblings (208) Ester Ifat Sultan, (209) Amira Turgeman, (210) Moshe Turgeman,

27   (211) Avi Turgeman, and (212) Orly Turgeman Goldshmit; Plaintiff Efraim Aroas's parents, (214)

28   Izak Aroas and (215) Yaffa Aroas, and his siblings, (216) Yossi Aroas, (217) Avi Aroas, (218)

Netanel Aroas, (219) Ben-Israel Aroas, (220) Or Aroas, and (221) Zehava Levi; Baruch Yehuda

Ziv Brill's parents, (2) Chaya Beili and (3) Shabtai Brill; Ortal Ganon's father, (224) Robert

Ganon, and siblings (225) Lihi Ganon and (226) Ben Ganon; Sharon Gili Hefetz's parents, (228)

Varda Hefetz and (229) Avraham Hefetz, and sister, (230) Or-Liel Hefetz; Adi Hoja's mother,

(232) Malka Nisim, and sister, (233) Moran Hoja; Hila Levi's parents, (235) Shimon Levi and

(236) Aviva Levi, and siblings, (237) Hayim Levi, (238) Itzhak Levi, and (239) Yotam Levi; Avi

Zino's mother, (244) Viki Zino, and siblings, (245) Yosef Zino, (246) Meir Zino, (247) Israel

Zino, (248) Moshe Zino, (249) Yinon Zino, (250) Yohi Zino, (251) Aliza Zino, (252) Sarah Zino,

and (253) Ruhama Zino.

138.     On March 2, 2002, Muhammad Ahmad Dagharmeh al-Shaw'ani detonated a bomb

near a yeshiva in the Beit Israel neighborhood of Jerusalem, where people were gathered for a bar

mitzvah celebration. The blast killed four people and injured fifty-seven, including the Nechmad

Family: Plaintiffs (254) Chen Nechmad, (255) Yaakov Nechmad, (256) Sigalit Nechmad, and

(257) Elior Nechmad, and Plaintiff (258) Yehiel Bornstein. Yehiel's wife, (259) Nechama

Bornstein, and children, (260) Yarden Bornstein, (261) Nachman Mordechai Bornstein, (262)

Natan Bornstein, and (263) Naftali Bornstein, also bring claims for their own suffering relating to

the attack and Yehiel's injuries. On or about June 14, 2002, the bomber's father received a check,

paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

kickbacks in violation of the OFP.

139.     On March 5, 2002, a suicide bomber named Abd al-Karim Tahayneh boarded an

Egged No. 823 bus and detonated an explosive device at the Afula bus station, killing one person

and injuring eleven others, including Plaintiff (264) David Elisha-Sherf. David's wife, (265) Ziva

Elisha-Sherf, and children, (266) Michal Elisha-Sherf, (267) Maor Elisha-Sherf, and (268) Zeevik

Elisha-Sherf, also bring claims for their own suffering relating to the attack and to David's

injuries. On or about May 6, 2002, the suicide bomber's mother received a check, paid on behalf

of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in

violation of the OFP.

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

140.    On March 9, 2002, a suicide bomber named Fuad Hurani detonated an explosive device at the entrance to Café Moment in Jerusalem. The force of the blast completely destroyed the crowded café, killing eleven and injuring more than fifty people. Among the casualties of the Café Moment attack were Nethanel Kochavi, whose sister, (269) Efrat Bar Dagan, brings claims on his behalf, and (270) Nir Borocov, whose estate brings claims on his behalf. Among the many wounded in the Café Moment attack were Plaintiffs (276) Maimon Amsalem, (4) Yoseff Cohen, (5) Asael Anicca, (282) Roy Gordon, (283) Roi Biton, (284) Mati Lev, and (288) Assaf Myara and his father, (289) Sinai Zaken. In a public ceremony held on or about June 23, 2002, the Café Moment bomber's mother was given a $25,000 check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

141.    Family members of the Plaintiffs who were killed or injured in the March 9, 2002 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Nethanel Kochavi's sister, (269) Efrat Bar Dagain; Nir Borocov's parents, (271) Mordechai Borocov and (272) Kochava Borocov, and siblings (273) Dorit Yadid, (274) Doron Borocov, (62) Iris Shfaim, (275) Yocheved Borocov; Maimon Amsalem's mother, (277) Fanny Amsalem, and siblings, (278) Shlomo Amsalem, (279) Galit Dror, (280) Meir Harel, and (281) Ilana Hayat; Mati Lev's mother, (285) Etti Frenchi Lev, and siblings, (286) Ziv Lev and (287) Kineret Lev; and Assaf Myara's mother and Sinai Zaken's wife, (290) Lisa Myara; and Assaf Myara's sister and Sinai Zaken's daughter, (291) Melody Myara.

