1   Robert A. Mittelstaedt (State Bar No. 60359)
    ramittelstaedt@JonesDay.com
2   Caroline N. Mitchell (State Bar No. 143124)
    cnmitchell@JonesDay.com
3   JONES DAY
    555 California Street, 26th Floor
4   San Francisco, CA  94104
    Telephone:  415.626.3939
5   Facsimile:   415.875.5700

6   Meir Feder (N.Y. Bar No. 2420842) (*Pro Hac Vice*)
    mfeder@ JonesDay.com
7   JONES DAY
    222 E. 41st Street
8   New York, NY  10017-6702
    Telephone:  212.326.3939
9   Facsimile:   877.833.3939

10  Attorneys for Defendant
    CHEVRON CORPORATION

11

                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15
    **Baruch Yehuda Brill, et al.,**          **Case No.  15-cv-04916 JD**
16
                    **Plaintiff,**            **DEFENDANT CHEVRON**
17                                            **CORPORATION'S NOTICE OF**
            **v.**                            **MOTION AND CORRECTED**
18                                            **MOTION TO DISMISS**
    **Chevron Corporation, et al.**
19                                            DATE:     January 27, 2016
                    **Defendant.**            TIME:     10:00 a.m.
20                                            PLACE:  Courtroom 11

21                                            **Judge:   Hon. James Donato**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................ 1

RELIEF REQUESTED ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 1

ARGUMENT ............................................................................................................. 2

I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ANTI-TERRORISM
       ACT'S CIVIL LIABILITY PROVISION, 18 U.S.C. § 2333 .............................. 2

       A.     Chevron's Alleged Oil Purchases Were Not Acts of "International
              Terrorism." ............................................................................................. 3

              1.     The Allegations Fail to Satisfy Subsection (A), 18 U.S.C. § 2333(1) ....... 3

              2.     The Allegations Fail to Satisfy Subsection (B), 18 U.S.C. § 2333(1) ....... 5

              3.     Plaintiffs' Failure to Satisfy the Definition of "International
                     Terrorism" Would Defeat Their ATA Claims Even if They Had
                     Pled a Violation of §§ 2339A or 2339C .................................................. 7

       B.     The Complaint Fails to Satisfy the Proximate Cause Requirement of
              § 2333 .................................................................................................... 8

       C.     The Complaint's Inability to Plausibly Plead That Chevron Knew Its Oil
              Payments Would Be Used to Support Terrorist Attacks in Israel
              Independently Defeats Plaintiffs' ATA Claims .................................... 11

       D.     Aiding-and-Abetting Liability Is Not Available Under 18 U.S.C. § 2333 .......... 12

II.    PLAINTIFFS' ALIEN TORT STATUTE CLAIMS FAIL FOR MULTIPLE,
       INDEPENDENT REASONS ........................................................................... 13

       A.     The ATS Claims Are Time-Barred ....................................................... 13

       B.     Plaintiffs Fail to Allege a Cognizable Claim for Aiding and Abetting
              Alleged Violations of the Law Of Nations ........................................... 15

              1.     The Complaint Fails to Satisfy the Mens Rea Element of an ATS
                     Aiding-and-Abetting Claim .................................................................. 15

**TABLE OF CONTENTS**
**(continued)**

Page

2. The Complaint Fails to Plead That Chevron's Oil Payments Substantially Assisted the Terrorist Attacks ............................................. 17

C. Plaintiffs Do Not Allege a Violation of any International Norm Actionable under the ATS ...................................................................................... 18

1. There Is No Actionable International Norm Against "Funding Terrorism," Let Alone One Against Indirectly Purchasing Commodities From a Government Listed as a State Sponsor of Terror.................................................................................................. 18

2. Plaintiffs Have Not Alleged the Elements of a Primary Violation of the Norm Against Extrajudicial Killing ....................................................... 21

3. Plaintiffs Have Not Alleged the Elements of a Primary Violation of the Norm Against Crimes Against Humanity ........................................... 21

4. Plaintiffs Cannot State an ATS Claim Based on Alleged "Treaty" Violations of the U.N. Charter or Security Council Resolutions.............. 22

D. Plaintiffs' ATS Claims Are Impermissibly Extraterritorial ................................. 23

III. THE COMPLAINT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND ................................................................................................................. 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page

**CASES**

*Abagninin v. AMVAC Chem. Corp.*,
    545 F.3d 733 (9th Cir. 2008)....................................................................21

*Abecassis v. Wyatt*,
    704 F. Supp. 2d 623 (S.D. Tex. 2010) ............................................... passim

*Abecassis v. Wyatt*,
    7 F. Supp. 3d 668 (S.D. Tex. 2014) .............................................................6

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ...................................................4, 10

*Ahmad v. Christian Friends of Israeli Cmtys.*,
    2014 WL 1796322 (S.D.N.Y. May 5, 2014).................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................5, 11, 16

*Aziz v. Alcolac, Inc.*,
    658 F.3d 388 (4th Cir. 2011)......................................................................16

*Balintulo v. Daimler AG*,
    727 F.3d 174 (2d Cir. 2013).......................................................................24

*Baloco v. Drummond Co.*,
    767 F.3d 1229 (11th Cir. 2014)..................................................................24

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) (en banc)............................................. passim

*Bradford v. Scherschligt*,
    803 F.3d 382 (9th Cir. 2015).....................................................................13

*Burgess v. United States*,
    553 U.S. 124 (2008) .....................................................................................8

*Cardona v. Chiquita Brands Int'l, Inc.*,
    760 F.3d 1185, 1194 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1842 (2015) ..........................24

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Central Bank of Denver v. First Interstate Bank,*

4

    511 U.S. 164 (1994) ...................................................................................................12

5

*City of Milwaukee v. Illinois,*

    451 U.S. 304 (1981) ...................................................................................................20

6

7

*Couch v. Cate,*

    379 Fed. Appx. 560 (9th Cir. 2010) ..........................................................................10

8

*Deutsche v. Turner Corp.,*

9

    324 F.3d 692 (9th Cir. 2003) .....................................................................................13

10

*Diggs v. Richardson,*

11

    555 F.2d 848 (D.C. Cir. 1976) ..................................................................................22

12

*Doe I v. Nestle USA, Inc.,*

13

    766 F.3d 1013 (9th Cir. 2014) ........................................................................... passim

14

*Doe v. Drummond Co.,*

15

    782 F.3d 576 (11th Cir. 2015) ...................................................................................24

16

*Doe v. Exxon Mobil Corp.,*

    527 Fed. Appx. 7 (D.C. Cir. 2013) ...........................................................................16

17

18

*Dyniewicz v. United States,*

    742 F.2d 484 (9th Cir. 1984) .....................................................................................13

19

*Flores v. S. Peru Copper Corp.,*

20

    414 F.3d 233 (2d Cir. 2003) ......................................................................................20

21

*Forti v. Suarez-Mason,*

22

    672 F. Supp. 1531 (N.D. Cal. 1987) .........................................................................21

23

*Giraldo v. Drummond Co.,*

24

    2013 WL 3873960 (N.D. Ala. July 25, 2013) *aff'd sub nom. Doe v. Drummond
Co.,* 782 F.3d 576 (11th Cir. 2015) ..........................................................................23

25

*Goldberg v. UBS AG,*

26

    690 F. Supp. 2d 92 (E.D.N.Y. 2010) ..........................................................................7

27

*Guerrero v. Gates,*

28

    442 F.3d 697 (9th Cir. 2003) .....................................................................................14

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Hemi Grp., LLC v. City of New York*

4

559 U.S. 1 (2010) ............................................................................................9, 10

5

*Holmes v. Sec. Inv'r Prot. Corp.*,

503 U.S. 258 (1992) .............................................................................................9

6

7

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,

2015 WL 71562 (S.D. Fla. Jan. 6, 2015) .........................................9, 12, 20

8

9

*In re Chiquita Brands Int'l Inc. Alien Tort Statute & S'holder Derivative Litig.*,

792 F. Supp. 2d 1301 (S.D. Fla. 2011) ...................................................19, 20

10

*In re S. African Apartheid Litig.*,

11

617 F. Supp. 2d 228 (S.D.N.Y. 2009) .............................................................17

12

*In re Terrorist Attacks on September 11, 2001*,

13

714 F.3d 118 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014) ................. passim

14

*Jimenez v. Quarterman*,

15

555 U.S. 113 (2009) .............................................................................................8

16

*Jovic v. L-3 Servs., Inc.*,

17

69 F. Supp. 3d 750, 759 (N.D. Ill. 2014) ......................................................24

18

*Kiobel v. Royal Dutch Petroleum Co.*,

133 S. Ct. 1659 (2013) ..............................................................13, 18, 23, 24

19

20

*Krishanthi v. Rajaratnam*,

2010 WL 3429529 (D.N.J. Aug. 26, 2010).....................................................20

21

*Lazerson v. Colvin*,

22

2014 WL 967048 (N.D. Cal. Mar. 6, 2014)....................................................14

23

*Linde v. Arab Bank*,

24

97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015) .................................................11, 12

25

*Linde v. Arab Bank, PLC*,

384 F. Supp. 2d 571 (E.D.N.Y. 2005) .............................................................13

26

27

*Lopez-Jacuinde v. Holder*,

600 F.3d 1215 (9th Cir. 2010)...........................................................................8

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Mastafa v. Chevron Corp.*,

4

759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010) *aff'd*, 770 F.3d 170, 192 (2d Cir.

