UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARUCH YEHUDA ZIV BRILL, et al., | Case No. 15-cv-04916-JD |
| Plaintiffs, | |
| v. | **ORDER RE MOTION TO DISMISS** |
| | Re: Dkt. No. 24 |
| CHEVRON CORPORATION, | |
| Defendant. | |

This is a case brought by 329 individual plaintiffs against defendant Chevron Corporation. Plaintiffs are claimed victims of international terrorism. They allege that they or their family members were injured or killed in twenty-one separate terrorist attacks in Israel that were carried out under the direction of Saddam Hussein and with the material support of Chevron. On that basis, the plaintiffs who are United States nationals bring claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and the plaintiffs who are foreign nationals sue under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. Chevron has moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 24. The complaint is dismissed with leave to amend most but not all claims.

## BACKGROUND

The complaint makes the following allegations. "From his rise to power in the 1970s until his capture by United States' forces in 2003, Saddam Hussein and his Iraqi regime (collectively 'Saddam Hussein') engaged in countless international acts of terrorism involving extrajudicial killings, merciless bombings, and brutal abuses of human rights." Dkt. No. 1 ¶ 1. After Hussein's invasion of Kuwait in 1990, the United Nations ("UN") passed a resolution imposing a near-total blockade on any trade or transfer of resources to or from Iraq. *Id.* When the embargo was so effective that it led to famine and other dire consequences for the citizens of Iraq, the UN

established in 1996 an Oil-for-Food Program ("OFP").  *Id*. ¶ 3.  Under that program, the Iraqi government was permitted to export limited quantities of oil so long as all proceeds were deposited into an escrow account monitored by the UN that could be drawn upon only to purchase humanitarian goods for the benefit of the Iraqi people.  *Id*.

OFP allowed Iraq to decide who could buy oil, and beginning in August 2000, Hussein turned this authority into an opportunity to collect bribes by conditioning purchases on the payment of secret surcharges.  *Id*. ¶ 5.  Chevron was one of the entities that bought oil from Iraq during this time, and it paid illegal surcharges above the official selling price that was set by a UN committee.  *Id*. ¶ 65.  These surcharges were not deposited into the OFP escrow account, and Chevron falsely designated them as "premiums" in its own accounting.  *Id*. ¶¶ 6-7, 12.  Chevron paid these premiums not to Hussein directly, but to third parties through which it purchased oil.  *See*, *e.g.*, *id*. ¶¶ 70-75.  In 2007, the Securities and Exchange Commission ("SEC") filed suit against Chevron for these illegal payments.  As a part of the settlement of that suit, Chevron admitted to having paid approximately $20 million in illegal surcharges for Iraqi oil that were not deposited into the OFP escrow account, and it agreed to pay $27 million in disgorged profits and penalty payments.  *Id*. ¶ 12.

The complaint alleges that plaintiffs or their family members were among the victims of twenty-one separate terrorist acts.  *Id*. ¶ 13.  Some were injured and some died.  *Id*. ¶¶ 15, 27. Each attack took place in Israel at the hands of suicide bombers or gunmen.  *Id*. ¶¶ 16-26, 112-48. After the attacks, the terrorists' families received a check paid on behalf of Hussein in a televised ceremony.  *Id*. ¶ 109.  Plaintiffs allege that these payments, known as "President Saddam Hussein's Grant," "played an important role in persuading Palestinians to become suicide bombers" and "heavily influenced and motivated susceptible youths to join terrorist organizations and seek martyrdom."  *Id*. ¶¶ 107-10.  Chevron's payment of illegal surcharges and "kickbacks" is said to have contributed to the funds Hussein used to incentivize terrorist attacks in this way.  *Id*.

## DISCUSSION

## I.    ARTICLE III STANDING

As a threshold matter, the Court considers whether plaintiffs have standing under

Article III of the United States Constitution to bring this case in federal court.  The standing requirement is derived from Article III's case-or-controversy limitation on a federal court's jurisdiction, and was developed in case law "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).  The "irreducible constitutional minimum" of standing requires three things:  the plaintiff must have suffered an "injury in fact"; the injury must be "fairly traceable" to the challenged action of the defendant; and the injury must be "likely to be redressed by a favorable judicial decision." *Id.*; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S.Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

The Court has an independent duty to determine a plaintiff's standing to sue even when the parties do not raise the issue.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).  "Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotations omitted).