142.    On March 20, 2002, a suicide bomber named Rafet Salim Abu Diyak boarded an Egged No. 823  bus and detonated an explosive device strapped to his body in Wadi Ara, near Afula, killing seven people and injuring thirty. Among the casualties were (292) Meir Fahima, whose estate brings claims on her behalf. Those wounded in the attack include Plaintiff (302) Yunis Zeid. On or about May 6, 2002, the suicide bomber's father received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

/ / /

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

143.     Meir Fahima's family members also bring claims for their own suffering relating to the March 20, 2002 attack that killed Meir: his parents, (293) Shalom Fahima and (294) Kokhava Fahima; his siblings (295) Mazal Fahima, (296) Rachel Asraf Fahima, and (297) Daniel Navon; his wife, (298) Ester Fahima; and his children (299) Lidor Fahima, (300) Natali Fahima, and (301) Ortal Fahima.

144.     On March 31, 2002, a suicide bomber named Shadi Tubasi detonated an explosive device strapped to his body in Matza Restaurant in Haifa. The blast killed fifteen and injured over forty people, including Plaintiffs (303) Paul Drimmer, (304) Rahel Drimmer, and (305) Baruch Naim. On or about May 6, 2002, the suicide bomber's father received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

145.     Family members of the Plaintiffs who were killed or injured in the March 31, 2002 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Paul Drimmer's wife and Rachel Drimmer's mother, (306) Pnina Drimmer, and Paul's children (also Rachel's siblings), (307) Hani Drimmer, (308) Illana Drimmer, and (309) Asher Drimmer.

146.     On April 10, 2002, a suicide bomber named Ghareb Ahmad Jaradat detonated an explosive device strapped to his body while on an Egged No. 960 bus en route from Haifa to Jerusalem. The explosion occurred near Kibbutz Yagur, east of Haifa, and killed seven people, including (310) Zeev Hanik, whose estate brings claims herein. Zeev's father, (311) Boris Hanik, and siblings (312) Lior Hanik and (313) Ilana Vaknin also bring claims for their own suffering relating to the attack and Zeev's death. On or about May 6, 2002, the suicide bomber's father received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

147.     On April 12, 2002, a suicide bomber named Andalib Taqatqa detonated an explosive device strapped to her body at a bus stop on Jaffa Road at the entrance to Jerusalem's Mahane Yehuda open-air market, killing six people and injuring 104, including Plaintiffs (314) Zila Cohen, (316) Yaakov Shfaym, (317) Naomi Shfaym, (323) Rahmim Hason, and (325)

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    Kineret Rahamim. On or about June 14, 2002, the father of the suicide bomber received a check,

2    paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

3    kickbacks in violation of the OFP.

4         148.    Family members of the Plaintiffs who were injured in the April 12, 2002 bombing

5    also bring claims for their own suffering relating to the attack and their family member's serious

6    injuries: Zila Cohen's sister, (315) Tikva Peres; Yaakov and Naomi Shfaym's children, (318) Yael

7    Raviva Gideoni, (319) Yardena Malkiel, (320) Azriel Shfaym, (61) Shmuel Shfaim, (321) Yoram

8    Shfaym, and (322) Eliyahu Shfaym; Rahmim Hason's mother, (324) Carmela Hason; and Kineret

9    Rahamim's mother, (326) Haia Rahmim, and siblings, (327) Yinon Rahamim, (328) Yair

10   Rahamim, and (329) Elia Rahamim.

11        149.    Due, in part, to Chevron's payment of at least $20 million into his "slush" fund,

12   Saddam Hussein had the means to finance and direct these violent acts of terrorism, and Plaintiffs

13   have suffered death, disfigurement, and lasting psychological trauma and pain as a result.