2014) ...................................................................................................7, 15, 16, 24

5

*Morrison v. Nat'l Australia Bank Ltd.*,

6

561 U.S. 247 (2010)................................................................................23, 24

7

*Mujica v. AirScan Inc.*,

8

771 F.3d 580 (9th Cir. 2014)................................................................................23

9

*Mwani v. Bin Ladin*,

10

2006 WL 3422208 (D.D.C. Sept. 28, 2006) ...............................................20

11

*OBB Personenverkehr AG v. Sachs*,

12

136 S. Ct. 390 (2015)................................................................................23

13

*Pace v. DiGuglielmo*,

544 U.S. 408 (2005)................................................................................14

14

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,

15

582 F.3d 244 (2d Cir. 2009)...............................................................7, 16, 17, 18

16

*Rothstein v. UBS AG*,

17

708 F.3d 82 (2d Cir. 2013)........................................................... passim

18

*Ruiz v. Fed. Gov't of Mexican Republic*,

19

2007 WL 2978332, at *3 (W.D. Tex. Sept. 28, 2007), *aff'd*, 269 Fed. Appx. 451

(5th Cir. 2008) ................................................................................22

20

*Santa Maria v. Pac. Bell*,

21

202 F.3d 1170 (9th Cir. 2000), *overruled on other grounds by Scoop-Gonzalez*

22

*v. I.N.S.*, 272 F.3d 1176 (9th Cir. 2001)................................................15

23

*Saul v. United States*,

24

928 F.2d 829 (9th Cir. 1991)................................................................25

25

*Sosa v. Alvarez-Machain*,

26

542 U.S. 692 (2004) ........................................................... passim

27

*Stansell v. BGP, Inc.*,

2011 WL 1296881 (M.D. Fla. Mar. 31, 2011)................................................5, 6, 8

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Stutts v. De Dietrich Grp.*,
  2006 WL 1867060 (E.D.N.Y. June 30, 2006) ...................................................................4, 6

*Tarros S.p.A. v. United States*,
  982 F. Supp. 2d 325 (S.D.N.Y. 2013)........................................................................22

*Tel-Oren v. Libyan Arab Republic*,
  726 F.2d 774 (D.C. Cir. 1984) ............................................................................19

*Tymoshenko v. Firtash*,
  2013 WL 1234821 (S.D.N.Y. Mar. 26, 2013) ............................................................17

*United States v. Hicks*,
  997 F.2d 594 (9th Cir. 1993).............................................................................5

*United States v. Manatau*,
  647 F.3d 1048 (10th Cir. 2011)...........................................................................7

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)...............................................................................20

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Corp.*,
  517 F.3d 104 (2d Cir. 2009)..............................................................................19

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ......................................................................6, 9

STATUTES

18 U.S.C. § 1361 ......................................................................................................8

18 U.S.C. § 2331 ....................................................................................2, 3, 4, 5, 6, 7, 8

18 U.S.C. § 2332d...............................................................................................2, 4, 5

18 U.S.C. § 2332g(b)(5)..........................................................................................12

18 U.S.C. § 2332h(b)(5)..........................................................................................12

18 U.S.C. § 2333 ........................................................................................... passim

Chevron's Corrected Motion to Dismiss
3:15-CV-04916 JD

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

18 U.S.C. § 2339A ...................................................................................2, 5, 7, 8

4

18 U.S.C. § 2339B(d)(1)(F) ...................................................................................12

5

18 U.S.C. § 2339C ................................................................................2, 4, 5, 7, 8

6

7

18 U.S.C. § 2339D(b)(6) ........................................................................................12

8

28 U.S.C. § 1350 ...............................................................................1, 21, 22

9

28 U.S.C. § 1350, Note ........................................................................................21

10

11

**OTHER AUTHORITIES**

12

1998 Arab Convention for the Suppression of Terrorism Article 2 .................................21

13

Convention on the Prevention and Combating of Terrorism Article 4 ........................21

14

U.N. Charter and U.N. Security Council Resolutions 661, 670 and 687 Articles 25
and 48 ...................................................................................................22

15

16

U.S. Army Field Manual No. FM 3-0, ch. 9-37 (2001) ...................................................5

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that at 10:00 a.m. on January 27, 2016, before the Honorable James Donato, in Courtroom 11, 450 Golden Gate Ave., San Francisco, California, defendant Chevron Corporation (Chevron) will and hereby does move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds stated below.

**RELIEF REQUESTED**

The complaint should be dismissed in its entirety under Rule 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This lawsuit claims that an oil company's commercially motivated purchases of Iraqi crude oil are "international terrorism" and "crimes against humanity" actionable under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, and the Alien Tort Statute (ATS), 28 U.S.C. § 1350. Plaintiffs and their relatives were allegedly injured or killed in Israel by Palestinian terrorists whose families later received payments from Saddam Hussein.  Plaintiffs assert that any company, including Chevron, that purchased Iraqi oil from third parties under the United Nations Oil-for-Food Programme (OFFP), and in doing so paid premiums Iraq imposed, is liable for the acts of those terrorists.  As shown below, Chevron is not liable for the conduct of Palestinian terrorists, and all of plaintiffs' claims must be dismissed.

**BACKGROUND**

In 1990, the United Nations responded to Iraq's invasion of Kuwait with sanctions that restricted trading with Iraq.  Cmplt. ¶ 1.  In 1996, the United Nations established the OFFP as a limited exception to these sanctions, enabling the Iraqi government to sell oil to finance the purchase of food and other humanitarian goods.  *Id.* ¶ 3.

In August 2000, Iraq began conditioning sales under the OFFP on the purchaser's payment of illegal surcharges and port fees.  *Id.* ¶¶ 66, 67.  According to the complaint, between July 2000 and December 2002, Chevron purchased oil from third parties who had purchased it from Iraq pursuant to the OFFP, and paid premiums on these purchases (and extra port-loading fees), allegedly with knowledge that a portion would be passed on to the Iraqi government outside

the OFFP.  *Id.* ¶¶ 69–74, 80–97.  Chevron's purpose was commercial, and the complaint does not allege that Chevron intended to support any terrorist activities.  *Id.*

After Palestinians initiated the so-called "Second Intifada" against Israel in 2000, Iraqi officials allegedly made public statements pledging support, including a Saddam Hussein speech promising to "donate 5 million euro for the martyrs of Palestine and in aid to the intifada."  *Id.* ¶ 56(a); *see id.* ¶ 56.  Iraq also allegedly promoted terrorist attacks against civilians in Israel, primarily by paying money to the families of suicide bombers and other terrorists after the acts of terror were committed.  *Id.* ¶¶ 16–26,112–48.  Although the cited public statements do not mention support for terrorist attacks, Chevron purportedly knew from those statements and other reports that Iraq would use governmental funds to support terrorist acts in Israel.  *Id.* ¶ 8.

Plaintiffs are 12 U.S. citizens and 317 foreigners alleging injuries to themselves or family members from terrorist attacks in Israel between November 2000 and April 2002.  *Id.* ¶¶ 16–26,112–48.  The U.S. citizens and eight foreigners[1] assert three causes of action under the ATA, 18 U.S.C. § 2333, alleging predicate terrorism crimes under 18 U.S.C. §§ 2332d, 2339A and 2339C.  The foreign plaintiffs allege three causes of action under the ATS, based on international norms against "terrorism financing," crimes against humanity and extrajudicial killing.

**ARGUMENT**

**I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ANTI-TERRORISM ACT'S CIVIL LIABILITY PROVISION, 18 U.S.C. § 2333.**

Plaintiffs' claim that Chevron's purchase of Iraqi oil from third parties was "international terrorism," and that Chevron is responsible for atrocities perpetrated by *actual* terrorists in Israel, fails in multiple ways.  First, Chevron's oil purchases do not satisfy the statutory definition of "international terrorism" (18 U.S.C. § 2331(1)), as required for liability under the ATA.  Second, as in the analogous case of *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), involving funds provided to Iran, the highly attenuated link between Chevron's oil purchases and terrorist attacks in Israel makes plaintiffs' allegation of proximate cause untenable.  Third, the complaint fails to plausibly plead another essential element of plaintiffs' claims: that Chevron knew it was funding

---

[1] The foreign nationals, numbered as plaintiffs 3, 8–9, 12, and 14–17, lack ATA standing, as they are not a "national of the United States … or his or her estate, survivors, or heirs."  § 2333.