Here, the element of whether the alleged injuries are fairly traceable to the defendant requires scrutiny.  While it is certainly true that this is not the "'[f]irst and foremost' of standing's three elements," *Spokeo*, 136 S.Ct. at 1547 (internal citation omitted), plaintiffs must still allege facts demonstrating that it is present in this case.  Specifically, plaintiffs must allege "a causal connection between the injury and the conduct complained of" showing that the injury is the product of "the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

In response to questions about the sufficiency of the complaint in this respect, Chevron said it did not contest standing because it believed the case to be "exactly parallel" to *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013).  Dkt. No. 41 at 13:15-14:1.  That was an overstatement because the facts alleged in *Rothstein* were significantly stronger in demonstrating traceability for

United States District Court
Northern District of California

3

standing purposes.  The *Rothstein* plaintiffs spelled out a clear path connecting terrorist attacks by Hizbollah and Hamas in Israel, which injured or killed plaintiffs or their family members, to funds derived from the defendant's illegal transfers of U.S. currency to Iran, their financial sponsor. *Rothstein*, 708 F.3d at 87, 92-93.

Plaintiffs here also name terrorist organizations like Hamas, the Palestinian Islamic Jihad, and the Al-Aqsa Martyrs' Brigade, and allege Hussein's support of those organizations.  *See*, *e.g.*, Dkt. No. 1 ¶¶ 37-40.  But this case is different from *Rothstein* in that the complaint does not provide any plausible factual allegations linking those terrorist groups -- and Hussein's alleged support of them -- to the twenty-one attacks that injured plaintiffs.  Plaintiffs do not even allege that the suicide bombers or gunmen who perpetrated those attacks were affiliated with any particular terrorist faction.  The only stated connection is that the perpetrators' families received money from Hussein after the crimes.  *See id.* ¶¶ 16-26, 112-148.

This rather thin chain of causation contrasts rather than comports with *Rothstein*, but the Court nevertheless finds that plaintiffs allege enough to meet the fairly traceable element for Article III standing.  The Supreme Court has instructed that it is wrong to equate "injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."  *Bennett*, 520 U.S. at 168-69.  While it does not suffice if the alleged injury is "the result of the independent action of some third party not before the court," the Article III traceability requirement "does not exclude injury produced by determinative or coercive effect upon the action of someone else."  *Id.* (internal quotations omitted).  In addition, the rule in this circuit is that plaintiffs need not, for Article III purposes, "demonstrate that defendants' actions are the 'proximate cause' of plaintiffs' injuries."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).  It is sufficient to "establish a line of causation between defendants' action and their alleged harm that is more than attenuated," and a causal chain "does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible."  *Id.* (internal quotations and alterations omitted); *see also Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008) (Article III causation threshold is "less rigorous" than "the proximate causation that is necessary for civil RICO standing") (citing cases).

United States District Court
Northern District of California

The complaint meets these requirements.  Plaintiffs allege that Hussein had a practice of rewarding suicide bombers' families with compensation ranging between $10,000 and $25,000. Dkt. No. 1 ¶ 107.  Following a deadly attack, the perpetrators' families would be celebrated in a public ceremony that was heavily covered by Palestinian, European, American and Iraqi electronic and print media, and during the ceremony, the substantial payments would be presented to the family.  *Id*. ¶ 109.  These financial rewards are alleged to have been the single most effective strategy in inciting terrorist acts, as these were "life-changing sums of money" for the "poverty-stricken families of suicide bombers."  *Id*. ¶ 110.  Plaintiffs have further drawn a connection between those rewards and the attacks at issue here.  For each of the twenty-one terrorist attacks described in the complaint, the perpetrators' families are alleged to have received reward money afterwards.  *Id*. ¶¶ 16-26, 112-148.  And, plaintiffs allege, it was the illegal surcharge payments made by companies like Chevron that enabled, or at least increased the ability of, Hussein to give out these financial rewards.  *See*, *e.g.*, *id*. ¶¶ 108, 110.