14                          **FIRST CLAIM FOR RELIEF**
15        **Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A**

      (Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili,
16      (3) Shabtai Brill, (4) Yossef Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz,
        (7) Shifra Markowitz, (8) Devorah Esther Markowitz, (9) Gerald Markowitz,
17   (10) Sarah Mordechai, (11) Shirin Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff,
     (14) Aviva Rubinoff, (15) Mitchell Jay Rubinoff, (16) Yosef Rubinoff, (17) Hananel Rubinoff,
18              (18) Gila Schnall, (19) Frances Schnall, and (20) Ira Schnall)

19        150.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

20   in Paragraphs 1 through 149 as if fully set forth herein.

21        151.    Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Yossef Cohen,

22   Asael Anicca, Yissachar Zvi Lebowitz, Shifra Markowitz, Devorah Esther Markowitz, Gerald

23   Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff,

24   Aviva Rubinoff, Mitchell Jay Rubinoff, Yosef Rubinoff, Hananel Rubinoff, Gila Schnall, Frances

25   Schnall, and Ira Schnall bring this cause of action against Defendants Chevron Corporation and

26   DOES 1 through 9, inclusive.

27        152.    Plaintiffs are nationals of the United States who were seriously injured or killed, or

28   are the estates, heirs, or survivors of U.S. nationals who were killed or injured, as a result of the

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   suicide bombings and unprovoked attacks detailed, *supra*, at Paragraphs 15 through 26. These acts

2   constituted acts of international terrorism, as that term is defined in 18 U.S.C. § 2331(1), and were

3   ordered, funded, and directed by Saddam Hussein.

4         153.   The acts of international terrorism alleged herein occurred primarily outside the

5   territorial jurisdiction of the United States, involved the use, without lawful authority, of a

6   destructive device constituting a "weapon of mass destruction" under 18 U.S.C. § 2332a(c)(2)(A)

7   and the detonation of an "explosive" under 18 U.S.C. § 2332f(e)(8), in a place of public use or a

8   public transportation system, with the intent to cause death or serious bodily injury.

9         154.   At all relevant times, Chevron knew or deliberately avoided discovering that

10   Saddam Hussein was engaged in acts of international terrorism, and that any funds provided to

11   Saddam Hussein could and would be used in preparation for or in carrying out such acts in

12   violation of 18 U.S.C. §§ 2332, 2332a, 2332b, and 2332f.

13         155.   At all relevant times, Chevron knowingly provided substantial material support and

14   resources to Saddam Hussein in the form of illegal kickbacks and surcharges in violation of the

15   UN Oil-for-Food Program. Chevron knew or deliberately avoided discovering that its payments of

16   illegal kickbacks to Saddam Hussein would be and were used to finance international terrorism,

17   including indiscriminate suicide bombings and other murderous attacks against Plaintiffs and other

18   American residents and visitors in Israel.

19         156.   Furthermore, Chevron, a multinational oil company regularly engaged in business

20   with the international business community, knew or deliberately avoided discovering that Saddam

21   Hussein was designated as a state sponsor of terrorism and that he and his regime supported,

22   directed, and executed acts of international terrorism against U.S. nationals (including civilians)

23   such as those alleged herein. As such, Chevron knew and it was obvious that paying illegal

24   surcharges to Saddam Hussein constituted material support of terrorism.

25         157.   Knowing the UN Oil-for-Food Program and U.S. federal law prohibited payments,

26   either directly or indirectly, to Saddam Hussein and the Iraqi government, Chevron disguised the

27   nature and source of the illegal surcharges it paid to Saddam Hussein.

28   / / /

158.    Chevron itself committed an act of international terrorism when it paid illegal kickbacks it knew were intended to be and were paid to Saddam Hussein, in knowing violation of strict rules set for transacting business with Iraq, a state sponsor of terrorism. This provision of material support was an act dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. § 2339A.