Chevron's Corrected Motion to Dismiss
3:15-CV-04916 JD

Palestinian terrorism.  Plaintiffs cannot avoid these deficiencies in their ATA claims by alleging an aiding-and-abetting theory of liability, as aiding-and-abetting claims are not cognizable under the ATA, and—even if they were—the allegations fail to satisfy the elements of such a claim.

**A.   Chevron's Alleged Oil Purchases Were Not Acts of "International Terrorism."**

To plead a claim under 18 U.S.C. § 2333, plaintiffs must allege that Chevron committed acts of "international terrorism," and that they were injured "by reason of" those acts.  Section 2333(a) states:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

In 18 U.S.C. § 2331(1), "international terrorism" is defined as "activities that –

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended –
>
>> (i)    to intimidate or coerce a civilian population;
>> (ii)   to influence the policy of a government by intimidation or coercion; or
>> (iii)  to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

Plaintiffs' allegations fail to satisfy the first and second prongs of this definition.  Buying and paying for crude oil is neither violent nor dangerous to human life, and plaintiffs do not even allege that these manifestly commercial transactions "appear[ed] to be intended" by Chevron to intimidate, coerce, influence or affect the conduct of anyone.

**1.   The Allegations Fail to Satisfy Subsection (A), 18 U.S.C. § 2333(1).**

The first prong of the § 2331(1) definition requires "violent acts or acts dangerous to

human life that are a violation of the criminal laws of the United States or of any State."

§ 2331(1)(A).  Buying Iraqi crude oil, and paying a premium to brokers, is not violent or

dangerous to human life, even where the Iraq government receives some of the proceeds.  As

explained in another case involving commercial dealings with Iraq, "'[t]he plain language of the

ATA compels the conclusion that, by engaging in commercial banking activity, the Bank

Defendants were not involved in 'violent acts or acts dangerous to human life.'"  *Stutts v. De

Dietrich Grp.*, 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006).  The same is true of

Chevron's payments to obtain Iraqi oil.

Some courts have found that direct payments to terrorists and terrorist front groups satisfy

this requirement, primarily on the theory that "[g]iving money to Hamas, like giving a loaded gun

to a child (which also is not a violent act), is an 'act dangerous to human life.'"  *Boim v. Holy

Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).  But that reasoning

cannot be extended to payments to purchase a product from a foreign government, let alone from

a third party (as alleged here), without stretching the ordinary meaning of "acts dangerous to

human life" past the breaking point.[2]

Nor do Chevron's alleged oil transactions violate any of the three predicate criminal

statutes cited by plaintiffs as establishing a "violation of the criminal laws of the United States or

of any State," as required by § 2331(1)(A).  Section 2339C was not enacted until June 25, 2002,

which is after the last terrorist attack alleged in the complaint.  Chevron cannot have violated a

statute that did not then exist.  And § 2332d prohibits "engag[ing] in a financial transaction with

the government of" a country that has been designated as "supporting international terrorism."

---

[2] The court in *Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011), made the error of stretching *Boim*'s reasoning beyond *Boim*'s context of direct support for terrorist groups. *Abecassis* was a suit brought by many of the plaintiffs who are parties here, alleging similar claims, against defendants that allegedly were closely involved in Iraq's subversion of the OFFP. *Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010).  The court dismissed the Alien Tort Statute claims with prejudice, *id.*, but (after an initial dismissal) declined to dismiss the ATA claims in an amended complaint.  As to § 2331(1)(A), the court relied on *Boim* to find that the defendants' payments to Iraq were acts "dangerous to human life," 785 F. Supp. 2d at 648, but failed to address the fundamental difference between giving money to an active terrorist group, and merely doing business with a government—even a so-called "rogue" government—which "has many legitimate agencies, operations, and programs to fund" in addition to its support of terror.  *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).

1    No allegation is made that Chevron engaged in any transactions with the government of Iraq.

2    Rather, Chevron allegedly purchased oil from third parties that had obtained it from Iraq.  Cmplt.

3    ¶¶ 70–74, 80–97.  These are not transactions "with the government" of Iraq under § 2332d.

4          Further, §§ 2339A and 2339C both expressly require knowledge by the defendant that its

5    funds will be used to support terrorism, and—as addressed in Point I(C), *infra*—the complaint

6    pleads no plausible allegations that Chevron knew Iraq was financially supporting terrorist attacks

7    in Israel, let alone that its oil payments would be used for that purpose.

8          Accordingly, even if Chevron's conduct could be deemed "dangerous to human life"

9    within § 2331(1)(A), the complaint fails to plead "a violation of the criminal laws of the United

10   States or of any State," as required by the statute.

11          **2.     The Allegations Fail to Satisfy Subsection (B), 18 U.S.C. § 2333(1).**

12          The second prong of the definition, § 2331(1)(B), requires that the defendant's acts

13   "'appear to be intended' to do one of three things: 'intimidate or coerce a civilian population';

14   'influence the policy of a government by intimidation or coercion'; or 'affect the conduct of a

15   government by mass destruction, assassination, or kidnapping.'"  *Stansell v. BGP, Inc.*, 2011 WL

16   1296881, at *9 (M.D. Fla. Mar. 31, 2011) (citation and internal quotation marks omitted).  This

17   critical requirement recognizes that what distinguishes terrorism from other dangerous and

18   unlawful conduct is use of violence to achieve political or policy goals.  *See, e.g.*, *United States v.*

19   *Hicks*, 997 F.2d 594, 599 (9th Cir. 1993) (noting statutory definition of terrorism, for purposes of

20   annual State Department reports, as "premeditated, *politically motivated* violence perpetrated

21   against noncombatant targets by subnational groups or clandestine agents") (emphasis added)

22   (quoting 22 U.S.C. § 2656f(d)(2)); U.S. Army Field Manual No. FM 3-0, ch. 9-37 (2001)

23   (terrorism is the use of violence "to coerce or intimidate governments or societies ... [to attain]

24   political, religious, or ideological goals").  To satisfy this provision, plaintiffs must plausibly

25   plead allegations that would "lead an objective observer to conclude Defendants intended to

26   achieve" the terrorism-specific goals in § 2331(1)(B), rather than merely "stat[ing], in conclusory

27   fashion, that Defendants['] actions appear to be intended to achieve any of the enumerated

28   results."  *Stansell*, 2011 WL 1296881, at *9.; *see Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009)

("conclusory" allegations and "bare assertions" disregarded).

Unsurprisingly—in light of the facial absurdity of the notion that Chevron sought to advance terrorist goals—the complaint contains no such allegations.  Indeed, it does not allege even in conclusory terms that Chevron's payments appeared to be intended to intimidate civilians, influence government policy or affect government conduct.  To the contrary, it affirmatively alleges the opposite: that "Chevron paid the illegal kickbacks demanded by Saddam Hussein *so that its supply of Iraqi oil would not be cut off.*"  Cmplt. ¶ 10 (emphasis added).  Thus, by plaintiffs' own account, the plain intention of Chevron's payments was commercial.  Accordingly, the complaint fails to allege that Chevron committed acts of "international terrorism," and the § 2333 claims must be dismissed.  *See Stansell*, 2011 WL 1296881, at *9; *Stutts*, 2006 WL 1867060, at *2 (commercial banking services supporting alleged terrorist activity were not "designed to coerce civilians or government entities as required under § 2331"); *cf. Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48–49 (D.D.C. 2010) (§ 2331(1)(B) allegations sufficient solely because defendant was expressly warned by Israeli government that its direct financial transfers to terrorists were being used for terrorist activity).

*Boim*, in which the Seventh Circuit held that donating money to terrorist organizations satisfied § 2331(1)(B), underscores the point.  It is one thing to say that a voluntary gift to Hamas "appears to be intended" to advance Hamas's goals.  But the same cannot remotely be said about purchasing a foreign country's oil for what plaintiffs admit were business purposes.  Cmplt. ¶ 10.[3]

The district court in *Abecassis* found § 2331(1)(B) satisfied by allegations that the defendants purchased Iraqi oil knowing that Iraq was funding terrorist acts in Israel.  *Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014).  But its reasoning is demonstrably incorrect.  First, *Abecassis* relies on *Boim* for this conclusion, without addressing the major difference, in determining a defendant's apparent intention, between gifting money to Hamas, as in *Boim*, and

---

[3] In addition, *Boim*'s conclusion is premised on the defendant's knowing that its funds would support Hamas's terrorism, whereas here, as established in Point I(C), the complaint fails to adequately plead that Chevron knew Iraq was funding Palestinian terrorism.  This lack of plausible knowledge allegations also distinguishes the *Abecassis* decision discussed in the text.

1    merely purchasing Iraqi oil. *Id.* at 676. Even more problematic, *Abecassis* mistakenly equates

2    the intention to further terrorist goals—which is the focus of § 2331(1)(B)—with mere knowledge

3    that those goals might be furthered. *See id.* (asserting that "[d]onations appear to be intended to"

4    achieve terrorist goals "when a donor knows the terroristic aims and activities of its recipient and

5    when it is foreseeable that the donations will advance such terroristic aims").