These are more than conclusory allegations, and they are sufficient at this stage of the case to bring plaintiffs within "the category of litigants empowered to maintain a lawsuit in federal court."  *Spokeo*, 136 S.Ct. at 1547.  It may be that facts and evidence emerge in discovery that undermine or disprove these allegations.  If so, Chevron would be well-positioned to challenge standing, as it "represents a jurisdictional requirement which remains open to review at all stages of the litigation."  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) (citation omitted).  But the well-pleaded allegations in the complaint establish that Article III standing exists as of now.

## II.     ANTI-TERRORISM ACT CLAIMS

The parties dispute the viability of the claims under the Anti-Terrorism Act, 18 U.S.C. § 2333, by the plaintiffs who are United States nationals.  Dkt. No. 1 ¶¶ 150-75.  As an initial matter, both sides agree that there is no aiding and abetting liability under the ATA, and consequently the complaint must state a claim against Chevron as the primary violator.  Dkt. Nos. 24, 33.  The Court accepts that undisputed position, which is consistent with what other

United States District Court
Northern District of California

5

circuit courts have found.  *See*, *e.g.*, *Rothstein*, 708 F.3d at 97; *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 689 (7th Cir. 2008).

The parties disagree on whether the complaint sufficiently alleges a primary violation of the statute by Chevron.  The ATA's main substantive section, 18 U.S.C. § 2333(a), provides a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism."  The injured person or his or her estate, survivors or heirs may recover triple damages and attorney's fees.

"International terrorism" is defined in 18 U.S.C. § 2331(1) and consists of three elements. The first element is that the accused conduct must "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."  18 U.S.C. § 2331(1)(A).  To meet the criminal violation requirement, plaintiffs alleged in the complaint that Chevron committed acts dangerous to human life in violation of 18 U.S.C. § 2339A, 18 U.S.C. § 2332d and 18 U.S.C. § 2339C.  Dkt. No. 1 ¶¶ 150-59 (§ 2339A claim), ¶¶ 161-69 (§ 2332d claim), ¶¶ 170-75 (§ 2339C claim).  Plaintiffs forthrightly conceded at the motion hearing that 18 U.S.C. § 2339C could not be invoked because it postdates all of the attacks alleged in the complaint.  Dkt. No. 41 at 31:2-14.  The third ATA claim premised on a violation of 18 U.S.C. § 2339C is dismissed with prejudice for that reason.

The remaining ATA claims are dismissed, without prejudice, under the second definitional element of "international terrorism."  In addition to violating the criminal laws of the United States, the violent acts must "appear to be intended -- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).  Plaintiffs make no allegations whatsoever along these lines or about these conditions.  *See* Dkt. No. 1 ¶¶ 150-69.  They try to justify this silence by suggesting that Section 2331(1)(B) should not be treated as an independent element, and they cite *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008), as purported authority for this position.  *See* Dkt. No. 33 at 8.  But *Boim* says no such thing.  The Seventh

6

1    Circuit expressly found that donations to Hamas "would 'appear to be intended . . . to intimidate

2    or coerce a civilian population' or to 'affect the conduct of a government by . . . assassination'" as

3    required by § 2331(1)(B).  549 F.3d at 693-94.  This was because it would have been a

4    "foreseeable consequence" to a "knowing donor to Hamas -- that is, a donor who knew the aims

5    and activities of the organization," that "donations to Hamas, by augmenting Hamas's resources,

6    would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel."  *Id*.

7         Contrary to plaintiffs' suggestion, *Boim* indicates that § 2331(1)(B) needs to be met in its

8    own right as a required element of "international terrorism."  And unlike *Boim*, the factual

9    allegations here do not establish that terrorism was a "foreseeable consequence" of Chevron's

10   actions such that the outward appearance requirement of § 2331(1)(B) has already been satisfied.

11   *Boim* concerned a "knowing" -- and direct -- "donor to Hamas."  549 F.3d at 694.  The allegations

12   here are not nearly as immediate.  Chevron is alleged at most to have made payments to third

13   parties, and while the complaint alleges that Chevron "was aware that illegal kickbacks were being

14   paid on its behalf to Saddam Hussein outside the OFP," Dkt. No. 1 ¶ 69, those allegations are

15   conclusory and without adequate support.  The non-conclusory allegations state that Chevron

16   "turned a blind eye" when records showed that the premiums it was paying to third parties

17   "increased noticeably when Saddam Hussein began demanding kickbacks in August 2000," and

18   that Chevron "routinely purchased oil from unknown entities without conducting any background