159.    Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

160.    Chevron's knowing provision of material support to Saddam Hussein was a proximate cause of and a substantial factor in causing the injuries to Plaintiffs, and each of them, in their person, property, or business by reason of acts of international terrorism. Plaintiffs therefore seek treble damages, according to proof, and to recover the cost of suit, including attorney's fees, pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**
**Engaging in Financial Transactions with a Known State**
**Sponsor of Terrorism in Violation of 18 U.S.C. § 2332d**

(Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili,
(3) Shabtai Brill, (4) Yossef Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz,
(7) Shifra Markowitz, (8) Devorah Esther Markowitz, (9) Gerald Markowitz,
(10) Sarah Mordechai, (11) Shirin Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff,
(14) Aviva Rubinoff, (15) Mitchell Jay Rubinoff, (16) Yosef Rubinoff, (17) Hananel Rubinoff,
(18) Gila Schnall, (19) Frances Schnall, and (20) Ira Schnall)

161.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 149, and Paragraphs 152 through 159, as if fully set forth herein.

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

162.     Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Yossef Cohen, Asael Anicca, Yissachar Zvi Lebowitz, Shifra Markowitz, Devorah Esther Markowitz, Gerald Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff, Aviva Rubinoff, Mitchell Jay Rubinoff, Yosef Rubinoff, Hananel Rubinoff, Gila Schnall, Frances Schnall, and Ira Schnall bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

163.     Chevron is a juridical person organized under the laws of the United States, as defined in 18 U.S.C. § 2332d(b)(2)(C).

164.     At all relevant times, Chevron knew or had reasonable cause to know that Iraq and its then-President Saddam Hussein were designated under section 6(j) of the Export Administration Act of 1979 as a state sponsor of terrorism. Despite such knowledge, Chevron knowingly and intentionally engaged in hundreds (if not thousands) of illegal financial transactions with Saddam Hussein in the form of illegal surcharge and kickback payments amounting to over $20 million.

165.     Chevron's payment of illegal kickbacks to Saddam Hussein constituted "financial transactions" as that term is defined in 18 U.S.C. § 1956(c)(4), in that Chevron moved funds by wire or other means, or involved monetary instruments, to effectuate a gift, transfer, delivery, or other disposition affecting interstate or foreign commerce.

166.     The financial transactions at issue do not fall within the safe harbor provisions of the regulations issued by the Secretary of the Treasury and therefore violated the criminal provisions of 18 U.S.C. § 2332d(a). In fact, the transactions at issue explicitly violated 31 C.F.R. §§ 575.201; 575.203; 575.210; 575.211; 575.523(e); and 575.526(b).

167.     Chevron itself committed an act of international terrorism when it paid illegal kickbacks it knew were intended to be and were paid to Saddam Hussein, in knowing violation of strict rules set for transacting business with Iraq, a state sponsor of terrorism. These financial transactions were themselves acts dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. § 2332d.

/ / /

168.   Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

169.   Chevron's financial transactions with Saddam Hussein, which provided millions of dollars to a state sponsor of terrorism, were a proximate cause of and a substantial factor in causing the injuries to Plaintiffs, and each of them, in their person, property, or business by reason of acts of international terrorism. Plaintiffs therefore seek treble damages, according to proof, and to recover the cost of suit, including attorney's fees, pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF
### Financing Terrorist Organizations in Violation of 18 U.S.C. § 2339C

(Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili,
(3) Shabtai Brill, (4) Yossef Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz,
(7) Shifra Markowitz, (8) Devorah Esther Markowitz, (9) Gerald Markowitz,
(10) Sarah Mordechai, (11) Shirin Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff,
(14) Aviva Rubinoff, (15) Mitchell Jay Rubinoff, (16) Yosef Rubinoff, (17) Hananel Rubinoff,
(18) Gila Schnall, (19) Frances Schnall, and (20) Ira Schnall)

170.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 149, Paragraphs 152 through 159, and Paragraphs 163 through 169, as if fully set forth herein.

171.   Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Yossef Cohen, Asael Anicca, Yissachar Zvi Lebowitz, Shifra Markowitz, Devorah Esther Markowitz, Gerald Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff, Aviva Rubinoff, Mitchell Jay Rubinoff, Yosef Rubinoff, Hananel Rubinoff, Gila Schnall, Frances Schnall, and Ira Schnall bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

172.     By engaging in the acts complained of herein, Chevron unlawfully and willfully provided, and conspired to provide, funds, directly or indirectly, to Saddam Hussein. At the time Chevron provided such funds to Saddam Hussein (in the form of $20 million in illegal kickbacks outside the UN Oil-for-Food Program), Chevron knew or deliberately avoided discovering that those funds would be (and were) used, in full or in part, to carry out suicide bombings and other violent acts intended to cause death or serious bodily injury to civilians, including Plaintiffs, for the purpose of intimidating the U.S. and Israeli populations and to compel the U.S. and Israel to exit the Middle East.