6         This is a fundamental error, because "[t]he simple fact is intent and knowledge are

7    different things." *United States v. Manatau*, 647 F.3d 1048, 1051 (10th Cir. 2011). The Second

8    Circuit emphasized this point in another recent case alleging that Chevron was responsible for

9    wrongdoing by Saddam Hussein. The allegation that Chevron "knew full well" that oil payments

10   outside the OFFP "promoted serious human rights abuses in Iraq" was "clearly" inadequate to

11   satisfy a requirement that defendants had the purpose, or intention, to promote those abuses.

12   *Mastafa v. Chevron Corp.*, 770 F.3d 170, 193 (2d Cir. 2014). Similarly, other cases addressing

13   the state-of-mind standard for aiding-and-abetting claims under the ATS emphasize the

14   significant difference between requiring only "knowledge that the aider and abetter's acts would

15   facilitate the commission of the underlying offense" and requiring that the defendant "act with the

16   *purpose* of facilitating the criminal act." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1023 (9th Cir.

17   2014) (emphasis in original); *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582

18   F.3d 244, 259 (2d Cir. 2009) (emphasizing distinction between knowledge and purpose).

19        In any event, the complaint here lacks even a conclusory allegation that Chevron's

20   payments for oil appeared to be intended to achieve the § 2331(1)(B) purposes, and it recognizes

21   that the evident purpose of Chevron's actions was commercial. Cmplt. ¶ 10. This failure to

22   satisfy the definition of "international terrorism" requires dismissal of plaintiffs' ATA claims.

23               **3.    Plaintiffs' Failure to Satisfy the Definition of "International
                        Terrorism" Would Defeat Their ATA Claims Even if They Had Pled a**
24                      **Violation of §§ 2339A or 2339C.**

25        Some district courts have suggested that the 18 U.S.C. § 2331(1) definition can be

26   disregarded whenever plaintiffs are able to plead a violation of § 2339A or § 2339C, *i.e.*, that

27   these criminal offenses automatically satisfy the definition of "international terrorism." *See, e.g.*,

28   *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 112 (E.D.N.Y. 2010). That suggestion is erroneous.

Where a term is "expressly defined" by statute, the courts are not free to depart from that definition. *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009); *Burgess v. United States*, 553 U.S. 124, 135–36 (2008); *see Lopez-Jacuinde v. Holder*, 600 F.3d 1215, 1218 (9th Cir. 2010) (courts must determine application of defined term by reference to specific statutory definition). Here, each element of the § 2331 definition must be satisfied, as recognized in *Stansell*, *Abecassis and Boim*. *See Stansell*, 2011 WL 1296881, at *9; *Abecassis*, 7 F. Supp. 3d at 676; *Boim*, 549 F.3d at 694 (finding § 2331(1)(B) satisfied on facts of donation to Hamas).

Nor can it be said that a §§ 2339A or 2339C violation will necessarily satisfy the three prongs of § 2331(1), because some violations plainly do not satisfy those prongs. For example, § 2339A prohibits material support for a violation of 18 U.S.C. § 1361—which in turn prohibits injuring "any property of the United States." An injury to property is neither always "violent" nor inherently "dangerous to human life" within § 2331(1)(A), and does not necessarily suggest any intent to intimidate or coerce civilians or governments as required by § 2331(1)(B).

This point has particular force here, in that plaintiffs seek to stretch § 2339A or § 2339C far beyond direct support for terrorists. Even if voluntarily donating to Hamas can be said to be "dangerous to human life" and to appear intended to further Hamas's terrorist goals, the same is not true of merely engaging in a commercially motivated commodity purchase. Such conduct plainly cannot be said to automatically satisfy the three-prong definition of § 2331(1).

**B.     The Complaint Fails to Satisfy the Proximate Cause Requirement of § 2333.**

The purported link between Chevron's purchases of Iraqi oil from third parties and terror attacks in Israel is far too attenuated to satisfy the proximate causation requirement of § 2333. As held by the only Circuit to address providing funds to a foreign government known to sponsor terrorism—but not to terrorists themselves—such allegations do not satisfy the § 2333 causation element. *See Rothstein*, 708 F.3d at 97 (providing "hundreds of millions of dollars in cash" to Iran insufficient to plead proximate cause of terrorist attacks funded by Iran); *see also In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013) (providing funds to entities known to support terrorism insufficient to plead proximate cause of Al Qaeda attacks), *cert. denied*, 134 S. Ct. 2870 (2014).

Proximate cause is an essential element of any claim under § 2333, which is limited to injuries that occur "by reason of" international terrorism.  That phrase has long been understood, in other statutes, to require proximate causation.  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) ("by reason of" language in RICO requires proximate cause).  Because Congress is presumed to know and intend "the interpretation federal courts had given the words earlier Congresses had used," *id.*, the courts have recognized that § 2333 likewise requires proximate causation.  *See Rothstein*, 708 F.3d at 95; *In re Terrorist Attacks*, 714 F.3d at 123; *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 2015 WL 71562, at *5 (S.D. Fla. Jan. 6, 2015); *Wultz*, 755 F. Supp. 2d at 42.

Some litigants have argued, citing *Boim*, that a relaxed standard of proximate cause—or a presumption of causation—should apply to § 2333 claims.  This contention was definitively rejected by *Rothstein*, which emphasized Congress's decision to use the well-defined "by reason of" language:  If "Congress had intended to allow recovery upon a showing lower than proximate cause, we think it either would have so stated expressly or would at least have chosen language that had not commonly been interpreted to require proximate cause for the prior 100 years." *Rothstein*, 708 F.3d at 95.  And, reading in an implicit presumption of proximate cause could not be squared with the *express* adoption of presumptions in other provisions of the ATA.  *Id.* at 96.

The proximate-cause requirement is fatal to the ATA claims here.  The complaint alleges that Chevron entered into oil transactions with entities that in turn paid kickbacks to Iraq; that Iraq used government resources to pay the families of Palestinian terrorists *after* their family members committed terrorist acts; that these payments helped to incentivize terrorism; and that plaintiffs were injured by the terrorists.  This falls far short of the required "proximate causal relationship between the cash transferred . . . and the terrorist attacks . . . that injured plaintiffs." *Ahmad v. Christian Friends of Israeli Cmtys.*, 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014).

As the Supreme Court explained in *Hemi Grp., LLC v. City of New York*, in interpreting the identical "by reason of" requirement in RICO, proximate causation requires a "*direct* relation between the injury asserted and the injurious conduct alleged.  A link that is too remote, purely contingent, or indirect is insufficient."  559 U.S. 1, 9 (2010) (emphasis added) (internal quotation

1  marks and brackets omitted).  Moreover, in assessing proximate causation, as with damages,

2  "[t]he general tendency of the law . . . is not to go beyond the first step."  *Id.* at 10 (internal

3  quotation marks omitted).  Here, plaintiffs' theory of liability is the very definition of "remote"

4  and "indirect," and would require the Court to go far "beyond the first step."  There are a host of

5  independent actors between Chevron's alleged payments and the acts that allegedly injured

6  plaintiffs, and no direct connection at all.  The complaint does not allege that Chevron paid any

7  money directly to terrorists, or even to Iraq; that any of Chevron's payments was provided to the

8  terrorists or played a role in any alleged attack; that Chevron provided any material part of Iraq's

9  funds; that without Chevron's payments, Iraq would not have supported Palestinian terrorists; or

10  that those payments affected the number or type of attacks.[4]

11         The complaint alleges, at most, that it was "foreseeable" to Chevron that Iraq might use

12  any funds it obtained to support terrorism, and that injuries would result.  But *Hemi Group* makes

13  clear that mere foreseeability cannot satisfy proximate cause, and only "a sufficiently 'direct

14  relationship' between the [violation] and the harm" will suffice.  559 U.S. at 12; *see Couch v.*

15  *Cate*, 379 Fed. Appx. 560, 566 (9th Cir. 2010) ("*Hemi Group* definitively foreclosed RICO

16  liability for consequences that are only foreseeable without some direct relationship.").[5]

17         *Rothstein* is squarely on point.  The defendant there allegedly "provided Iran with

18  hundreds of millions of dollars" in violation of U.S. law, knowing that Iran funded Hamas and

19  Hizbollah terror attacks in Israel; and the plaintiffs alleged injuries from Hamas and Hizbollah

20  attacks.  708 F.3d at 92–93.  Noting that "Iran is a government, and as such it has many legitimate

21  agencies, operations, and programs to fund" in addition to its support of terror, the Second Circuit

22  held that the allegations failed to satisfy the proximate cause element of an ATA claim.  *Id.* at 97.