19   checks or investigation into potential ties with Saddam Hussein." *Id*. ¶ 70.  But these are a far cry

20   from an allegation that Chevron was a knowing and direct donor to Hussein akin to the allegations

21   in *Boim*.  The allegation here is more that Chevron should have, but didn't, take a harder look at

22   the consequences of its payments.  That is not enough.  Where the alleged link between Chevron's

23   payment of bribes, Hussein and the attacks is so attenuated, it is impossible to apply the logic of

24   *Boim* (which is not controlling in any event) to say that plaintiffs have satisfied the requirement of

25   alleging that Chevron's payments "appear[ed] to be intended -- (i) to intimidate or coerce a

26   civilian population; (ii) to influence the policy of a government by intimidation or coercion; or

27   (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," 18

28   U.S.C. § 2331(1)(B).  Plaintiffs will need to try again if they want to pursue this claim.

United States District Court
Northern District of California

7

United States District Court
Northern District of California

If plaintiffs choose to amend the ATA claim, attention should also be given to the proximate causation element in Section 2333(a)'s "by reason of" language.  The parties do not dispute that proximate causation is the applicable standard.  Dkt. Nos. 24, 33.  Although our circuit has not addressed how it should be applied to claims under the ATA, the proximate causation standard articulated by the Second Circuit in *Rothstein v. USB AG*, 708 F.3d 82 (2d Cir. 2013) and *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013), is well-reasoned and compelling, and the Court applies it here.  Plaintiffs fall short under that test because they do not allege that Chevron "participated in" the twenty-one terrorist attacks that injured plaintiffs or that they "provided money directly to" Hussein; nor are there factual allegations that the premiums paid by Chevron "actually [were] transferred to [Hussein] and aided in" the twenty-one attacks.  *See* 714 F.3d at 124.  Plaintiffs have a particularly steep causation mountain to climb because their claim is premised on financial rewards Hussein is alleged to have paid after the commission of terrorist attacks.  This issue warrants careful consideration should plaintiffs choose to amend, with an appreciation of the fact that what is adequate for traceability in the context of standing might be inadequate for substantive causation purposes.  *See Rothstein*, 708 F.3d at 92-97 (finding Article III standing satisfied, but higher bar of proximate causation under the ATA was not).

## III.   ALIEN TORT STATUTE CLAIMS

The claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, are brought by the plaintiffs who are foreign nationals.  Dkt. No. 1 ¶¶ 176-94.  Each ATS claim alleges a different violation of the "law of nations."  *Id.* ¶¶ 176-84 (financing terrorism); 185-89 (crimes against humanity); 190-94 (extrajudicial killings).  Under the ATS, "[t]he district courts . . . have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

Chevron makes the initial argument that plaintiffs' claims are time-barred under the 10-year statute of limitations that applies to ATS claims.  Dkt. No. 24 at 13-15.  Chevron says that, because the alleged attacks took place between November 2000 and April 2002, the limitations period expired years before plaintiffs filed suit on October 26, 2015.  *Id.*  Plaintiffs do not contest

that the applicable limitations period is ten years, but argue that the limitations period was tolled "because they did not know, nor could they know, of their potential claims until October 27, 2005, at the earliest, when the UN published the 'Volcker Report' on the millions of dollars paid to Hussein by various entities, including Chevron." Dkt. No. 33 at 12. Chevron does not dispute that equitable tolling can be applied to plaintiffs' ATS claims, but contends that the doctrine cannot be applied here because "the allegedly necessary information was known nearly 10 years before plaintiffs sued." Dkt. No. 34 at 11.

That might or might not be true, but this pleading motion is not the time or place to test the facts. As our circuit court has held, "[g]enerally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003-04 (9th Cir. 2006). This is not a rare case warranting a departure from the general rule, and the statute of limitations defense is denied without prejudice pending pertinent discovery. *See* Dkt. No. 1 ¶ 33 (alleging plaintiffs "did not know or have reason to know of their potential claims against Chevron until at least October 27, 2005," when Volcker Report was issued), *and compare with Huynh*, 465 F.3d at 1004 (observing that, "[h]ad appellants offered any indication that, until recently, they themselves were unaware of their claims, were held in reeducation camps, or were in refugee camps, we would gladly consider their equitable tolling argument," and affirming denial of 30-year tolling).