173.     Chevron itself committed an act of international terrorism when it paid illegal kickbacks it knew were intended to be and were paid to Saddam Hussein, in knowing violation of strict rules set for transacting business with Iraq, a state sponsor of terrorism. This financial support was itself an act dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. § 2339C.

174.     Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

175.     Chevron's unlawful and willful provision of funds to Saddam Hussein was a proximate cause of and a substantial factor in causing the injuries to Plaintiffs, and each of them, in their person, property, or business by reason of acts of international terrorism. Plaintiffs therefore seek treble damages, according to proof, and to recover the cost of suit, including attorney's fees, pursuant to 18 U.S.C. § 2333(a).

/ / /

**FOURTH CLAIM FOR RELIEF**
**Financing Terrorism in Violation of the Law of Nations**

(Against all Defendants by Plaintiffs (3), (8) through (9), (12),
(14) through (17), and (21) through (329))

176.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 149, Paragraphs 152 through 159, Paragraphs 163 through 169, and Paragraphs 172 through 175, as if fully set forth herein.

177.    Plaintiffs (3), (8) through (9), (12), (14) through (17), and (21) through (329) bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

178.    Chevron's acts, as alleged herein, occurred within the U.S., were directed from its corporate headquarters in the U.S., and/or were committed for the benefit of Chevron Corporation, a U.S. citizen, all with intent to defeat U.S. and international laws prohibiting transfer of funds to Saddam Hussein, a known state sponsor of terrorism with a well-publicized anti-American and anti-Israeli agenda. The millions of dollars in U.S. currency Chevron illegally transferred to Saddam Hussein via the U.S. federal wire system compromised vital U.S. national security interests, both at home and abroad, and provided Saddam Hussein with the means to carry out deadly attacks in Israel, a nation that is closely allied with the U.S., is home to hundreds of thousands of U.S.-citizen residents, and is a popular destination for millions of U.S.-citizen tourists.

179.    Chevron's illegal transfer of millions of dollars to Saddam Hussein was intentional and purposeful. Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

180.     Chevron's acts, as alleged herein, constitute torts in violation of a United States treaty under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron violated UN Security Council resolutions that prohibited U.S. citizens and corporate entities, such as Chevron, from transferring or causing to be transferred any funds to Iraq or its citizens other than through the Oil-for-Food Program. Security Council resolutions are mandatory and binding against the United States, who is obligated to implement their terms pursuant to Articles 25 and 48 of the UN Charter. The UN Security Council expressly stated in its decisions that States were to act in *strict accordance* with the provisions of the embargo against transfer of funds or trade with Iraq, and required States to report on their compliance. *See, e.g.,* Resolutions 661 (1990), para. 5; 670 (1990), para. 3; and 687 (1991), para. 25. To carry out its obligations under the UN Charter, the United States designated Iraq as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, and expressly and completely prohibited financial transactions with Iraq and its then-president Saddam Hussein.

181.     Chevron's acts, as alleged herein, also constitute torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron violated clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit the provision of funds or other material support to individuals, groups, or governments who may use the funds to commit a violent act against innocent civilians for purposes of intimidation or to persuade a government to do or abstain from doing an act. These international laws are outlined in, for example:

a.     the International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. Doc. A/Res/53/108 (Dec. 9, 1999) ("Financing Convention"), which has been ratified by over 130 countries, including the United States (18 U.S.C. § 2339C). The Financing Convention punishes willful and knowing direct or indirect provision of funds with knowledge that the funds may be used, at least in part, to finance acts of international terrorism such as suicide bombings and mass shootings, and states that the financing of such acts "is a matter of grave concern to the international community as a whole."