23         Similarly, in *In re Terrorist Attacks,* the defendants were "alleged to have provided

24  funding to purported charity organizations known to support terrorism that, in turn, provided

---

25  [4] The complaint alleges that Iraq received $20 million in oil payments from Chevron, ¶ 6, and is silent about what other funds Iraq had at its disposal.  Notably, the Volcker Report states

26  that Iraq generated over $1.8 billion through its evasion of OFFP restrictions alone.  Report of the U.N. Independent Inquiry Committee into the United Nations Oil-for-Food Programme 1 (2005).

27         [5] *Abecassis* went astray on precisely this point, upholding proximate cause on the inadequate ground that "it was foreseeable that … Hussein would use at least some of [the oil]

28  payments] to support terrorist attacks" in Israel.  785 F. Supp. 2d at 649.

Chevron's Corrected Motion to Dismiss
3:15-CV-04916 JD

funding to al Qaeda and other terrorist organizations," and to have provided "routine banking services to organizations and individuals said to be affiliated with al Qaeda." 714 F.3d at 124. The Second Circuit held that absent allegations that "defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda," or that their money "actually was transferred to al Qaeda and aided in the September 11, 2001 attacks," the plaintiffs could not claim that the defendants' funding proximately caused the September 11 attacks. *Id.*

The same analysis applies here. Mere allegations that a defendant's commercial transactions increased the funds available to a country like Iran or Iraq do not establish proximate causation and make that defendant responsible for any and all acts of terrorists that country ends up supporting with a portion of whatever funds it may have in its entire state budget.

**C.   The Complaint's Inability to Plausibly Plead That Chevron Knew Its Oil Payments Would Be Used to Support Terrorist Attacks in Israel Independently Defeats Plaintiffs' ATA Claims.**

The complaint also fails because the ATA, as a treble-damages statute, "require[s] proof of intentional misconduct," which at a minimum requires that the defendant must know he is "supporting … a terrorist organization." *Boim*, 549 F.3d at 693; *see Linde v. Arab Bank*, 97 F. Supp. 3d 287, 331 (E.D.N.Y. 2015). Plaintiffs' inability to plausibly allege such knowledge defeats their ATA claims.

The complaint's conclusory allegations that Chevron knew its oil payments would be used to fund "Saddam Hussein's anti-American, anti-Israel agenda," Cmplt. ¶ 56, are unsupported by "factual allegation[s] sufficient to plausibly suggest" such knowledge, and therefore must be disregarded. *Iqbal*, 556 U.S. at 683. The complaint highlights a series of statements that allegedly show Chevron's knowledge, *see* ¶¶ 56–57, but none of these even indicates that Chevron knew *Iraq* was supporting terrorism in Israel, let alone that it knew that Chevron's payments for oil were "supporting … a terrorist organization." *Boim*, 549 F.3d at 693.

- The alleged statements by Saddam Hussein and reports in Iraqi media are not alleged to have come to Chevron's attention. *See* ¶ 56(a), (b); (c); (d); (e).
- A February 2001 Washington Times report that Iraq "offered a total of $4 million to families of these 'martyrs,'" ¶ 56(b), referred to payments "to the family of

1    every Palestinian killed by Israeli forces" in the intifada, not payments focused on

2    suicide bombers or others engaged in terrorism.

3    • The complaint's citation of a memorial in honor of a Palestinian suicide bomber,

4    ¶ 56(f), points to nothing indicating any funding of terrorism in Israel.

5    • The statements by American officials in April and October 2002 were made after

6    the last attack involving any ATA plaintiffs.  Cmplt.  ¶¶ 8, 57.

7    In sum, plaintiffs fail to allege any basis for their conclusory assertions that Chevron

8    knew, at the times relevant to the ATA claims, that Iraq was financing terrorist attacks in Israel.

9    Absent plausible allegations of such knowledge, there was no violation of 18 U.S.C. § 2333.

10   **D.    Aiding-and-Abetting Liability Is Not Available Under 18 U.S.C. § 2333.**

11   Plaintiffs cannot remedy their failure to plead an ATA claim by proceeding on the theory

12   that Chevron aided and abetted ATA violations by others.  Notwithstanding early decisions to the

13   contrary, both Circuits to address the issue have rejected that view, and it is now well established

14   that "the ATA does not provide for secondary liability."  *In re Terrorist Attacks*, 714 F.3d at 123;

15   *accord Rothstein*, 708 F.3d at 97; *Boim*, 549 F.3d at 689–90; *Linde*, 97 F. Supp. 3d at 324 (same);

16   *In re Chiquita Brands*, 2015 WL 71562, at *5.

17   The reason is straightforward: *Central Bank of Denver v. First Interstate Bank*, 511 U.S.

18   164 (1994), held that "when Congress enacts a statute under which a person may sue and recover

19   damages from a private defendant for the defendant's violation of some statutory norm, there is

20   no general presumption that the plaintiff may also sue aiders and abettors," *id.* at 182, and

21   congressional intention to "impose . . . aiding and abetting liability" ordinarily cannot be inferred

22   from "statutory silence."  *Id.* at 185.  Not only is § 2333 silent as to aiding-and-abetting liability,

23   but multiple criminal provisions of the ATA do expressly refer to aiding-and-abetting liability.

24   *E.g.*, 18 U.S.C. §§ 2339B(d)(1)(F), 2332g(b)(5), 2332h(b)(5), 2339D(b)(6).  As *Rothstein* noted,

25   it is unlikely "that Congress, having included in the ATA several express provisions with respect

26   to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to

27   authorize civil liability for aiding and abetting through its silence."  708 F.3d at 98.

28   If there *were* aiding-and-abetting liability under § 2333, the complaint would still be

Chevron's Corrected Motion to Dismiss
3:15-CV-04916 JD

inadequate. The claim would require Chevron's "awareness of its role as part of an overall illegal activity, and [its] knowing and substantial assistance to the principal violation." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005). Here, the complaint pleads no basis for any claim that Chevron knew it was supporting terrorist activity, and, for the same reasons the complaint fails to plausibly allege proximate causation, it fails to plead that Chevron *substantially assisted* any terrorist acts. These deficiencies are fatal to an aiding-and-abetting claim.

## II.   PLAINTIFFS' ALIEN TORT STATUTE CLAIMS FAIL FOR MULTIPLE, INDEPENDENT REASONS.

The ATS claims also fail on multiple grounds. First, those claims arose in the years 2000–2002, and are untimely under the 10-year ATS statute of limitations. Second, the ATS claims are fundamentally claims for aiding and abetting the terrorist attacks that injured plaintiffs, and the complaint fails to plausibly allege both key elements of this claim: that Chevron acted with the *purpose* of advancing the terrorist acts, and that Chevron's oil purchases *substantially assisted* those acts. Third, plaintiffs fail to plead even the bare minimum for an ATS claim under *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004): a violation of the narrow category of well-defined norms of international law universally accepted by "civilized nations," *i.e.*, those "specific, universal, and obligatory." *Nestle USA*, 766 F.3d at 1019 (internal quotation marks omitted). Finally, plaintiffs' claims, given their overwhelming focus on overseas conduct, are impermissibly extraterritorial under *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

### A.   The ATS Claims Are Time-Barred.

The ATS statute of limitations is 10 years. *Deutsche v. Turner Corp.*, 324 F.3d 692, 717 (9th Cir. 2003). It begins to run when the plaintiff knows of his injury, even if he does not know the defendant's identity. *See Bradford v. Scherschligt,* 803 F.3d 382, 387 (9th Cir. 2015); *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984) ("Discovery of the cause of one's injury, however, does not mean knowing who is responsible for it. The 'cause' is known when the immediate physical cause of the injury is discovered."). The alleged injuries occurred between November 2000 and April 2002. Cmplt. ¶¶ 112–48. Thus, the limitations periods

1    expired long before plaintiffs' claims were filed October 26, 2015.

2         Contrary to plaintiffs' assertion, Cmplt. ¶ 33, equitable tolling is inapplicable.

3    "[E]quitable tolling is an extraordinary remedy" that applies only in "rare cases." *Lazerson v.*

4    *Colvin*, 2014 WL 967048, at \*4–5 (N.D. Cal. Mar. 6, 2014).  The plaintiff "'bears the burden of

5    establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some

6    extraordinary circumstances stood in his way.'"  *Id.* at \*4 (quoting *Credit Suisse Sec. (USA) LLC*

7    *v. Simmonds*, 132 S. Ct. 1414, 1419 (2012)).  Here, plaintiffs allege neither an "extraordinary

8    circumstance" nor their own due diligence.  Instead, they have merely asserted that "information

9    regarding Chevron's involvement in funding Saddam Hussein's acts of international terrorism

10   was not available … or reasonably discoverable" before October 2005.  Cmplt. ¶ 33.  They plead

11   no facts suggesting any effort to investigate their claims or any reason Chevron's role was not

12   discoverable.  Nor do their allegations reflect due diligence *after* 2005; in particular, they allege

13   no reason for delaying 10 years after 2005, despite initiating an almost identical lawsuit in 2009.