While not necessarily time-barred, the complaint fails to state a plausible ATS claim. The Ninth Circuit's examination of the ATS in *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014), drives this finding. *Nestle* addressed in detail the *mens rea* requirement for an aiding and abetting ATS claim. 766 F.3d at 1023-27. Plaintiffs here do not dispute that all three of their ATS claims are aiding and abetting claims. *See* Dkt. No. 33 at 14-15. Although *Nestle* expressly left open the question of whether the correct *mens rea* standard was mere knowledge or a heightened purpose standard, *see* 766 F.3d at 1024 ("we need not decide whether a purpose or knowledge standard applies to aiding and abetting ATS claims"), the court focused on whether the more stringent purpose standard had been met. *See id.* at 1024-26. *Nestle* also took note of the fact that

the Second and Fourth Circuits have adopted a purpose standard.  *See id.* at 1023-24 ("two of our sister circuits have concluded that knowledge is insufficient and that an aiding and abetting ATS defendant must act with the *purpose* of facilitating the criminal act") (emphasis in original) (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) and *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 399-400 (4th Cir. 2011)).

      *Nestle*, then, points strongly toward purpose as the governing *mens rea* standard, and the Court has little trouble concluding that it is not met here.  *Nestle* was a case brought by former child slaves who had been forced to harvest cacao in the Ivory Coast.  The court held that the purpose standard was satisfied not only "because the defendants intended to profit by doing business in the Ivory Coast," 766 F.3d at 1025, but also because "the defendants allegedly intended to support the use of child slavery as a means of reducing their production costs.  In doing so, the defendants sought a legitimate goal, profit, through illegitimate means, purposefully supporting child slavery."  *Id.* at 1025-26.  No similar alignment of interest is alleged for Chevron's pursuit of profit on the one hand and any desire on Chevron's part to pay surcharges to Saddam Hussein or to encourage his acts of terrorism on the other.  Instead, Chevron is alleged to have paid these surcharges "so that its supply of Iraqi oil would not be cut off."  Dkt. No. 1 ¶ 10.  And unlike the defendants in *Nestle*, paying premiums to Hussein did not reduce Chevron's costs, it increased them.  Consequently, this case stands in a different category than *Nestle*, and this difference defeats a finding that the allegations here satisfy a purpose standard of *mens rea*.

      Even if mere knowledge were enough, the complaint would still fail.  The non-conclusory allegations in the complaint show at most that Chevron knew that it was paying premiums; they do not sufficiently show that Chevron knew that those premiums were going into the hands of Saddam Hussein, much less that they were then being used to finance terrorism, crimes against humanity and extrajudicial killings.  *See*, *e.g.*, Dkt. No. 1 ¶¶ 72 (internal Chevron e-mail regarding amount of premium to be paid, but without discussion of whom the premium would ultimately go to); 75 (Chevron employee "kept Chevron's senior management informed regarding his negotiations with Loioli [owner of third-party company through which Chevron purchased Iraqi oil], including the inclusion of the illegal kickbacks").

10

Consequently, plaintiffs' current allegations do not adequately allege the *mens rea* element of an ATS claim, whether measured against a purpose or knowledge standard.  Because that is enough to dismiss these claims, the Court does not reach the other ATS issues raised by defendant.[1]

## CONCLUSION

The complaint is dismissed.  Plaintiffs may amend the ATS claim and the ATA claim other than for a violation of 18 U.S.C. § 2339C by **February 13, 2017**.  As the Court made clear at the motion hearing some time ago, the parties were to move forward with discovery.  Dkt. No. 41 at 51:7-10.  The Court anticipates that any fruits of those discovery efforts will be reflected in the next version of plaintiffs' complaint.

**IT IS SO ORDERED.**

Dated:  January 9, 2017

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

---

[1] After the motion to dismiss hearing, Chevron submitted a statement of recent decision pointing the Court to *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090 (2016).  Dkt. No. 48. Plaintiffs objected and requested leave to file a response.  Dkt. No. 49.  Because the *RJR Nabisco* case concerns extraterritoriality issues the Court does not address at this time, the Court strikes the statement of recent decision and denies plaintiffs' request for leave to file a response as moot.  The parties may of course address the case as warranted in any future rounds of pleadings challenges.