/ / /

b.      the International Convention for Suppression of Terrorist Bombings, G.A. Res. 52/164, U.N. Doc. A/Res/52/164 (Dec. 15, 1997) ("Bombing Convention"), which has been ratified by more than 120 countries, including the United States (18 U.S.C. § 2332f). The Bombing Convention prohibits unlawful and intentional discharge or detonation of an explosive or lethal device in a place of public use with intent to cause death or serious bodily injury. The Bombing Convention states that terrorist attacks by means of explosives and other lethal devices is a matter of grave concern to the international community as a whole, and imposes accomplice liability on anyone who intentionally contributes to the sponsoring group with knowledge of the intention of the group to commit the bombings;

c.      Common Article 3 of the Geneva Conventions of 1949, which has been ratified by more than 180 countries, including the United States (18 U.S.C. § 2441). The Geneva Conventions prohibits the deliberate attack of civilians;

d.      UN General Assembly Resolution on Measures to Eliminate International Terrorism, G.A. Res. 49/50, U.N. Doc. A/Res/49/60 (Dec. 9, 1994), which urges members states to proscribe the financing of terrorism;

e.      UN General Assembly Resolution on Measures to Eliminate International Terrorism, G.A. Res. 51/210, U.N. Doc. A/Res/51/210 (Dec. 17, 1996), which notes the need to specifically address the international problem of terrorist attacks carried out by bombs, explosives, and other lethal devices; calls for enactment of domestic laws preventing financing of terrorists or movement of funds intended for terrorist purposes; and condemns the financings of terrorist acts;

f.      UN Security Council Resolution 1269 (1999), calling upon states to take steps to deny those who finance terrorist acts safe haven;

g.      UN Security Council Resolution 1373 (2001), on threats to international peace and security caused by terrorist acts, and requiring all States to prevent and suppress the financing of terrorist acts and mandating the formation of the Counter-terrorism Committee; and

h.      UN Security Council Resolution 1377 (2001), calling upon states to fully implement Resolution 1373 (2001).

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

182.    World condemnation of terrorist financing is equally reflected in the various regional conventions, which prohibit the financing of terrorist acts. *See* Annex to Resolution No: 59/26P; 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism, Art. 3; 1999 Organization of African Unity Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3; Inter-American Convention against Terrorism (Bridgetown, July 2003); South Asian Association for Regional Cooperation's Regional Convention on Suppression of Terrorism (Kathmandu, November 1987).

183.    Chevron was a direct actor and was also complicit in and aided and abetted the aforementioned acts of financing terrorism, which proximately caused and were a substantial factor in the injuries to Plaintiffs, and each of them, alleged herein. Plaintiffs seek compensatory damages, according to proof, and costs of suit, including attorney's fees, as allowed by law.

184.    In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and make an example of Chevron.

### FIFTH CLAIM FOR RELIEF
### Crimes Against Humanity in Violation of the Law of Nations

(Against all Defendants by Plaintiffs (3), (8) through (9), (12),
(14) through (17), and (21) through (329))

185.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 149, Paragraphs 152 through 159, Paragraphs 163 through 169, Paragraphs 172 through 175, and Paragraphs 178 through 183, as if fully set forth herein.

186.    Plaintiffs (3), (8) through (9), (12), (14) through (17), and (21) through (329) bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

187.    Chevron's acts, as alleged herein, constitute torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron was complicit in and aided and abetted violations of clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit crimes against humanity of the type suffered by Plaintiffs. These international laws are outlined in, for example:

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1         a.     Article 2 of the Statute of the Special Court for Sierra Leone, adopted by

2 UN Security Council Resolution 1315 on August 14, 2000, which defines a "crime against

3 humanity" as murder, persecution, or other inhumane acts committed as part of a widespread or

4 systematic attack directed against any civilian population;

5         b.     Chapter II, Articles 2 and 18 of the Draft Code of Crimes Against the Peace

6 and Security of Mankind, adopted on July 26, 1996 by the UN's International Law Commission,

7 U.N. Doc. A/CN.4/L.532, corr.1, corr.3 (1996);

8         c.     Article 6 of the Charter of the International Military Tribunal, issued

9 August 8, 1945; and

10         d.     Article 5 of the International Criminal Tribunal for the former Yugoslavia,

11 enacted by the UN Security Council in 1993.

12      188.    Chevron's aiding and abetting the crimes against humanity committed by Saddam

13 Hussein and Iraq proximately caused and were a substantial factor in the injuries to Plaintiffs, and

14 each of them, alleged herein. Plaintiffs seek compensatory damages, according to proof, and costs

15 of suit, including attorney's fees, as allowed by law.