14   *See Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005) (rejecting equitable tolling where litigant

15   failed to "advance[] his claims within a reasonable time of their availability," and holding that

16   "petitioner's lack of diligence precludes equity's operation").

17        Nor can plaintiffs rely on equitable estoppel.  "Equitable estoppel, also termed fraudulent

18   concealment, halts the statute of limitations when there is *active conduct* by a defendant, *above*

19   *and beyond the wrongdoing upon which the plaintiff's claim is filed*, to prevent the plaintiff from

20   suing in time."  *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2003) (emphasis added) (internal

21   quotation marks omitted).  Plaintiffs "must plead with particularity the facts which give rise to the

22   claim of fraudulent concealment," and "must demonstrate that [they] relied on the defendant's

23   misconduct in failing to file in a timely manner."  *Id*. at 706–07 (internal quotation marks

24   omitted).  Here, plaintiffs allege only that Chevron's conduct was "surreptitious," and that its

25   internal accounting for the alleged kickbacks and extra port fees was improper.  Cmplt. ¶¶ 33, 7.

26   But these are not allegations of "active conduct . . . above and beyond the wrongdoing" that is the

27   basis of the lawsuit, "to prevent the plaintiff from suing in time."  *Guerrero*, 442 F.3d at 706

28   (citing and quoting *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000), *overruled on*

1    *other grounds by Scoop-Gonzalez v. I.N.S.*, 272 F.3d 1176 (9th Cir. 2001)).  Nor do plaintiffs

2    allege that they reviewed Chevron's accounting, let alone relied on it in any way in deciding not

3    to file suit within the limitations period.  *Santa Maria*, 202 F.3d at 1172 (reliance required for

4    equitable estoppel).  These deficiencies preclude application of equitable estoppel, and their

5    claims are time barred.

### B.    Plaintiffs Fail to Allege a Cognizable Claim for Aiding and Abetting Alleged Violations of the Law Of Nations.

Plaintiffs' three ATS claims all seek to impose secondary liability: Counts Five and Six—

based on alleged crimes against humanity and extrajudicial killing, respectively—are expressly

framed as aiding-and-abetting claims.  And, although Count Four, based on "financing terrorism,"

is alleged against Chevron as both a "direct actor" and "aide[r] and abette[r]," Cmplt. ¶ 183,

"[e]ven if articulated as a theory of direct or primary liability, financing the terrorism of others is

inherently accessorial." *Abecassis*, 704 F. Supp. 2d at 655.  Because such allegations, "however

the plaintiffs label them, are secondary in nature," "the analysis is the same" as for any other

claim of aiding-and-abetting liability under the ATS.  *Id.*

As *Abecassis* correctly held in dismissing similar ATS claims, allegations that a defendant

purchased Iraqi oil in violation of the OFFP and thereby provided funds to Iraq fail to establish

the requisites of aiding and abetting, and therefore fail to state a cognizable ATS claim.  Indeed,

the Second Circuit recently affirmed, on precisely this ground, the dismissal of ATS allegations

based on Chevron's alleged violations of the OFFP in purchasing oil from Iraq.  *See Mastafa*, 770

F.3d at 192.  The same reasoning is controlling here.

### 1.    The Complaint Fails to Satisfy the *Mens Rea* Element of an ATS Aiding-and-Abetting Claim.

Plaintiffs fail to satisfy the *mens rea* element of aiding and abetting, regardless of whether

the necessary state of mind is deemed to be mere knowledge or, as the weight of authority holds,

purpose to assist the violations.

"Customary international law—not domestic law—provides the legal standard for aiding

and abetting ATS claims." *Nestle USA*, 766 F.3d at 1023.  Thus, it is subject to *Sosa*'s

requirement that any imposition of ATS liability be based on an "international consensus" that

1    certain conduct provides a sufficient basis for liability.  *Abecassis*, 704 F. Supp. 2d at 654.

2         Although the Ninth Circuit has reserved the question, the two Circuits to have addressed

3    the issue—the Second and the Fourth[6]—have held that "knowledge is insufficient and that an

4    aiding and abetting ATS defendant must act with the purpose of facilitating the criminal act."

5    *Nestle USA*, 766 F.3d at 1023–24 (citing *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 399–400 (4th Cir.

6    2011); *Talisman*, 582 F.3d at 259.  As *Talisman* explained, "no [international] consensus exists

7    for imposing liability on individuals who knowingly (but not purposefully) aid and abet a

8    violation of international law."  582 F.3d at 259.  Accordingly, "[o]nly a purpose standard,

9    therefore, has the requisite 'acceptance among civilized nations,' for application in an action

10   under the ATS."  *Id.* (quoting *Sosa*, 542 U.S. at 732).

11        Under this standard, the ATS claims must be dismissed.  As the Second Circuit found in

12   *Mastafa*—in which the plaintiffs, as here, alleged that Chevron knowingly aided and abetted

13   violations of international law by purchasing oil in violation of the OFFP—"plaintiffs clearly do

14   not meet the *mens rea* requirement established in" *Talisman*.  770 F.3d at 192.  Here, too,

15   plaintiffs do not allege that Chevron acted with the purpose to assist Palestinian terrorism; to the

16   contrary, they expressly allege that Chevron's motivations were commercial.  Cmplt. ¶ 10.

17        Even if, contrary to the weight of authority, only knowledge were required for *mens rea*,

18   dismissal would still be required.  The complaint contains only wholly conclusory and inadequate

19   allegations of knowledge, such as the unsupported allegation that Chevron knew that the Iraqi

20   regime "funded and committed terrorist acts, such as suicide bombings, and other crimes against

21   humanity."  Cmplt. ¶ 8; *See Iqbal*, 556 U.S. at 683 (complaint must contain "factual allegation[s]

22   sufficient to plausibly suggest" that defendant had the applicable "state of mind").  Here, as

23   detailed in Point I(C), the complaint fails to allege facts to support the claim that Chevron knew

24   that money from its oil purchases would be used to fund terrorist attacks in Israel.

25        In sum, the complaint fails to plausibly suggest even knowledge by Chevron, let alone the

26   affirmative purpose to assist the terrorist attacks required by *Talisman* and *Aziz*.  *Cf. Mastafa*, 759

---

27        [6] The one opinion that was temporarily to the contrary, from the D.C. Circuit, has been
28   vacated, citing, *inter alia*, "changes in governing law regarding . . . the standard to be applied for
     aiding and abetting liability."  *Doe v. Exxon Mobil Corp.*, 527 Fed. Appx. 7, 7 (D.C. Cir. 2013).

F. Supp. 2d 297, 300 (S.D.N.Y. 2010) (holding that plaintiffs failed to plausibly plead even

"'actual knowledge' that [Chevron's] actions would contribute to the commission of human rights

abuses") *aff'd*, 770 F.3d 170, 192 (2d Cir. 2014).  The complaint thus fails to satisfy the *mens rea*

element of the ATS aiding-and-abetting claims.

### 2. The Complaint Fails to Plead That Chevron's Oil Payments Substantially Assisted the Terrorist Attacks.

To satisfy the *actus reus* element of an ATS aiding-and-abetting claim, "the assistance

offered must be substantial."  *Nestle USA*, 766 F.3d at 1026.  That is, the defendant can be liable

only if it "provides *practical* assistance to the principal which has a *substantial* effect on the

perpetration of the crime."  *Talisman*, 582 F.3d at 259 (emphasis added).

For much the same reason that the complaint fails to plead proximate cause, *see* Point

I(B), it fails to plead a plausible claim that Chevron's oil payments had any practical effect, let

alone a substantial one, on the alleged terrorist activities.  Multiple cases hold that merely being a

source of funds for a perpetrator of international law violations is not substantial assistance.  *See,*

*e.g.*, *Tymoshenko v. Firtash*, 2013 WL 1234821, at *10 (S.D.N.Y. Mar. 26, 2013) (assisting

perpetrators "by laundering money and shielding it from the Ukrainian authorities" fell "far short

of the 'substantial assistance' that is required to support a claim of secondary liability under the

ATS"); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 269 (S.D.N.Y. 2009) (

"[S]upplying a violator of the law of nations with funds—even funds that could not have been

obtained but for those loans—is not sufficiently connected to the primary violation to fulfill the

*actus reus* requirement of aiding and abetting a violation of the law of nations.").  In the

influential *Ministries Case*, for example, the Nuremberg Tribunal found that a banker who

facilitated large loans to a fund at the personal disposal of the head of the S.S. was not guilty of

aiding and abetting crimes against humanity.  *See id.* at 258.

Here, the claims against Chevron are even further removed from substantial assistance:

the complaint alleges only the attenuated claim that Chevron's oil payments reached Iraq

indirectly, and that one of Iraq's (presumably many) uses of its governmental funds was support

for terrorist attacks in Israel—in essence, a claim that Chevron aided and abetted an aider and

abetter.  The complaint does not allege that Chevron's oil payments themselves were transferred to terrorists, nor that the terrorists received more funding than they would have received absent Chevron's alleged role.  Thus, no basis exists for a plausible claim that Chevron's oil payments provided any "practical assistance" to the terrorists, let alone assistance that had "a substantial effect on the perpetration of the crime."  *Talisman*, 582 F.3d at 259.