16      189.    In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or

17 malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and

18 make an example of Chevron.

19 **SIXTH CLAIM FOR RELIEF**<br>**Extrajudicial Killings in Violation of the Law of Nations**

20

21 (Against all Defendants by Plaintiffs (21) Estate of Shoshana Ris, (68) Estate of Naftali Lanzkron, (80) Estate of Eliran Rozenberg, (93) Estate of Vladislav Sorokin, (156) Estate of Haim Ben Ezra, (132) Estate of Simona Rudin, (162) Estate of Lea Ben Ezra, (163) Estate of Menashe Regev, (201) Estate of Yossi Elezra, (206) Estate of Golan Turgeman, (269) Efrat Bar Dagan, as successor-in-interest to Nethanel Kochavi, deceased, (270) Estate of Nir Borocov, (292) Estate of Meir Fahima, (310) Estate of Zeev Hanik, and (316) Estate of Yaakov Shfaym)

22

23

24      190.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth

25 in Paragraphs 1 through 149, Paragraphs 152 through 159, Paragraphs 163 through 169,

26 Paragraphs 172 through 175, Paragraphs 178 through 183, and Paragraphs 187 through 188, as if

27 fully set forth herein.

28 / / /

191.   Plaintiffs (21) Estate of Shoshana Ris, (68) Estate of Naftali Lanzkron, (80) Estate of Eliran Rozenberg, (93) Estate of Vladislav Sorokin, (156) Estate of Haim Ben Ezra, (132) Estate of Simona Rudin,  (162) Estate of Lea Ben Ezra, (163) Estate of Menashe Regev, (201) Estate of Yossi Elezra, (206) Estate of Golan Turgeman, (269) Efrat Bar Dagan, as successor-in-interest to Nethanel Kochavi, deceased, (270) Estate of Nir Borocov, (292) Estate of Meir Fahima, (310) Estate of Zeev Hanik, and (316) Estate of Yaakov Shfaym, bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

192.   Chevron's conduct, alleged herein, constituted torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron was complicit in and aided and abetted violations of clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit crimes against humanity of the type suffered by Plaintiffs. These international laws are outlined in, for example, article 5 of the Universal Declaration on Human Rights and article 7 of the International Covenant on Civil and Political Rights.

193.   As a proximate and foreseeable result of Chevron's conduct, Plaintiffs were deliberately killed under color of law by agents of Saddam Hussein without the authority of a previous judgment of a regularly constituted court and were not afforded any of the judicial processes which are recognized as indispensable to civilized peoples. Plaintiffs seek compensatory damages, according to proof, and costs of suit, including attorney's fees, as allowed by law.

194.   In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and make an example of Chevron.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendant Chevron as follows:

a.   As to the first, second, and third claims for relief, for an award of treble damages, according to proof;

b.   As to the fourth, fifth, and sixth claims for relief, for an award of compensatory damages, according to proof;

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

c.    As to the fourth, fifth, and sixth claims for relief, for an award of punitive damages, in an amount sufficient to punish and make an example of Chevron;

d.    For an award of attorney's fees and costs, as allowed by law;

e.    For pre-judgment and post-judgment interest to the extent allowed by law; and

f.    For such other and further relief as the Court deems appropriate.

DATED:  October 26, 2015                    Respectfully submitted,

BOUCHER LLP


By:    _____*/s/ Raymond P. Boucher*_____
       Raymond P. Boucher
       Maria L. Weitz
       Hermez Moreno
       Milin Chun

MM-LAW LLC
       Gavriel Mairone
       Bena Ochs

GERAGOS & GERAGOS
       Mark J. Geragos
       Ben Meiselas

*Attorneys for Plaintiffs*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  October 26, 2015         Respectfully submitted,

BOUCHER LLP


By:       */s/ Raymond P. Boucher*
        Raymond P. Boucher
        Maria L. Weitz
        Hermez Moreno
        Milin Chun

MM-LAW LLC
        Gavriel Mairone
        Bena Ochs

GERAGOS & GERAGOS
        Mark J. Geragos
        Ben Meiselas

*Attorneys for Plaintiffs*

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903