### C.   Plaintiffs Do Not Allege a Violation of any International Norm Actionable under the ATS.

The ATS claims must also be dismissed because plaintiffs do not plead a violation of any international law norm actionable under the ATS.  Because the federal courts properly hesitate to judicially create federal common law causes of action, *Sosa* sets a high bar to recognizing any new category of ATS claims.  In particular, *Sosa* precludes recognizing any international-law norm under the ATS unless it is universally accepted and well defined; thus, no claim may be recognized "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when" the ATS was adopted in 1789.  *Sosa*, 542 U.S. at 732.  Even for norms clearing that hurdle, courts must exercise "judicial caution," *Kiobel*, 133 S. Ct. at 1664, analogous to the constraints on creating implied rights of action or new federal common law.  *Sosa*, 542 U.S. at 725–28.

### 1.   There Is No Actionable International Norm Against "Funding Terrorism," Let Alone One Against Indirectly Purchasing Commodities From a Government Listed as a State Sponsor of Terror.

Count Four alleges an international norm against "funding terrorism," which plaintiffs define as "the provision of funds or other material support to individuals, groups, or governments who may use the funds to commit a violent act against innocent civilians for purposes of intimidation or to persuade a government to do or abstain from doing an act."  Cmplt. ¶ 181.  This purported norm falls far short of the universal acceptance and definite content required by *Sosa*.

As an initial matter, even if there were a *Sosa*-compliant norm against "funding terrorism," Chevron is not alleged to have provided funds to any terrorist group, but rather to have been several steps removed from that description—*i.e.*, purchasing oil from third parties, who paid kickbacks that contributed to the total funds available to Iraq, which in turn used some

1    of its government funds to reward families of terrorists who committed attacks in Israel.  Thus,

2    even if there were international consensus on a specifically defined norm against funding

3    terrorism—and, as explained below, there is not—plaintiffs claim no consensus addressing the

4    type of conduct alleged here: engaging in business transactions that result in providing resources

5    to a state sponsor of terror.  While some *countries* (including the United States) have laws

6    limiting trade with state sponsors of terror like modern Iran, there is no consensus "binding

7    customary international law" principle, *Sosa*, 542 U.S. at 735, that prohibits such trade.

8            In any event, the courts have recognized that the persistent international disagreement

9    over what types of violence constitute terrorism means that there is no consensus prohibition on

10   "financing terrorism"—or even on terrorism itself—that can satisfy *Sosa*.  As *In re Terrorist*

11   *Attacks on Sept. 11, 2001*, held, addressing almost precisely the same time period at issue here,

12   "no universal norm against 'terrorism' existed under customary international law (*i.e.*, the 'law of

13   nations') as of September 11, 2001."  714 F.3d at 125; *see Vietnam Ass'n for Victims of Agent*

14   *Orange v. Dow Chem. Corp.*, 517 F.3d 104, 123 (2d Cir. 2009) (an ATS claim can be based only

15   on a rule of international law "that was universally accepted at the time of the events giving rise

16   to the injuries alleged").  As the court explained:

17           "We regrettably are no closer now ... to an international consensus
         on the definition of terrorism or even its proscription ….  [T]here
18           continues to be strenuous disagreement among States about what
         actions do or do not constitute terrorism, nor have we shaken
19           ourselves free of the cliché that 'one man's terrorist is another
         man's freedom fighter.'"
20

21   *In re Terrorist Attacks*, 714 F.3d at 125 (quoting *United States v. Yousef*, 327 F.3d 56, 106–08 (2d

22   Cir. 2003)).  Numerous other cases have agreed.  *See, e.g.*, *In re Chiquita Brands Int'l Inc. Alien*

23   *Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1318–22 (S.D. Fla. 2011)

24   (finding no actionable norm against financing terrorism); *Tel-Oren v. Libyan Arab Republic*, 726

25   F.2d 774, 795 (D.C. Cir. 1984) (Edwards J., concurring) (finding "the nations of the world are so

26   divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area

27   of harmony or consensus"), 806 (Bork, J., concurring) (finding "little or no consensus"

28

prohibiting terrorism); *Yousef*, 327 F.3d at 106–08 (no "international consensus on the definition of terrorism or even its proscription"); *Mwani v. Bin Ladin*, 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations.").

Contrary to plaintiffs' key assertion (Cmplt. ¶ 181), their cited international agreements and resolutions do not establish that a prohibition on financing terrorism is a "clear and definite norm[] of international law," and "universally accepted by the civilized world."  Most notably, the International Convention for the Suppression of the Financing of Terrorism (Financing Convention),[7] proves the *lack* of international consensus at the relevant time.  As the *In re Chiquita* court observed, "[i]n April 2002, when the Financing Convention came into force, only 26 of the 192 nations of the world, or roughly 14%, had ratified it."  792 F. Supp. 2d at 1319. Even as of February 2004, significantly after the time period alleged here, "111 States, or roughly 58% of the nations of the world, had ratified the Financing Convention.  These figures do not constitute the 'overwhelming majority' necessary to establish a widely accepted norm of international law prohibiting financial support for terrorism."  *Id.*; *see also Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003) (an international treaty "will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty").  Even among the signatories, many attached reservations, such as Egypt's declaration "that it 'does not consider acts of national resistance in all its forms, including armed resistance against foreign occupation and aggression with a view to liberation and self-determination, as terrorist acts.'"  *In re Chiquita*, 792 F. Supp. 2d at 1319.[8]

Most of the other cited agreements are irrelevant: some do not address terrorism at all, *see, e.g.*, Cmplt. ¶ 181(c); others do not address funding, *see, e.g.*, *id.* ¶ 181(b); many of them impose

_____

[7] G.A. Res. 54/109, U.N. Doc. A/Res/53/108 (Dec. 9, 1999).

[8] Notably, Congress chose not to create a civil cause of action implementing the Financing Convention.  *Krishanthi v. Rajaratnam*, 2010 WL 3429529, at *13 (D.N.J. Aug. 26, 2010).  Thus, creating a federal common law claim under the ATS for financing terrorism would "in effect rewrite[] legislation where Congress has previously contemplated the purported international norm."  *Id.*; *see also Sosa*, 542 U.S. at 731 (legislation on the same subject may implicitly preclude recognition of ATS claims); *City of Milwaukee v. Illinois*, 451 U.S. 304, 313–14 (1981).

no obligations on parties other than states, *see, e.g.*, *id.* ¶ 181(d)–(h); and some, such as Article 2 of the 1998 Arab Convention for the Suppression of Terrorism and Article 4 of the Convention on the Prevention and Combating of Terrorism, underscore the lack of international consensus even on the definition of terrorism, stating that struggles for "liberation or self-determination, including armed struggle against colonialism, occupation, aggression and domination by foreign forces shall not be considered as terrorist acts." *See* OAU Convention on the Prevention and Combating of Terrorism, July 14, 1999, 2219 U.N.T.S. 179.  None of them, in any event, provides any reason to diverge from the overwhelming authority holding that there is no international norm sufficiently universal or well defined to meets *Sosa*'s requirements.

In sum, claims based on a purported international norm against financing terrorism are not cognizable under the ATS.

**2.    Plaintiffs Have Not Alleged the Elements of a Primary Violation of the Norm Against Extrajudicial Killing.**

Plaintiffs' claim that Chevron aided and abetted extrajudicial killings fails—even aside from plaintiffs' inability to satisfy the *mens rea* or *actus reus* of aiding and abetting—because extrajudicial killing violates the law of nations only when perpetrated under color of law of a foreign nation.  *See, e.g.*, 28 U.S.C. § 1350, Note; *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1542 (N.D. Cal. 1987) (defining "summary execution" as "murder by the state").  Here, the terrorists who allegedly killed plaintiffs' decedents were not acting under color of law of any nation.  That the bombers' families purportedly received after-the-fact payments from Iraq in no way turns the terrorists' acts into conduct under the "actual or apparent authority" of a State.  § 1350.

**3.    Plaintiffs Have Not Alleged the Elements of a Primary Violation of the Norm Against Crimes Against Humanity.**

Plaintiffs fail to allege a cognizable claim based on crimes against humanity for the same reason.  The norm against crimes against humanity applies only to "a course of conduct 'pursuant to or in furtherance of a State or organizational policy to commit such attack.'"  *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 741 (9th Cir. 2008).  An "organization" is an entity that, while not formally a State, has "de facto control over a defined territory" where the crimes are committed, "similar to that of a State or government."  *Id.*

Plaintiffs allege that the terrorist acts were committed not by any State, but by Palestinian Islamic Jihad, Hamas and the Al-Aqsa Martyrs Brigade, Cmplt. ¶ 38, which plaintiffs acknowledge are not arms of the Iraqi government, but rather Palestinian groups to which Iraq merely provided funds. ¶¶ 100–02. No authority holds that mere financial support by a State turns independent terrorist acts into a crime against humanity. Moreover, as plaintiffs acknowledge, these terrorist groups were hardly a creation of (or controlled by) Iraq; they existed independent of, and long before, Iraq allegedly came to support them. *Id.*

### 4. Plaintiffs Cannot State an ATS Claim Based on Alleged "Treaty" Violations of the U.N. Charter or Security Council Resolutions.

Also meritless is plaintiffs' claim that they may recover under the ATS for a violation of a "treaty of the United States," 28 U.S.C. § 1350, based on claimed violations of the U.N. Charter and Security Council resolutions. Cmplt. ¶ 180. A U.S. treaty can provide the basis for an ATS claim only if the treaty is self-executing and confers rights on the plaintiffs and obligations on the defendant. *See Sosa*, 542 U.S. at 735 (ATS claim could not be based on a violation of the International Covenant on Civil and Political Rights because it is not self-executing); *Ruiz v. Fed. Gov't of Mexican Republic*, 2007 WL 2978332, at *3 (W.D. Tex. Sept. 28, 2007) (most treaties not actionable under the ATS because they are "contracts between or among independent nations, . . . [a]s such, they do not generally create rights that are enforceable in the courts") (citation and quotation marks omitted) (brackets and ellipsis in original) *aff'd*, 269 Fed. Appx. 451 (5th Cir. 2008).

Plaintiffs erroneously contend that Chevron's oil payments violated Articles 25 and 48 of the U.N. Charter and U.N. Security Council Resolutions 661, 670 and 687. Cmplt. ¶ 180. But those articles and resolutions impose rights and obligations only on Member States of the United Nations, not private individuals or entities.[9] Moreover, the U.N. Charter and Security Council resolutions are not self-executing. *See Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976); *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 340 (S.D.N.Y. 2013). Thus, they cannot be the basis for claims under the ATS. *Ruiz*, 2007 WL 2978332, at *4.

---

[9] *See* S.C. Res. 661, ¶ 4 (Aug. 6, 1990) (imposing obligations solely on States); S.C. Res. 670, ¶ 3 (Sept. 25, 1990) (same); S.C. Res. 687, ¶ 24 (Apr. 3, 1991) (same).

1          **D.    Plaintiffs' ATS Claims Are Impermissibly Extraterritorial.**

2          Under *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), an ATS claim "for

3   violations of the law of nations occurring outside the United States is barred" by the presumption

4   against extraterritorial reach of U.S. law. *Id.* at 1669.  To be actionable, claims must "touch and

5   concern the territory of the United States . . . with sufficient force to displace th[at] presumption."

6   *Id.*  That the defendant is a U.S. corporation, along with conclusory allegations that acts were

7   directed from the United States or benefits were derived in the United States, is insufficient to

8   displace the presumption. *Mujica v. AirScan Inc.*, 771 F.3d 580, 592-94 (9th Cir. 2014).

9          To determine whether a particular application of U.S. law is extraterritorial, courts must

10  look to "the 'focus' of congressional concern," defined by what "the statute seeks to regulate," or

11  "the objects of the statute's solicitude." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247,

12  266–67 (2010).  Where that "focus" occurs abroad, applying U.S. law is extraterritorial. *Id.* at

13  266.  For the ATS, the focus is the substantive violations of international law at issue. *See, e.g.,*

14  *Giraldo v. Drummond Co.*, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013) *aff'd sub nom.*

15  *Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015).

16         Here, the "focus" of the ATS claims occurred exclusively outside the United States.  The

17  suicide bombings and extrajudicial killings at issue here were committed by Palestinians in Israel

18  with alleged support from Iraq. *Cf. OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396

19  (2015) (the "gravamen" or "core" of a suit for Foreign Sovereign Immunities Act purposes arises

20  where the "acts that actually injured" plaintiffs occurred).  No allegation is made that any of those

21  atrocities was planned or initiated in the United States, and none of the injuries occurred in the

22  United States.  Accordingly, the ATS claims should be dismissed as impermissibly extraterritorial.

23         Plaintiffs allege, in impermissibly conclusory terms, that Chevron's acts "occurred within

24  the U.S., were directed from its corporate headquarters in the U.S., *and/or* were committed for the

25  benefit of Chevron Corporation, a U.S. citizen," and that unidentified "senior management"

26  approved negotiations with a direct purchaser of Iraqi oil including "illegal kickbacks." Cmplt.

27  ¶¶ 75, 178 (emphasis added).  Even if those conclusions were supported by fact allegations, they

28  would fail, given that the conduct that injured or killed plaintiffs and their relatives occurred in

Chevron's Corrected Motion to Dismiss
3:15-CV-04916 JD

1   Israel, and that the only conduct to which plaintiffs indirectly tie Chevron—the post-terrorism

2   payments by Saddam Hussein—occurred in the Palestinian territories. In these circumstances, it

3   cannot be said that the conduct actionable under the ATS "touches and concerns" the United

4   States "with sufficient force to displace the presumption."  133 S. Ct. at 1669.

5       This conclusion is reinforced by the fact that the only alleged United States conduct is

6   relevant, if at all, only to aiding and abetting.  The primary violations that Chevron allegedly

7   aided and abetted are plainly extraterritorial, and it is a "settled rule that claims of derivative

8   liability depend on the viability of the underlying claim." *Balintulo v. Daimler AG*, 727 F.3d 174,

9   192 n.28 (2d Cir. 2013).  It would be anomalous to adjudicate claims for aiding and abetting a

10  primary violation that itself is not actionable.  Moreover, the derivative nature of aiding and

11  abetting underscores that it is the primary violation conduct—all of which, in this case, occurred

12  outside the United States—that is the "focus" under *Morrison*.  Multiple courts have rejected

13  claims as extraterritorial when the domestic conduct related to accessorial liability, as in *Cardona*

14  *v. Chiquita Brands Int'l, Inc.*, in which the plaintiffs alleged that the defendant, from its U.S.

15  offices, reviewed, approved and concealed a scheme of support for Colombian terrorist

16  organizations.  760 F.3d 1185, 1194 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 1842 (2015).[10]

17  Even if the alleged aiding/abetting allegations are considered, they are insufficient as shown

18  above, which is an independent reason for rejecting the claims as extraterritorial.  *See Mastafa*,

19  770 F.3d at 181-94 (using a two-step test that broadens "focus" to include domestic conduct

20  relevant to secondary liability but dismissing case because domestic conduct did not meet

21  secondary liability standards).

22      Finally, this conclusion is aligned with a core concern motivating *Kiobel*—guarding

23  against judicial intrusion into foreign affairs best left to the political branches.  *Kiobel*, 133 S. Ct.

24

---

[10] *See Doe I v. Cisco Sys., Inc.*, 66 F. Supp. 3d 1239, 1246 (N.D. Cal. 2014) (U.S. corporation allegedly providing a security system for knowing use in human-rights violations was extraterritorial when abuses were not "planned, directed, or committed in the United States or directed against the United States"); *Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 759 (N.D. Ill. 2014) ("the substantial part of MPRI's challenged conduct occurred extraterritorially"); *see also Doe v. Drummond Co.*, 782 F.3d 576, 601 (11th Cir. 2015) (rejecting extraterritorial application of ATS for claims that aiding and abetting conduct in United States aided Colombian paramilitary group); *Baloco v. Drummond Co.*, 767 F.3d 1229, 1235–36 (11th Cir. 2014) (same).

1   at 1669.  The potential implications for U.S. foreign policy in the complicated Middle East of

2   trying claims of this nature—as well as the impracticalities of discovering and trying in U.S.

3   courts, *see Sosa*, 542 U.S. at 732–33, what happened over a decade ago on Israeli soil to hundreds

4   of plaintiffs, the roles of particular terrorists and terrorist groups, and the effect, if any, of

5   payments by Iraq—all strongly counsel against permitting the claims to proceed.

6   **III.     THE COMPLAINT SHOULD BE DISMISSED WITHOUT LEAVE TO AMEND.**

7            The complaint should be dismissed with prejudice, because any "amendment would be

8   futile."  *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991).  Among other things, no

9   amendment can cure plaintiffs' inability to satisfy the definition of "international terrorism"; to

10   plead proximate cause; to satisfy the requirements of an ATS aiding-and-abetting claim; or to

11   plead a violation of an international norm that satisfies *Sosa*.

12                                              **CONCLUSION**

13            For these reasons, the Complaint should be dismissed with prejudice.

14   Dated: December 21, 2015                    Respectfully submitted,

15                                               Jones Day

16

17                                        By:  /S/ Robert A. Mittelstaedt
                                               Robert A. Mittelstaedt
18

19                                        Counsel for Defendant
                                          CHEVRON CORPORATION
20

21   NAI-1500722382

22

23

24

25

26

27

28