Raymond P. Boucher, State Bar No. 115364
  *ray@boucher.la*
Maria L. Weitz, State Bar No. 268100
  *weitz@boucher.la*
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903
Tel:    (818) 340-5400
Fax:    (818) 340-5401

Gavriel Mairone, Esq. (*pro hac vice* pending)       Mark J. Geragos, State Bar No. 108325
  *ctlaw@mm-law.com*                                    *mark@geragos.com*
Bena N. Ochs, Esq. (*pro hac vice* pending)          Ben Meiselas, State Bar No. 277412
  *bena@mm-law.com*                                     *ben@geragos.com*
MM-LAW LLC                                           GERAGOS & GERAGOS
980 North Michigan Avenue, Suite 1400               644 S. Figueroa Street
Chicago, Illinois 60611                             Los Angeles, California 90017
Tel:    (312) 253-7444                              Tel:    (213) 625-3900
Fax:    (312) 275-8590                              Fax:    (213) 625-1600

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| (1) BARUCH YEHUDA ZIV BRILL, et al., | Case No. 15-cv-04916-JD |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | The Hon. James Donato |
| CHEVRON CORPORATION, et al., | Trial Date:          None Set |
| Defendant. | |

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................................................1

II. PARTIES .....................................................................................................................4

    A.    Anti-Terrorism Act Plaintiffs ...........................................................................4

    B.    Alien Tort Statute Plaintiffs .............................................................................4

    C.    Defendants........................................................................................................5

III. STATUTE OF LIMITATIONS ...................................................................................6

IV. JURISDICTION AND VENUE ..................................................................................6

V. FACTUAL ALLEGATIONS .......................................................................................7

    A.    Saddam Hussein's Involvement in and Support for Acts of Terrorism
           Against the U.S. and Israel was Well-Known to Chevron and the World at
           Large..................................................................................................................9

    B.    The UN Established the Oil-For-Food Programme to Provide for Iraq's
           Citizens  While Keeping Funds out of Saddam Hussein's Hands. ...................12

    C.    Chevron's Payment of Illegal Surcharges to Saddam Hussein Would
           Appear to Be Intended to Intimidate or Coerce a Civilian Population .................13

          1.    Saddam Hussein Set the Selling Price and Chose the Buyers of
                  Iraq's Oil ...............................................................................................13

          2.    Chevron's Support for Saddam Hussein Increased Profits by
                  Ensuring Oil Would be Available for Purchase at Prices Below
                  Market Value...........................................................................................15

    D.    The Funding of International Acts of Terrorism Was a Foreseeable
           Consequence of Chevron's Payments of Illegal Surcharges...................................21

          1.    UN Sanctions Had Effectively Crippled Saddam Hussein's Ability
                  to Commit International Acts of Terrorism...................................................21

          2.    Chevron Knew its Third-Party Intermediaries Directed Illegal
                  Surcharge Payments to Saddam Hussein. ....................................................22

          4.    Chevron Knew its Illegal Surcharge Payments Were Funneled to
                  Saddam Hussein's "Slush Fund" For Terrorist Activities ...........................33

    E.    Chevron's Use of Third-Party Intermediaries to Engage in Illegal
           Transactions on Its Behalf Concealed Chevron's Role in Financing Saddam
           Hussein's Terrorist Activities.................................................................................36

    F.    With Funds From the Surcharge Scheme, Saddam Hussein Joined Forces
           with Other Terrorist Groups to Attack U.S. and Israeli Citizens .............................40

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1.  Saddam Hussein Used Funds From the Illegal Kickback Scheme to Recruit and Compensate Suicide Bombers and Other Terrorists ................43

2.  Saddam Hussein's Army of Surcharge-Funded Suicide Bombers Committed Countless Acts of Terrorism Against U.S. and Israeli Citizens, Including the Heinous Attacks Against Plaintiffs ........................47

a.  November 22, 2000:  Hadera Bus Station ........................................48

b.  January 1, 2001: Herzel and Dizengoff Street in Natanya. Israel ....................................................................................................49

c.  March 3, 2001: Main Street in Netanya, Israel ...............................50

d.  March 27, 2001 Hagiva Hatzarftit Junction in Jerusalem ...............50

e.  March 28, 2001: Neveh Yamin/Kfar Saba Junction, Israel ............51

f.  May 18, 2001: Hasharon Mall in Netanya, Israel ..........................52

g.  May 25, 2001: Central Station in Hadera ........................................53

h.  June 1, 2001: Dolphinarium Dance Club in Tel Aviv, Israel ..........53

i.  July 16, 2001:  Bus Stop in Binyamina, Israel ...............................54

j.  August 9, 2001:  Sbarro Restaurant in Jerusalem, Israel ................54

k.  October 4, 2001:  Bus Station Afula, Israel ...................................55

l.  November 4, 2001:  French Hill Intersection in Jerusalem .............55

m.  November 27, 2001:  Central Bus Station in Afula, Israel .............57

n.  December 1, 2001: Ben Yehudah Street in Jerusalem, Israel .........58

o.  March 2, 2002:  Beit Israel Neighborhood in Jerusalem, Israel ....................................................................................................59

p.  March 5, 2002: Egged No. 823 Bus at Bus Station in Afula, Israel ....................................................................................................60

q.  March 9, 2002: Café Moment in Jerusalem, Israel .........................60

r.  March 20, 2002:  Egged No. 823 Bus in Wadi Ara, Israel .............62

s.  March 31, 2002: Matza Restaurant in Haifa, Israel ........................62

t.  April 10, 2002:  Egged No. 960 Bus ...............................................63

u.  April 12, 2002: Bus Stop on Jaffa Road in Jerusalem, Israel ..........63

VI. PRAYER FOR RELIEF ................................................................................83

Case No. 15-cv-04916-JD
FIRST AMENDED COMPLAINT

# I.

## INTRODUCTION

1.     From his rise to power in the 1970s until his capture by United States' ("U.S.") forces in 2003, Saddam Hussein and his Iraqi regime (collectively "Saddam Hussein") engaged in countless international acts of terrorism involving extrajudicial killings, merciless bombings, and brutal abuses of human rights. In 1990, Saddam Hussein launched an unprovoked military takeover of Kuwait. Saddam Hussein's ruthless attack on the tiny Gulf state was met with unanimous outrage from world leaders. The United Nations ("UN") called for decisive economic action against Iraq by passing a series of resolutions imposing economic sanctions designed "to cripple Iraq totally," chiefly by ensuring the international community "refus[ed] to buy any of [Iraq's] oil." To that end, UN Resolution 661 (1990) imposed a near-total blockade on any trade or transfer of resources to or from Iraq.

2.     While the UN sanctions effectively curtailed Saddam Hussein's ability to carry out terrorism by cutting off his access to funds needed to carry out such attacks, the complete economic isolation of Iraq also led to widespread epidemic and famine among its poverty-stricken citizens. Saddam Hussein's neglect for the Iraqi people led the UN to establish the Oil-for-Food Program ("OFP") in 1996. The OFP authorized the Iraqi government to export limited quantities of oil so long as *all* proceeds were deposited into an escrow account monitored by the UN and used only to purchase humanitarian goods and necessary services for the benefit of all Iraqi people. In other words, the OFP was designed to ensure funds were available and used for Iraq's legitimate government services and not for Saddam Hussein and his terrorist agenda.

3.     With the participation of a number of profit-motivated groups and corporations from around the world, including Defendant Chevron Corporation ("Chevron"), Saddam Hussein was able to manipulate the OFP to illegally funnel resources away from the UN-monitored escrow account and toward re-establishing his publically known global terrorism network, including payments to suicide bombers and other terrorists who engaged in crimes against humanity and extrajudicial killings.

4.     Because Saddam Hussein retained the power to set the price of Iraqi oil and the power to choose the entities with which Iraq would do business, in or around August of 2000, Saddam Hussein began conditioning the right to purchase oil under the OFP upon a purchaser's willingness to

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

pay secret surcharge payments to him. The proceeds from the surcharges bypassed the OFP escrow account and ultimately went into a private "slush" fund that Saddam Hussein used to pay for crimes against humanity and acts of terrorism against the U.S. and other foreign nations, including the acts committed against Plaintiffs. For this very reason, these surcharge payments were expressly forbidden under the OFP and the laws of the United States and the international community.

5.      Saddam Hussein also demanded extra fee payments before allowing Iraq's crude oil onto the cargo ships and chartered vessels docked in the Iraqi ports. Chevron knowingly paid extra port fees destined for Saddam Hussein, recording these kickbacks as part of the total price for loading the oil onto chartered vessels. These fees, like the surcharges, were illegally paid outside of the OFP and directly into bank accounts used by Saddam Hussein to fund terrorist activities.

6.      Soon after Saddam Hussein implemented his plan to use mandatory surcharges to siphon funds out of the OFP and away from legitimate services for Iraq's citizens, he began publicly offering life-changing sums of money to suicide bombers and other terrorists in exchange for carrying out his stated goal of displacing American interests in the Middle East and destroying the State of Israel. Saddam Hussein announced that such funds would be paid to surviving family members of anyone who successfully carried out acts of terrorism against the U.S. and Israel, and then followed through with his promise by making the payments part of public ceremonies designed to celebrate the "martyr" and broadcast the legitimacy of the promised payments. In this way, Saddam Hussein induced countless individuals to perpetrate deadly acts of terrorism, including those that injured Plaintiffs, by promising to pay and actually paying up to $25,000 in exchange for a successful attack. These payments, known as "Saddam's Grant," would not have been possible without the funds paid to Saddam Hussein through his illegal surcharge program.

7.      Saddam Hussein guaranteed the success of his illegal surcharge program by dramatically underpricing Iraqi oil. By setting the OFP sale price well below market value, Saddam Hussein could demand an additional surcharge payment while still keeping the overall price below market. Profit-motivated purchasers, including Chevron, had ample incentive to support Saddam Hussein, his continued reign, and his terrorist agenda: the continued availability of oil for less than market value. Indeed, between July 2000 and December 2002, Chevron illegally purchased over 78

BOUCHER LLP

21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

million barrels of Iraqi oil and paid approximately $20 million dollars in illegal kickbacks that bypassed the OFP escrow account in favor of "secret" bank accounts in Jordan and Lebanon that were controlled by Saddam Hussein. In blatant violation of UN sanctions and U.S. law, Chevron failed to properly record the nature of its oil payments by falsely, purposefully, and intentionally designating these illegal kickback payments as "premiums" to third parties/intermediaries in its accounting.

8.      Chevron's illegal payments caused the very thing the UN designed the OFP to prevent: the sale of Iraqi oil to fund deadly acts of terrorism. By participating in the illegal kickback scheme, Chevron knowingly and intentionally provided illegal financial and material support to Saddam Hussein, a designated state sponsor of terrorism. Based on publicly available reports and its own internal intelligence gathering, as well as U.S. and international laws designating Saddam Hussein as a state sponsor of terrorism and forbidding any business transactions with him or Iraq outside the OFP, Chevron knew that any financial or material support to Saddam Hussein would be (and was) used to incite, direct, and finance violent terrorist attacks of the type suffered by Plaintiffs. Chevron also knew, based on its own intelligence gathering and the OFP program regulations, that funds paid outside the OFP would not be used for any legitimate purpose because the OFP escrow account funded Iraq's legitimate government functions. Thus, when Chevron agreed to pay illegal kickbacks outside the OFP, it was reasonably foreseeable and anticipated that Saddam Hussein would use this money to engage in acts of terrorism and to pay the rewards he promised to the suicide bombers who killed and injured U.S. and foreign nationals, including Plaintiffs herein.

9.      In 2007, the Securities and Exchange Commission ("SEC") filed suit against Chevron for its payment of illegal surcharges to Iraq in violation of the OFP. The resulting non-prosecution agreement included an admission by Chevron that it had paid approximately $20 million in illegal surcharges that were not deposited into the OFP escrow account. Chevron agreed to pay a total of $27 million ($25 million in disgorged profits and a $2 million civil penalty) to the Department of Justice, the U.S. Treasury, and the District Attorney's Office of New York County. Now, this lawsuit seeks compensation for the victims of the terrorist attacks that Chevron helped to finance.

/ / /

/ / /

## II.

## PARTIES

10.     This complaint is brought on behalf of 18 U.S. nationals and 298 foreign nationals injured in their person, property, or business by reason of the twenty-one separate acts of international terrorism ordered, funded, and executed under the direction of Saddam Hussein and with the material support of Chevron.

11.     Because of the substantial assistance Chevron provided to Saddam Hussein, knowingly or with conscious disregard of the fact that money would be used to fund acts of international terrorism, extrajudicial killings, and crimes against humanity by virtue of its material financial support to a notorious sponsor of international terrorism, Chevron is liable to Plaintiffs under the Anti-Terrorism Act of 1990, 18 U.S.C. § 2333, and/or the Alien Tort Statute, 28 U.S.C. § 1350.

### A.     Anti-Terrorism Act Plaintiffs

12.     Plaintiffs (1) through (20), described below in Paragraphs 247 through 253, 259 through 261, and 268 through 270, are United States citizens who suffered substantial injuries as a result of international terrorism, extrajudicial killing, genocidal conduct, and crimes against humanity, or are the estates, survivors, or heirs of United States citizens who suffered such injuries.

### B.     Alien Tort Statute Plaintiffs

13.     Plaintiffs (3), (8) through (9), (12), (14) through (17), (19) through (23), (26) through (39), (41) through (179), (181) through (187), (189) through (194), (196) through (226), (231) through (241), (243) through (259), (261) through (314), and (316) through (329), described below in Paragraphs 213 through 214, Paragraphs 218 through 219, Paragraph 222, Paragraphs 225 through 226, Paragraphs 228 through 229, Paragraphs 231 through 232, Paragraphs 234 through 235, Paragraphs 237 through 238, Paragraphs 240 through 241, Paragraph 243, Paragraph 245, Paragraphs 247, Paragraph 254, Paragraphs 256-257, Paragraph 259, Paragraph 262, Paragraph 264, Paragraph 266, Paragraph 268, Paragraph 271, Paragraphs 273 through 274, Paragraphs 276 through 277, Paragraph 279, Paragraphs 281 through 282, are foreign national victims of international terrorism, extrajudicial killings, and other crimes against humanity that were financed, in part, by Chevron's illegal kickbacks to Saddam Hussein. They include persons injured and close family members or

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

representatives of persons killed or injured in suicide bombings and other shockingly egregious acts of international terror, extrajudicial killing, and crimes against humanity. These Plaintiffs are citizens of Israel and various other countries, not including the United States.

14.     Plaintiffs' damages were proximately caused by the actions of Chevron, who supported, assisted, conspired with, funded, and aided Saddam Hussein in violation of U.S. and international law and with full knowledge or reckless disregard of Saddam Hussein's acts of international terrorism, extrajudicial killings, inhumane and degrading treatment, and other crimes against humanity.

**C.     Defendants**

15.     Defendant Chevron Corporation is a multinational corporation incorporated in the state of Delaware. Chevron's headquarters and principal place of business is located in San Ramon, California. Chevron is involved in the production, processing, marketing, and transportation of crude oil and petroleum products, and conducts business in the United States and approximately 180 other countries. Chevron has approximately 61,456 employees worldwide and in 2014, reported $19.241 billion in net income.

16.     Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 9, inclusive; therefore, Plaintiffs sue these defendants by such fictitious names. Plaintiffs are informed and believe that each of the fictitiously named defendants are legally responsible in some manner for the occurrences herein alleged, assisted in and about the wrongs complained herein by providing financial support, advice, resources, or other assistance. Plaintiffs will seek leave to amend the complaint to allege their true names and capacities when ascertained.

17.     As used herein, the terms "Defendants" and "Chevron," unless otherwise specified, refer collectively to Chevron Corporation and DOES 1 through 9, inclusive.

18.     At all relevant times, each of the Defendants was the agent, servant, employee, co-conspirator and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant was acting within the course and scope of this agency, employment, conspiracy, and/or joint venture, and was acting with the consent, permission and authorization of each of the other Defendants. All actions of each Defendant, as alleged in the causes of action stated

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   herein, were ratified, approved, and/or authorized by every other Defendant with full knowledge of

2   such acts. Defendants are thus jointly and severally liable for such actions.

### III.

### STATUTE OF LIMITATIONS

19.     A ten-year statute of limitations ("SOL") generally applies to claims arising under the Anti-Terrorism Act and the Alien Tort Statute. The statutes of limitations on Plaintiffs' claims alleged herein were tolled because Plaintiffs did not know or have reason to know of their potential claims against Chevron until at least October 27, 2005, when the UN-appointed Independent Inquiry Committee issued its report (the "Volcker Report") on Saddam Hussein's manipulation of the Oil for Food Program and the assistance provided to him by various entities, including Chevron. Prior to October 27, 2005, Plaintiffs did not and could not have known or reasonably suspected that Chevron's conduct was a substantial factor in causing the injuries and damages alleged herein because—due to the surreptitious nature of Chevron's conduct—information regarding Chevron's involvement in funding Saddam Hussein's acts of international terrorism was not available to or reasonably discoverable by Plaintiffs.

### IV.

### JURISDICTION AND VENUE

20.     **Jurisdiction**.  This Court has original subject matter jurisdiction over this action pursuant to the Anti-Terrorism Act of 1990, 18 U.S.C. § 2331, et seq., and specifically 18 U.S.C. § 2333(a), and 28 U.S.C. § 1331, and pursuant to 28 U.S.C. § 1350, as an action by non-U.S. citizens for torts committed in violation of the law of nations or a U.S. treaty.

21.     **Venue**.  Venue is proper in this District pursuant to 18 U.S.C. § 2334 and 28 U.S.C. § 1391(b) because Chevron's headquarters and principle place of business is in San Ramon, California.

22.     **Intradistrict Assignment**.  A substantial part of the events or omissions giving rise to this complaint occurred at or were directed from Chevron's San Ramon headquarters, which is within Contra Costa County. Pursuant to Local Rule 3-2(d), this action must be assigned to the San Francisco Division or the Oakland Division.

### V.

Case No. 15-cv-04916-JD

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

## FACTUAL ALLEGATIONS

23.     This complaint seeks damages and other relief arising out of Chevron's provision of illicit material and financial support to Saddam Hussein and his embattled regime. With funding provided, in part, by Chevron, Saddam Hussein had the means to fund, direct, and authorize his agents within notorious terrorist organizations, such as the Islamic Resistance Movement ("Hamas"), the Palestinian Islamic Jihad ("PIJ"), and the Al-Aqsa Martyrs' Brigade and ("AAMB") to commit egregious human rights violations and felonious and tortious acts of international terrorism against U.S. and foreign nationals. These acts included attempted murder, murder, maiming, and infliction of psychological pain upon Plaintiffs.

24.     Through contracted agents and hired hit men within Hamas, the PIJ, and the AAMB, Saddam Hussein was able to engage in a systematic and widespread campaign of suicide bombings and other murderous crimes against humanity and acts of international terrorism. These costly agreements and terrorist attacks were financed, in part, by the illegal kickback payments knowingly made by Chevron in violation of the OFP, U.S. and international law.

25.     From as early as 1982, Saddam Hussein consistently provided command and control, safe havens, training camps, weapons, office space, and financial, operational, and logistical support for individual terrorists and terrorist groups. During the relevant time period, each of these terrorist groups acted with a common and widely-publicized purpose to both eradicate the State of Israel and eject the United States from the Middle East. Saddam Hussein, in alliance with Hamas, the PIJ, and the AAMB, implemented a common strategy to undermine American influence in Israel and throughout the Middle East through widespread campaigns of international terrorism and extrajudicial, savage killings of Americans and Israelis.

26.     In support and solidarity with these notorious terrorist organizations' objectives, Saddam Hussein provided Hamas, the PIJ, and the AAMB with weapons, weaponry training, ammunition, explosives, and even directed or coordinated joint international terrorist attacks that included the numerous suicide bombings directed at and suffered by Plaintiffs and other un-armed and innocent American and Israeli civilians. Funding for these costly and large-scale activities was

1    provided, in part, by the illegal kickback payments made and sanctioned by Chevron.

2        27.    Between 2000 and 2003, Saddam Hussein, through contracted agents within Hamas,

3    the PIJ, the AAMB, and other terrorist organizations, systematically and continuously terrorized,

4    injured, and killed unarmed civilians and U.S. citizens in Israel, including Plaintiffs, through suicide

5    bombings labeled as "martyrdom" operations. These terrorist attacks were largely incited and

6    incentivized by the hefty "financial rewards" Saddam Hussein offered as payment for carrying out a

7    deadly attack, and then paid directly to the families of deceased suicide bombers and terrorists.

8    Without the illegal surcharge payments made by Chevron and others, Saddam Hussein would not have

9    been able to offer and pay the life-changing sums of money that induced individuals to carry out

10   attacks against unarmed civilians in Israel, including the attacks against Plaintiffs.

11       28.    Under the OFP, the UN loosened trade embargoes against Iraq to allow the sale of Iraqi

12   oil *so long as* all proceeds were deposited into an escrow account monitored by a special UN

13   committee and used only to purchase humanitarian aid for Iraqi citizens. Chevron, for the purpose of

14   purchasing underpriced oil and making a greater profit, knowingly disregarded a substantial and

15   unjustifiable risk to the lives of U.S. and foreign nationals by participating in a scheme to provide

16   illegal and material financial support to Saddam Hussein by paying premiums for Iraqi oil. The

17   injuries Plaintiffs suffered were a reasonably foreseeable consequence of the financial support

18   Chevron provided to Saddam Hussein through the millions of dollars it paid "off-the-books" into

19   accounts outside the strictures of the OFP.

20       29.    Chevron, as one of the largest oil companies in the world, maintained its own foreign

21   policy apparatus – including political analysts, intelligence analysts, some former U.S. intelligence

22   and foreign policy-makers – to continuously monitor and assess the socio-political atmosphere in Iraq

23   and throughout the Middle East, and its potential effect on Chevron's business interests. Chevron was,

24   therefore, well-aware that Saddam Hussein was demanding illegal surcharge payments that Chevron

25   was paying surcharges to Saddam Hussein outside the OFP, and that such funds were used by Saddam

26   Hussein to fund acts of terrorism, including those that injured Plaintiffs. Chevron also knew, at all

27   times relevant herein, that Hamas, the PIJ, and the AAMB were designated by the United States as

28   Foreign Terrorist Organizations, Specially Designated Terrorists, and/or Specially Designated Global

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

FIRST AMENDED COMPLAINT

1    Terrorists, and that Saddam Hussein was closely aligned with and providing material support and

2    funding to these terrorist organizations.

3        **A.     Saddam Hussein's Involvement in and Support for Acts of Terrorism Against the
          U.S. and Israel was Well-Known to Chevron and the World at Large.**

4

5        30.     Saddam Hussein has long been designated an official state sponsor of international

6    terrorism, and his unapologetic, public practice of directing and authorizing acts of international terror

7    against, among others, Israelis and U.S. nationals was globally known and widely reported at the time

8    Chevron acted to bypass to OFP.

9        31.     In or about July 1968, the Ba'ath Party of Iraq seized control of the government of Iraq

10   in a bloody takeover. Saddam Hussein served as the head of intelligence for the army under the new

11   regime before he seized absolute power in or about 1979. Until his capture by Western forces in late

12   2003, Saddam Hussein was notorious for using international terrorism as a strategic weapon against

13   the United States and Israel.

14       32.     Beginning in 1990 and continuing throughout Chevron's participation in Saddam

15   Hussein's illegal kickback scheme, Iraq was designated a state sponsor of terrorism by the U.S.

16   Department of State. State sponsors of terrorism are countries found to have repeatedly provided

17   support for acts of international terrorism, and federal law places severe restrictions on financial

18   transactions with such countries. The purpose behind this designation, like the sanctions imposed by

19   UN Resolution 661, was to financially isolate Saddam Hussein so that he would be not have funds

20   available to continue using terrorism as a means of political expression.

21       33.     Saddam Hussein financed, directed, and authorized suicide bombings and other

22   murderous attacks involving the use of weapons of mass destruction such as explosives, incendiary

23   weapons, and other lethal devices designed to cause serious bodily injury and death.

24       34.     The suicide bombings and murderous attacks directed by Saddam Hussein involved the

25   intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and

26   lethal devices in public locations, state and government facilities, and on public transportation

27   systems, including buses commonly used by students, tourists, and Americans visiting or living in

28   Israel. At all relevant times, it was well-known that Americans are frequent visitors to Israel and that

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    many American citizens live in Israel. In fact, in 1999, 184,000 American citizens lived in Israel,

2    accounting for 3.1% of its population.

3         35.    Saddam Hussein publicly threatened and vowed to topple and eradicate the State of

4    Israel at any cost. In widely published statements, he vowed to expel and displace all Americans

5    within Israel, to target American entities in Israel, to create terror within the Israeli state, to murder the

6    Jewish people, and to forcibly remove all American presence from Israel and the Middle East. Saddam

7    Hussein's stated goal was to "liberate" Israel by imposing an Islamic and/or Palestinian state through

8    the use of suicide bombings and other shockingly egregious terrorist acts.

9         36.    As early as 1986, the U.S. State Department's annual "Patterns of Global Terrorism"

10   report noted that Iraq had offered safe haven to terrorists responsible for attacks against American and

11   Israeli targets. By 1990, the deepening relationship between Saddam Hussein and these terrorist

12   organizations was said to pose a great threat to U.S. national security, and Saddam Hussein's

13   continued support, financing, and training of anti-American terrorist organizations continued to be

14   reported by the U.S. State Department from 1994 through 2002.

15        37.    On August 21, 1990, the Washington Times reported that Saddam Hussein was

16   creating "an army of terrorist fanatics ready for suicidal attacks against U.S. and Arab targets," and

17   that Saddam Hussein was the instrument that could bring these terrorists together in "an anti-

18   American frenzy."

19        38.    From January to February of 1991, during the First Gulf War, Saddam Hussein

20   launched thirty-nine Scud missiles carrying military grade explosives against civilian populations in

21   major Israeli cities, including those populated with American citizens. The attacks caused an

22   incalculable number of deaths and injuries, and tens of millions of dollars in property damage. Tens of

23   thousands of Israeli residents, including U.S. nationals, were forced to flee their homes.

24        39.    In July of 1991, the Central Intelligence Agency reported that Saddam Hussein was

25   responsible for the bombing of an Austrian airliner over Thailand that killed three Americans.  U.S.

26   media outlets reported heavily on "Iraqi-sponsored terrorist groups" targeting the United States and its

27   citizens living and traveling abroad.

28   / / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

40.     Between 1992 and 1994, Saddam Hussein worked via the Arab Liberation Front, a terrorist group formed and controlled by Saddam Hussein, to deploy approximately 100 bombs to international terrorist cells located throughout the world. The bombs were intended for attacks against American civilians.

41.     In 1993, at the direction of Saddam Hussein, the Iraqi Intelligence Service tried to assassinate U.S. President George H. W. Bush.

42.     On June 27, 1993, President Clinton declared that Saddam Hussein "ruled by atrocity, slaughtered [his] own people, invaded two neighbors, attacked others and engaged in chemical and environmental warfare." This Presidential Address was reported on every major news station and newspaper in the United States, coverage of the assassination attempt was also repeatedly reported on and covered in the United States media.

43.     On July 29, 1996, Newsday confirmed Iraq's role as a leading sponsor of international terrorism, "eager to punish the United States for humiliations suffered during the Gulf War."

44.     In a news broadcast by Republic of Iraq Radio on October 6, 2000, recorded and translated from Arabic by the BBC, Deputy Prime Minister Tariq Aziz was reported to say "there is no way to liberated Palestine other than jihad and the armed popular struggle."

45.     In a news report broadcast approximately one hour later on October 6, 2000, official Iraqi television reported:

> Under the chairmanship of the comrade secretary general, the National Command of the Arab Socialist Ba'ath Party has held a meeting to examine the valiant popular intifada in occupied Palestine, as well as its distinguished developments in the Arab arena, and to continue its activities in support of this historic intifada... the National Command said that the pan-Arab approach, which should be focused on and inspired is [sic] leader President Saddam Hussein's speech on October 3, 2000, in which he called for pursuing jihad to liberate Palestine . . . the command called on . . . all Arab masses to pursue this approach to pressure the rulers . . . in support of our . . . intifada. . . . The National Command urged the people's masses to work relentlessly to expel the US embassies and centers from the Arab countries as well as to uproot and expel any Zionist presence in these countries . . . to provide the Palestinian people with all that is needed to enable them to pursue their valiant jihad. . . . The command warned against maneuvers and tactics that have been used or might be used by some official Arab quarters to contain the intifada and to turn the situation from a continuous process of jihad whose objective is liberation, into [a process of] settlements . . . and to resume the so-called peace process.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

11

Case No. 15-cv-04916-JD

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

**B.      The UN Established the Oil-For-Food Programme to Provide for Iraq's Citizens While Keeping Funds out of Saddam Hussein's Hands.**

46.      Following Saddam Hussein's unprovoked invasion of Kuwait in 1990, the UN Security Council imposed severe economic sanctions against Saddam Hussein and Iraq. Under the terms of the UN directive, the international community was forbidden from engaging in any trade with Iraq, its government, or its people.

47.      Within a few years, it became clear that the UN's near-total trade embargo had accomplished its goal of curtailing Saddam Hussein's terrorist activity by cutting him off from any legitimate sources of revenue or financing. At the same time, the sanctions left Iraq's citizens poverty-stricken and without access to life-sustaining food, medical supplies, and other basic needs. Perceiving an immediate humanitarian crisis in the region, the UN established the Oil-for-Food Program ("OFP"), which authorized Iraq to export limited quantities of oil so long as *all* proceeds were deposited in an escrow account monitored by the UN and used only to purchase humanitarian goods for the benefit of all Iraqi people.

48.      The goal of the OFP was not only to provide humanitarian assistance to Iraq, but to prevent Saddam Hussein from obtaining financial resources needed to purchase weapons and carry out acts of terrorism, including the acts that injured Plaintiffs.

49.      Under the OFP, the UN administered the sale of oil, approved all sales contracts, and deposited all sale proceeds into a UN-supervised escrow account at the Banque Nationale de Paris ("BNP") in Manhattan. However, Saddam Hussein retained the authority to set the selling price and to select which companies would be allowed to purchase allocations of Iraqi oil.

50.      To further minimize the potential for unauthorized payments to Saddam Hussein, the U.S. government required American purchasers to first obtain a license from the Treasury Department's Office of Foreign Assets Control ("OFAC"). OFAC would evaluate license applications and then refer them to the Department of State for further investigation. The Department of State would forward worthy applications to the UN for approval. If approved, OFAC would then issue a license allowing the American entity to purchase Iraqi oil.

51.      The Iraqi government began selling oil pursuant to the OFP in or about December

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1996. Anyone purchasing oil under the OFP was required to pay the full contract price by means of a letter of credit in favor of the OFP escrow account. Companies were prohibited from making payments to Saddam Hussein, directly or indirectly, outside of the OFP bank account.

> **C.    Chevron's Payment of Illegal Surcharges to Saddam Hussein Would Appear to Be Intended to Intimidate or Coerce a Civilian Population**
>
> **1.    <u>Saddam Hussein Set the Selling Price and Chose the Buyers of Iraq's Oil</u>**

52.    Around August 2000, Saddam Hussein began conditioning the sale of oil under the OFP on the purchaser's agreement to pay an illegal surcharge to Saddam Hussein. These kickbacks, which were a calculated percentage of each oil contract's total amount, were paid either to front companies or into bank accounts under Saddam Hussein's control. If a company was unwilling to pay the required surcharge, it would not receive oil allocations from Iraq. This allowed Saddam Hussein to deliberately set the price of Iraq's oil below market prices and then to choose buyers that were willing to pay kickbacks to obtain the underpriced oil.

 

**Figure:  The Relationship Between Illegal Revenues and Type of Buyers[1]**

53.    During the period of the illegal kickback scheme, major multinational oil companies like Chevron were able to conceal their role in funding Saddam Hussein by conducting business through small oil traders or shell companies. In fact, there were no major oil companies among those selected to purchase oil directly from Iraq in the first trimester of 2001, when underpricing reached its peak. Instead, Chevron purchased oil contracts – with the kickback built in – from these smaller

---

[1] *See* Chang-Tai Hsieh & Enrico Moretti, *Did Iraq Cheat the United Nations?  Underpricing, Bribes, and the Oil For Food Program* (National Bureau of Economic Research Working Paper 11202), http://www.nber.org/papers/w11202.

traders and shell companies authorized to do business with Saddam Hussein. Chevron would then finance the entire contract price, including the illegal surcharge, on behalf of the smaller entity. In every instance, the total price Chevron paid through this series of transactions was lower (or, worst case, no higher) than the market price of competing crude oils.

54.     As can be seen in the following chart showing the difference between the market price ("spot" price) of Iraq's Basrah crude oil and its official selling price ("OSP") under the OFP, Iraq's oil sold at prices well below market value during Saddam Hussein's illegal surcharge program:



**Figure: Comparing Market ("Spot") Price of Iraqi Oil and its Official Selling Price ("OSP")[2]**

55.     At various times relevant to this Complaint, Saddam Hussein also required payments of extra port fees in exchange for allowing crude oil to be loaded onto cargo ships and chartered vessels at Iraqi ports. On May 3, 2000, in blatant violation of UN sanctions and federal law, a Chevron trader known by the code name "Phoenix" agreed to pay extra port fees to Saddam Hussein through a third-party chartered-vessel owner. To conceal the nature of the payment, the extra port fee was lumped into

[2] *See* Chang-Tai Hsieh & Enrico Moretti, *Did Iraq Cheat the United Nations? Underpricing, Bribes, and the Oil For Food Program* (National Bureau of Economic Research Working Paper 11202), http://www.nber.org/papers/w11202.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

the total cost for loading Chevron's oil allocation onto the charter vessel. These extra port fees were illegal kickbacks paid into bank accounts controlled by Saddam Hussein, outside of the OFP.

56.     This illegal kickback scheme funneled money away from the OFP's escrow account and into the hands of known terrorist Saddam Hussein. Between July 2000 and December 2002, Chevron paid at least $20 million in illegal kickbacks that bypassed the OFP escrow account in favor of Saddam Hussein. By participating in the illegal kickback scheme, Chevron provided Saddam Hussein with the means to finance and direct over twenty separate acts of violent terrorist attacks and crimes against humanity inflicting death, disfigurement, and lasting psychological trauma and pain upon Plaintiffs and countless other victims.

### 2.     Chevron's Support for Saddam Hussein Increased Profits by Ensuring Oil Would be Available for Purchase at Prices Below Market Value.

57.     Prior to January 2000, Chevron purchased Iraqi oil directly by allocation from Saddam Hussein, without the use of third party agents. According to records obtained by the Independent Inquiry Committee into the United Nations Oil-For-Food Programme ("IIC"), Chevron lawfully lifted 9,533,690 barrels and paid $140,228,170.00 into the OFP escrow account during this time. IIC found no evidence that surcharges were applied to these contracts.

58.     Beginning in January 2000, when Saddam Hussein began demanding illegal kickbacks, Chevron began financing oil purchase contracts through third party companies rather than contracting directly with Iraq. The oil purchase contracts between Iraq and these third parties were, in effect, sham contracts because the named "purchasers" lacked the financial resources to actually purchase the oil. Chevron, thus, acted as both an oil purchaser and a financier of third party purchases of Iraqi oil under the OFP. According to records obtained by the IIC, Chevron lifted 83,854,714 barrels and paid $1,778,799,188.00 through these third-party contracts, and Chevron has admitted to making approximately $20 million in illegal payments outside the OFP program during this time.

59.     Chevron knowingly and purposefully made illegal payments to obtain underpriced Iraqi oil with the explicit awareness that Saddam Hussein would receive the unmonitored proceeds, contrary to the OFP, and against U.S. law. Chevron thereby undermined the previously successful international effort to cripple Saddam Hussein's financial support for suicide bombings and other acts

1    of extrajudicial killing and crimes against humanity.

2        60.    Chevron purchased Iraq's Basrah Light crude oil. The competing crude oil is Saudi

3    Arabian Light ("Arabian Light") crude oil, which is produced in Saudi Arabia and has virtually

4    identical physical characteristics to Basrah Light. In the years prior to the OFP, the difference between

5    the official market prices of Basrah Light and Arabian Light averaged zero. When Saddam Hussein

6    began demanding illegal surcharge payments in January 2000, however, the price difference between

7    the two oils was up to $5.



**Figure: Comparing Market Price of Arabian Light Oil to Official Selling Price of Iraqi Oil**[3]

18       61.    According to records obtained by the IIC and contracts between Chevron and Anwar

20   Akkad Son's Co. Trade & Ind. ("AAS"), Chevron purchased 2,059,989 barrels on SOMO contract

21   M/11/32, for, on information and belief, a per barrel price (including illegal surcharges paid outside

22   the OFP) that was significantly less than the market price of Arabian Light during this same time, in or

23   about March 2002.

24       62.    According to records obtained by the IIC and contracts between Chevron and

25   Belmetalenergo, Inc. ("Belmetalenergo"), Chevron purchased 2,958,171 barrels on SOMO contract

---

[3] *See* Chang-Tai Hsieh & Enrico Moretti, *Did Iraq Cheat the United Nations?  Underpricing, Bribes, and the Oil For Food Program* (National Bureau of Economic Research Working Paper 11202), http://www.nber.org/papers/w11202.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

M/09/08, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about February 2001.

63.     According to records obtained by the IIC and contracts between Chevron and Belmetalenergo, Chevron purchased 1,413,316 barrels on SOMO contract M/11/69, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about January 2002.

64.     According to records obtained by the IIC and contracts between Chevron and Erdem Holding Co. ("Erdem"), Chevron purchased 1,542,783 barrels on SOMO contract M/09/02, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about February 2001.

65.     According to records obtained by the IIC and contracts between Chevron and Erdem Holding Co., Chevron purchased 1,030,475 barrels on SOMO contract M/10/65, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about September 200.

66.     According to records obtained by the IIC and contracts between Chevron and Erdem Holding Co., Chevron purchased 2,001,688 barrels on SOMO contract M/11/11, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about December 2001.

67.     According to records obtained by the IIC and contracts between Chevron and Fal Oil Company Limited ("Fal Oil"), Chevron purchased 4,043,821 barrels on SOMO contract M/09/51, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about April 2001.

68.     According to records obtained by the IIC and contracts between Chevron and H.I.U. LTD., Chevron purchased 4,988,774 barrels on SOMO contract M/09/111, for, on information and

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less

2    than the market price of Arabian Light during this same time, in or about July 2001.

3         69.    According to records obtained by the IIC and contracts between Chevron and Jewan

4    Oil, Chevron purchased 4,069,646 barrels on SOMO contract M/09/72, for, on information and belief,

5    a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than

6    the market price of Arabian Light during this same time, in or about April 2001.

7         70.    According to records obtained by the IIC and contracts between Chevron and Kalmyk

8    Oil & Gas Company ("Kalmneftegaz"), Chevron purchased 2,067,652 barrels on SOMO contracts

9    M/11/03 and M/11/49, for, on information and belief, a per barrel price (including illegal surcharges

10   paid outside the OFP) that was significantly less than the market price of Arabian Light during this

11   same time, in or about February 2002.

12        71.    According to records obtained by the IIC and contracts between Chevron and LADA-

13   OMC Holding SA ("LADA-OMC"), Chevron purchased 1,500,000 barrels on SOMO contract

14   M/08/84, for, on information and belief, a per barrel price (including illegal surcharges paid outside

15   the OFP) that was significantly less than the market price of Arabian Light during this same time, in or

16   about October 2000.

17        72.    According to records obtained by the IIC during its investigation as well as contracts

18   between Chevron and Machinoimport, Chevron purchased 2,235,673 barrels on SOMO contracts

19   M/10/11 and M/10/19, for, on information and belief, a per barrel price (including illegal surcharges

20   paid outside the OFP) that was significantly less than the market price of Arabian Light during this

21   same time, in or about July 2001.

22        73.    According to records obtained by the IIC and contracts between Chevron and

23   Machinoimport, Chevron purchased 850,000 barrels on SOMO contract M/10/19, for, on information

24   and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly

25   less than the market price of Arabian Light during this same time, in or about July 2001.

26        74.    According to records obtained by the IIC and contracts between Chevron and

27   Machinoimport, Chevron purchased 2,000,000 barrels on SOMO contract M/11/17, for, on

28   information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

significantly less than the market price of Arabian Light during this same time, in or about January 2002.

75.     According to records obtained by the IIC and contracts between Chevron and Machinoimport, Chevron purchased 1,500,000 barrels on SOMO contract M/11/79, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about March 2002.

76.     According to records obtained by the IIC and contracts between Chevron and Machinoimport, Chevron purchased 1,475,065 barrels on SOMO contract M/12/01, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about October 2002.

77.     According to records obtained by the IIC and contracts between Chevron and Naftogaz of Ukraine, Chevron purchased 2,004,217 barrels on SOMO contract M/10/41, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about August 2001.

78.     According to records obtained by the IIC and contracts between Chevron and Phoenix International, Chevron purchased 1,499,532 barrels on SOMO contract M/08/73, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about August 2001.

79.     According to records obtained by the IIC and contracts between Chevron and Sinochem International Oil London Co., Ltd. ("Sinochem"), Chevron purchased 3,562,811 barrels on SOMO contract M/12/38, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about September 2002.

80.     According to records obtained by the IIC and contracts between Chevron and Tatneft, Chevron purchased 1,030,475 barrels on SOMO contract M/10/05, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the

market price of Arabian Light during this same time, in or about October 2001.

81.     According to records obtained by the IIC and contracts between Chevron and Zerich GMBH ("Zerich"), Chevron purchased 540,000 barrels on SOMO contract M/08/102, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about August 2000.

82.     According to records obtained by the IIC and contracts between Chevron and Zerich, Chevron purchased 1,960,627 barrels on SOMO contract M/08/87, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about August 2000.

83.     According to records obtained by the IIC and contracts between Chevron and Zerich GMBH, Chevron purchased 2,026,458 barrels on SOMO contract M/09/86, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about May 2001.

84.     According to records obtained by the IIC and contracts between Chevron and Zerich, Chevron purchased 1,000,000 barrels on SOMO contract M/10/75, for, on information and belief, a per barrel price (including illegal surcharges paid outside the OFP) that was significantly less than the market price of Arabian Light during this same time, in or about January 2002.

85.     Chevron knew that purchasing Basrah oil from Iraq increased its bottom line. According to an internal memorandum, "Basrah is heavily discounted." For this reason, Chevron knew "[t]he economic driver for Californian Crude supply [was] to keep importing Basrah Lt" because "Basrah makes USWC refining over $2/bbl [per barrel] higher [profit] margin than spot ANS [Alaska North Slope]."

86.     The Basrah crude oil purchased under the UN's OFP was "destined for Chevron's USWC [U.S. West Coast] refineries." Each of the contracts on which illegal surcharges were paid made clear that the purchased oil was destined for North America. Accordingly, Chevron created internal spreadsheets comparing Basrah and Arabian Light, among others, with the West-Texas Intermediate ("WTI") spot price. The WTI is the benchmark crude oil in the United States. When

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  Saddam Hussein was underpricing Iraqi oil and demanding a surcharge, the price of Basrah oil was as

2  much as $4 less per barrel than Arabian Light.

3      87.    Saddam Hussein's desire to have access to funds to finance and engage in terrorist

4  activities allowed Chevron the opportunity to increase its profits by purchasing significantly

5  underpriced oil. By purchasing underpriced Iraqi oil with the built-in kickback surcharge, Chevron

6  clearly profited and deliberately sought a legitimate goal through illegitimate means. Thus, Chevron's

7  support of Saddam Hussein furthered its bottom line.

8  **D.**    **The Funding of International Acts of Terrorism Was a Foreseeable Consequence of Chevron's Payments of Illegal Surcharges**

9

10      **1.**    <u>**UN Sanctions Had Effectively Crippled Saddam Hussein's Ability to Commit International Acts of Terrorism**</u>

11      88.    As Joseph A. Morris, a former Department of Justice Attorney and former General

12  Counsel of the United States Information Agency, testified in 1990: "International terrorism has

13  become, in many respects, an industry. It rests on a foundation of money, Money is often more

14  important to the masters of terrorism than are people."

15      89.    In August 1990, the United Nations imposed economic sanctions against the Saddam

16  Regime. One of the purposes of the sanctions was to eliminate funds with which the Saddam Regime

17  could indiscriminately use in fomenting international terrorism, acquiring weapons of mass

18  destruction and committing crimes against humanity against Iraqis and citizens of other countries,

19  including Israel.

20      90.    On April 14, 1995, Madeline Albright, then US Permanent Representative to the

21  United Nations stated to the Security Council, "let us not forget that this is a government that has

22  invaded its neighbor, supported terrorism, built weapons of mass destruction, and continues to

23  threaten the stability of the Persian Gulf. It is only when the regime changes its underlying objectives

24  that the resolutions will no longer be necessary and the Iraqi people no longer will be suffering."

25      91.    By 1996 the UN's economic sanctions had the desired effect on Saddam Hussein:

26  according to the 1996 Patterns of Global Terrorism report issued by the U.S. State Department, "Iraq's

27  ability to carry out terrorism abroad ha[d] been curbed by UN sanctions."

28

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Case No. 15-cv-04916-JD

**FIRST AMENDED COMPLAINT**

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

92.     Only through the complicity of entities, like Chevron, who were willing to pay a known terrorist illegal kickbacks in exchange for greater profit, was Saddam Hussein able to rebuild his financial infrastructure to resume his reign of terror against innocent civilians:



**2.     Chevron Knew its Third-Party Intermediaries Directed Illegal Surcharge Payments to Saddam Hussein.**

93.     Beginning in the early autumn of 2000, SOMO employees informed each beneficiary that a surcharge was imposed on each barrel of oil and was to be collected *directly* by the Government of Iraq. These funds would then be funneled into accounts controlled by Saddam Hussein.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

94.     On December 15, 2000, the oil overseers sent a fax to all buyers of Iraqi oil informing them that the sanctions committee had not approved a surcharge of any kind of Iraqi oil, and they were not to pay any kind of surcharge.



**UNITED NATIONS        NATIONS UNIES**

SECURITY COUNCIL COMMITTEE ESTABLISHED BY RESOLUTION 661 (1990)
CONCERNING THE SITUATION BETWEEN IRAQ AND KUWAIT

S/AC.25/2000/OIL/1330/FAX.                                          15 December 2000

| TO: BUYERS OF IRAQI CRUDE OIL | FROM: THE OIL OVERSEERS UNDER SECURITY COUNCIL RESOLUTION 986 (1995) |
|---|---|
| FAX NO.: | FAX NO.: (212) 963-1628 |
| ATTENTION: | REF.: OIL-FOR-FOOD ARRANGEMENT |

TOTAL NUMBER OF TRANSMITTED PAGES INCLUDING THIS PAGE : 1

Dear Sirs,

    Following consultation with the 661 Committee, the UN Oil Overseers wish to advise Buyers of the following:

    1) The sanctions committee has not approved a surcharge of any kind on Iraqi Oil.

    2) Payments for purchasing Iraqi crude oil cannot be made to a non-UN account.

    3) Therefore, buyers of Iraqi oil shall not pay any kind of surcharge to Iraq.

Figure: Oil overseers fax to the buyers of Iraqi crude oil (Dec. 15, 2000) (excerpt).

**Figure:  UN Oil overseers fax warning buyers of Iraqi crude oil (Dec. 15, 2000)**

95.     Chevron knew that the premiums it was paying were demanded by SOMO and not the typical premium associated with intermediaries. On November 30, 2000, Colin Parfitt[4], Area Manager in Crude Cargo Trading, emailed his colleagues describing his conversation with Michell Tellings, a UN overseer.  Tellings had informed Parfitt that "if the lifter paid the 50c … this looks like an illegal payment." In response to Parfitt's email, on December 1, 2000, Paul Kullar, who worked in operations in London, relayed that he had spoken with a UN inspector, who advised that he had conversations with Ali Hassan at SOMO Commercial about the surcharge issue and that "it could be a long drawn out issue."

---

[4] Mr. Parfitt is currently the President of Supply & Trading at Chevron.

96. On December 19, 2000, Parfitt emailed his colleagues that there "was circumstantial evidnece [*sic*] that Somo were waiving the 40c/bbl fee for lifters that were sitting in the queue." Michael Dugdale, a trader for Chevron, responded on December 20, 2000, that "Reuters reports suggest a 30 cpb premium is now being asked rather than 40 cpb."

97. In early 2001, Chevron was further put on notice of Saddam Hussein's demand for surcharges and the intermediaries' role through both news articles and professional press:

a. According to a January 7, 2001 article from the London Sunday Times, which a Chevron employee printed and retained, the "[c]oncern about demands from Iraq for 'surcharges' of 40 cents per barrel paid into Iraqi bank accounts has caused a collapse in exports of Iraqi crude."

b. According to a January 23, 2001 article from the Wall Street Journal, which a Chevron employee printed and retained, a source close to Iraqi political circles stated that "[Saddam Hussein] will never drop the surcharge and "[oil majors] can pay it – not directly to SOMO (Iraq's State Oil Marketing Organization) – and the intermediaries will do the job, the intermediaries will pay SOMO."

c. A Chevron employee printed and retained a January 20, 2001 article titled, "Iraq export rise delayed by surcharge". The Chevron employee specifically marked and starred portions of the article that states that "Iraqi marketer Somo appears to have reached a compromise on a surcharge of up to 40¢/bl it is attempting to charge some customers over and above prices agreed with the UN" and a quote from an anonymous U.S. trader, "Everyone offering me cargoes is ready to give me a written declaration that no surcharge is involved, but do you believe them?".

d. According to a February 24, 2001 article from the Oakland Tribune, which a Chevron employee printed and retained, "Baghdad announced that effective Dec. 1, companies buying Iraqi crude through the official "oil-for food" program would have to pay a 5-cent-per-barrel surcharge to a separate account controlled by the regime."  The employee specifically underlined the fact that "[s]everal dozen unknown companies have emerged as the main buyers of Iraqi crude" and these companies "pay the surcharges and then sell Iraqi crude to established oil-trading firms."

e. According to a March 9, 2001 article from Energy Compass, which a Chevron employee printed and retained, "State marketer Somo is still demanding its illegal surcharge of 25¢-

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  30¢/bbl from all lifters."

2  f.  A Chevron employee printed and retained a March 12, 2001 article, titled "US

3  tracks traders of Iraqi crude.  The employee specifically marked and underlined portions of the article

4  stating that "Washington is now focusing on traders and oil companies that buy Iraqi crude or sell it to

5  the US market" and "[t]hese middle men provided a legal cushion for trading to resume … [b]ut

6  officials in Washington assume that many of the small traders' sole function is to buy Iraqi crude, pay

7  the fee and resell the cargoes to large traders or end users."

8  98.  On February 5, 2001, Parfitt emailed C.L. Lew Blackwell, the Director of Global

9  Crude Trading.  Per Chevron's purported policy to prohibit the payment of surcharges, all traders were

10  to obtain prior written approval from Mr. Blackwell for all proposed Iraqi oil purchase.  During the

11  peak of the surcharge scheme, Parfitt emailed Blackwell and under the heading

12  "Premium/Surcharges", he writes that there is "talk that the surcharge that Somo is asking for have

13  been reduced."

14  99.  It is clear that even in early 2001, Chevron knew that "[n]on government

15  aligned/connected companies [were] being required to pay a .35/bbl premiun [*sic*]" to SOMO, and yet

16  they continued to approve contracts with premiums at or around this amount, as set forth in

17  Paragraphs 154 through 176.

18  100.  Following the retroactive pricing implemented to combat the surcharges, on November

19  21, 2000, Parfitt again emails other employees at Chevron, stating that Tellings "thought is that

20  premuims [*sic*] in the market will come off as the current pricing (which has pretty much become

21  retroactive) means that there is nothing to support the trading co's paying high premiums & taking the

22  bbls to the USGC."

23  101.  Despite knowing that the "premiums" it paid to third parties constituted illegal

24  surcharges and kickbacks to Saddam Hussein, rather than stop the payments, Chevron factored the

25  cost of such illegal kickbacks into its trading decisions, then processed and accounted for the

26  payments in a manner calculated to avoid detection by the UN or the U.S. government. On at least one

27  occasion, Chevron asked if the seller of Iraqi oil could negotiate a lower kickback payment to Saddam

28  Hussein in order to reduce Chevron's costs.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

102.    In another instance, on November 14, 2001, Minnie Gok, Contracts Specialist at ChevronTexaco Global Trading, e-mailed Michael Dugdale, one of Chevron's traders, after receiving a request for a price confirmation on a contract with a third-party seller. The seller wanted confirmation that the kickback due from Chevron on a specific contract would be $0.33 per barrel. Gok admitted to being confused by the price confirmation request because the parties had *already* agreed in October 2001 that Chevron would pay a premium of $0.41 per barrel. That same day, Dugdale e-mailed back: "[v]ery interesting…looks to me as though they have inadvertently given us the details of their purchase cost from SOMO [Iraq's State Organization for Marketing Oil]. You can ignore the number. The .41 cents still stands."

103.    In early 2001, Chevron purchased Iraqi oil from Samir Vincent, a United States citizen who had agreed to serve as Saddam Hussein's U.S.-agent for payment of illegal kickbacks. In or about March 2001, pursuant to SOMO contract M/09/50, Chevron purchased more than 2 million barrels of oil from Vincent, illegally paying a premium of $0.40 per barrel, or $807,204.00, over the UN's Official Selling Price. Before this period, Chevron had been paying Vincent a premium of between $0.12 and $0.15 per barrel. For example, in 1997, Chevron purchased Basrah oil on contracts M/02/29 and M/02/02 with a premium of $0.150, and in 1998, Chevron paid a premium of $0.120 on contract M/04/29. Chevron knew or deliberately avoided discovering that the increased premium was paid to Saddam Hussein on Chevron's behalf. In 2005, Vincent pled guilty to charges of conspiracy, tax-evasion, and for serving as an unregistered agent of Saddam Hussein.

104.    On March 13, 2002, Betoil, a company owned by Italian businessman Fabrizio Loioli, paid $45,000.00 into one of Saddam Hussein's bank accounts in Jordan. Betoil made the payment on behalf of Chevron, in satisfaction of its kickback obligations for oil loaded onto the tanker Overseas Ann. Chevron had contracted with Betoil to purchase 1,400,000 BBL with a premium of $0.49 over official selling price ("OSP").

105.    Dugdale was Loioli's primary contact at Chevron.  Per Chevron's purported policy, Dugdale was required to and did keep Chevron's senior management informed regarding his negotiations with Loioli, including the inclusion of the illegal kickbacks.  In fact, Blackwell, as stated in Paragraph 98, was required to approve this purchase and yet a year after being on notice that it was

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

SOMO who required these premiums, rather than stop the purchase of oil, Chevron's senior management approved every purchase Dugdale made through Loioli.

106.   In a sworn statement to an Italian prosecutor in 2006, Loioli stated that Chevron was aware of Saddam Hussein's demands for payment of illegal surcharges and kickbacks: "In fact, each final beneficiary involved used to add this [kickback] amount to the official price to disguise it as a premium to be paid to the intermediary . . . . [i]n reality, they were perfectly aware that only a part of that would go to the intermediary, while the remaining part was to be paid to the Iraqis."

107.   Dugdale clearly knew that these high premiums were illegal and constituted kickbacks to Saddam Hussein.  In an email to Dugdale, dated October 30, 2001, several months before his deal with Loioli, Sara El-Gammai of Reuters attached an article, discussing the U.N. sanctions committee's attempts to eliminate the oil kickbacks and states that "[t]he U.N. said it attempts to allow for a 5-cent per barrel profit margin for Iraqi crude brokers, but added that premiums have averaged as much as six times higher than that during the past year." In April 2002, Dugdale stated in an email to other Chevron employees that "[a]ny revenue from [the surcharges] would go directly to the Govt of Iraq."

108.   Chevron, knowing and having reasonable cause to know that Iraq was a designated state sponsor of terrorism, and knowing that the UN and federal law prohibited any business dealings with Iraq or Saddam Hussein outside the OFP, knowingly engaged in financial transactions with Saddam Hussein without complying with the licensing and authorization requirements of the Iraqi Sanctions Regulation. In particular, Chevron knew that Saddam Hussein was inciting, incentivizing and contracting for suicide bombing attacks against Americans and Israelis in Israel and that funds, in U.S. dollars, were being distributed by Saddam Hussein to the families of suicide bombers in public, televised ceremonies in broadcasts across the Middle East and in American and western media.

109.   Importantly, federal anti-terrorism laws do not differentiate between the criminal, terrorist activities of persons like Saddam Hussein, and the civil, non-violent activities in which they might also engage, such as selling oil at an additional premium. In legislating this particular dimension of the "material support" ban, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

110.     In addition, the international community has also universally condemned the financing of and material support for terrorism, incorporating the offense into the law of nations, as articulated in, for example, UN General Assembly Resolution 49/60 Declaration on Measures to Eliminate International Terrorism; the International Convention for the Suppression of Terrorist Bombings; the International Convention for the Suppression of the Financing of Terrorism; and UN Security Council Resolution 1373.

111.     Without the millions of dollars provided by Chevron and others who conspired to corrupt the OFP, Saddam Hussein's access to the funds needed to finance his terrorist objectives would have continued to be severely hampered by UN sanctions. Instead, Chevron's participation in the illegal scheme allowed Saddam Hussein to quickly incite and finance a massive wave of suicide bombings and violent acts of international terrorism against Americans and Israelis, including the violent attacks suffered by Plaintiffs.

### 3.     Chevron's Surcharge Payments Were Actually Transferred to Accounts Controlled by Saddam Hussein

112.     The Independent Inquiry Committee into the United Nations Oil-For-Food Programme, upon reviewing bank records and information recorded in the SOMO database, discovered surcharge payments were ultimately transferred to Saddam Hussein in various ways designed to avoid detection.

113.     According to the IIC, most surcharges were paid through deposits in designated SOMO bank accounts at Bank al Rafidain, in Amman, Jordan ("Rafidain Bank") or Iraqi embassies abroad. The significance role of the Rafidain Bank at the time of the OFP was included in the CIA report on Iraq, which indicated that much of Iraq's money in Jordan was held in private accounts operated by the Iraqi Embassy in Amman or the Iraqi Trading Office. Of particular interest was the Jordanian Branch of the Rafidian Bank, which was established purely for use of the Iraqi government and outside the reach of the OFP. Those wishing to buy oil outside of the OFF program would pay cash to an account at Rafidian Bank in Amman.

114.     At times, the surcharges were paid into one of many special clearing accounts, known as "bridge accounts" at Jordan National Bank, in Jordan, and Fransabank in Lebanon. The accounts at Fransabank and at Jordan National Bank were opened under the names of two SOMO employees, the

Executive Director of SOMO and the Director of the Financial Department.  Once the illegal surcharges were deposited or transferred to these "bridge" accounts, the funds were then transferred to accounts of the Central Bank of Iraq ("CBI") where CBI employees would then withdraw the funds in cash and transport it to the CBI in Baghdad.

115.    Illegal surcharges were also paid into the bank accounts of third-party or front companies in Jordan, Egypt and the United Arab Emirates, which then transferred the funds to Iraqi controlled accounts.  At other times, illegal surcharges were paid in cash, either at the border between Iraq and neighboring states or directly at the responsible ministry in Baghdad. This cash was deposited at the Rafidain Bank in Baghdad, and then periodically transferred to the Ministry of Finance at the Central Bank of Iraq.

116.    Illegal payments sometimes were paid to the Iraq State Company for Water Transport ("ISCWT") at Rafidain bank, a governmental port authority that received $919 million in illegal payments between 1999 and 2003.



**Figure:  Oil Surcharges – Flow of Funds**[5]

---

[5] Independent Inquiry Committee Into the United Nations Oil-For-Food Programee, Manipulation of

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

117.     According to information derived from SOMO's surcharge records and information from the Iraqi embassy and/or bank records, the IIC found that $104,990.00 in surcharges collected from M/11/32, a contract in which Anwar Akkad Son's Co. Trade & Ind. was the contracting company and Chevron was the underlying oil financier, was deposited into the Jordan National Bank.

118.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,455,463.80 in surcharges collected from M/09/08, a contract in which Belmetalenergo, Inc. was the contracting company and Chevron was one of the underlying oil financiers, was deposited into Fransabank.

119.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $423,983.00 in surcharges collected from M/11/69, a contract in which Belmetalenergo, Inc. was the contracting company and Chevron was the underlying oil financier, was deposited into Fransabank.

120.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,200,810.00 in surcharges collected from M/09/02, a contract in which Erdem Holding Co. was the contracting company and Chevron was one of the underlying oil financiers, was deposited into the Embassy in Ankara and Jordan National Bank.

121.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $866,669.00 in surcharges collected from M/10/65, a contract in which Erdem Holding Co. was the contracting company and Chevron was one of the underlying oil financiers, was deposited into the Embassy in Ankara and Jordan National Bank.

122.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $600,507.00 in surcharges collected from M/11/11, a contract in which Erdem Holding Co. was the contracting company and Chevron was the underlying oil financier, was deposited into the Jordan National Bank.

123.     According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,213,146.30 in surcharges collected from

_____

the Oil-For-Food Programme by the Iraqi Regime.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

M/09/51, a contract in which Fal Oil Company Limited was the contracting company and Chevron was the underlying oil financier, was deposited into Jordan National Bank.

124.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,499,979.00 in surcharges collected from M/09/111, a contract in which H.I.U. LTD. was the contracting company and Chevron was the underlying oil financier, was deposited into Fransabank and Jordan National Bank.

125.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,220,833.70 in surcharges collected from M/09/72, a contract in which Jewan Oil was the contracting company and Chevron was the underlying oil financier, was deposited into Jordan National Bank.

126.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $620,295.60 in surcharges collected from M/11/03 and M/11/49 (Kalmyk Oil & Gas Company (Kalmneftegaz) contracts on which Chevron was the underlying oil financier) was deposited at the Embassy in Moscow.

127.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $149,980.00 in surcharges collected from M/08/84, a contract in which LADA-OMC Holding SA was the contracting company and Chevron was the underlying oil financier, was deposited into Fransabank.

128.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,426,265.80 in surcharges collected from M/10/11 & M/10/19 (Machinoimport contracts on which Chevron was the underlying oil financier) was deposited into the Embassy in Moscow and Jordan National Bank.

129.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,221,074.40 in surcharges collected from M/10/19, a contract in which Machinoimport was the contracting company and Chevron was one of the underlying oil financiers, was deposited into the Embassy in Moscow and Jordan National Bank.

130.   According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $912,771.30 in surcharges collected from

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

M/11/17, a contract in which Machinoimport was the contracting company and Chevron was one of the underlying oil financiers, was deposited into Jordan National Bank.

131.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,584,399.30 in surcharges collected from M/11/79, a contract in which Machinoimport was the contracting company and Chevron was one of the underlying oil financiers, was deposited into Jordan National Bank.

132.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $286,240.00 in surcharges collected from M/12/01, a contract in which Machinoimport was the contracting company and Chevron was one of the underlying oil financiers, was deposited into the Embassy in Moscow.

133.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $601,266.36 in surcharges collected from M/10/41, a contract in which Naftogaz of Ukraine was the contracting company and Chevron was the underlying oil financier, was deposited into Jordan National Bank.

134.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $8,000.00 in surcharges collected from M/08/73, a contract in which Phoenix International was the contracting company and Chevron was the underlying oil financier, was deposited into Jordan National Bank.

135.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,170,573.35 in surcharges collected from M/12/38 (a Sinochem International Oil London Co., LTD. contract on which Chevron was one of the underlying oil financiers) was deposited into Jordan National Bank.

136.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $1,468,281.00 in surcharges collected from M/10/05, a contract in which Tatneft was the contracting company and Chevron was one of the underlying oil financiers, was deposited into Jordan National Bank.

137.    According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $100,000.00 in surcharges collected from

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

M/08/102, a contract in which Zerich GMBH was the contracting company and Chevron was one of the underlying oil financiers, was deposited into Jordan National Bank.

138.  According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $729,677.30 in surcharges collected from M/08/87, a contract in which Zerich GMBH was the contracting company and Chevron was the underlying oil financier, was deposited into the Embassy in Moscow and Jordan National Bank.

139.  According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $607,985.00 in surcharges collected from M/09/86, a contract in which Zerich GMBH was the contracting company and Chevron was the underlying oil financier, was deposited into Jordan National Bank.

140.  According to information derived from SOMO's records and information from the Iraqi embassy and/or bank records, the IIC found that $901,588.95 in surcharges collected from M/10/75, a contract in which Zerich GMBH was the contracting company and Chevron was one of the underlying oil financiers, was deposited into the Embassy in Moscow.

**4.  Chevron Knew its Illegal Surcharge Payments Were Funneled to Saddam Hussein's "Slush Fund" For Terrorist Activities**

141.  Soon after he began demanding surcharges, Saddam Hussein announced a plan to provide financial rewards for Palestinians killed or wounded during the violent confrontations and terrorist campaigns called the Intifada, or the Intifada Al Quds. In order to encourage and incentivize suicide bombing attacks against Israeli civilian targets, Saddam Hussein publicized the rewards program providing more than double the reward for suicide bombers' families, and handed out checks to surviving family members at public ceremonies which were covered by Palestinian and Iraqi electronic and print media.

142.  Chevron, a multinational oil company constantly engaged with the international business community and with its own foreign policy apparatus, knew that Saddam Hussein funded and committed terrorist acts, such as suicide bombings, and other crimes against humanity against the citizens of the U.S. and Israel. As such, Chevron knew that payment of illegal surcharges outside the OFP would be used by Saddam Hussein, in part, to finance terrorist acts and other violations of the

laws of nations against U.S. and foreign nationals around the world. In fact, these illegal surcharges were the only means Saddam Hussein had to fund his continued acts of terrorism. Yet, Chevron continued making illegal payments into Saddam Hussein's slush fund despite what former U.S. Secretary of Defense Donald Rumsfeld described in April 2002 as Saddam Hussein's proud and publicly made decision "to go out and actively promote and finance human sacrifice."

143.   During the relevant time period and peak of the surcharge scheme, in addition to the numerous articles discussing Saddam Hussein's demand for surcharges, various news outlets reported on Saddam Hussein's reward payments to the families of Palestinian "martyrs":

a.   On January 5, 2001, the San Francisco Chronicle reported on Saddam Hussein's financial support of Palestinian suicide bombers.  The article stated that "Israelis accuse Hussein of using his money to cynically encourage Palestinian families to send their children to die. They say Hussein wants the uprising to escalate into a full-fledged Israeli-Arab war, which would advance his political rehabilitation."

b.   On January 7, 2001, major newspapers within the United States published a story from Newsday by which it was reported that "$10,000 payments to families of Palestinians killed in violence are intended to boost Saddam Hussein's influence." The news report quoted members of the ALF who were providing a $10,000 check to a family of a suicide bomber who had died in an attack against civilians. The article states that Saddam Hussein has distributed over 270 checks since November 2000 in an amount "equal to years of annual income for many Palestinian families."

c.   On August 1, 2001, the Houston Chronicle published an article stating that "Saddam has tried to align himself with the Palestinian uprising and has sent money to the families of Palestinians killed in the conflict…."

d.   On December 28, 2001, the New York Times reported that Saddam Hussein "openly, defiantly pays the families of suicide bombers…."

e.   On March 12, 2002 the Associated Press (AP) reported that Iraq Deputy Minister Tariq Aziz, told an Iraqi newspaper that Iraq has increased payments to families of Palestinian suicide bombers from $10,000 to $25,000. It was reported that Saddam Hussein had been

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1 making payments to families of terrorists since the Palestinian uprising began in September 2000.

2    f.   On April 4, 2002, the New York Post reported that Hussein has

3 increased payments to the families of Palestinian suicide bombers from $10,000 to $25,000, in order

4 to promote a "culture of political murder". This report quotes Hussein as stating that he would

5 continue to support Palestinian attacks "even if it means selling my own clothes". Defense Secretary

6 Donald Rumsfeld said that Saddam has "proudly, publicly made a decision to go out and actively

7 promote and finance human sacrifice...." The article also states that "it is clear that the payments are

8 playing an important role in convincing young Palestinians to become suicide bombers, and are being

9 welcomed by their families."  The very same information was published by the Houston Chronicle on

10 April 10, 2002.

11    144.   In April 2002, employees at Chevron communicated via email regarding a bill in the

12 Senate that would prohibit the import of Iraqi crude "until Iraq stops paying the families of suicide

13 bombers".

14    145.   In October 2002—*while Chevron was still actively engaged in the illegal kickback*

15 *scheme*—United States President George W. Bush observed: "[Saddam Hussein] has given shelter and

16 support to terrorism and practices terror against [his] own people. The entire world has witnessed

17 Iraq's 11-year history of defiance, deception and bad faith. . . . And we know that Iraq is continuing to

18 finance terror and gives assistance to groups that use terrorism to undermine Middle East peace."

19 Despite this clear message from the President of the United States, despite Saddam Hussein's decades-

20 long and widely known commitment to supporting terrorist activities, and despite clear federal and

21 international laws, Chevron *continued* to funnel illegal kickbacks into Saddam Hussein's terrorist

22 slush fund.

23    146.   Combining the knowledge of Saddam Hussein's demand for a surcharge and the

24 knowledge of his financial support of suicide bombers, Chevron knew that the money it was providing

25 Saddam Hussein through the surcharge scheme was being used to facilitate his terrorist activities.

26 / / /

27 / / /

28 / / /

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

E. **Chevron's Use of Third-Party Intermediaries to Engage in Illegal Transactions on Its Behalf Concealed Chevron's Role in Financing Saddam Hussein's Terrorist Activities**

147.    Oil companies paid high premiums to intermediaries on Iraqi oil purchases to cover surcharges. Chevron's payment of surcharges was concealed because it employed clandestine agents to bypass UN scrutiny. These intermediaries were corporate and private entities who received favorable and profitable oil allocations from Saddam Hussein for resale to purchasers such as Chevron in exchange for collecting illegal payments to be passed on to Saddam Hussein.

148.    As described in Paragraph 103, above, in early 2001, Samir Vincent assisted Chevron with the payment of illegal kickbacks to Saddam Hussein in connection with the purchase of over two (2) million barrels of oil.

149.    Belmetalnergo was a Belarusian trading company owned by the government of Belarus. Trustbank (formerly Infobank) owned 10% of the company and financially supported the company's business activities with Iraq. Trustbank is a private bank based in Minsk, Republic of Belarus with the Belarus government as a principal shareholder of the bank's capital. Belmetalnergo purchased oil from Iraq and had at least twenty written agreements with Iraq to provide illicit surcharge payments in exchange for oil allocations. Both Belmetalnergo's director Vladimir Zhavrid and Trustbank board of directors' chairman Victor Shevtsov acknowledged that illegal kickbacks were part of the contracts made with Iraq.

150.    Belmetalnergo paid nearly $464.2 million into the UN escrow account for Iraqi oil purchases totaling 21.6 million barrels. Chevron financed these oil purchases, made the necessary arrangements, filed the paperwork, and subsequently purchased the oil from Belmetalnergo. Between January 2001 and June 2002, Belmetalnergo purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contracts M/09/08, with a premium of $0.350, and M/11/69, with a premium of $0.40 or $0.41[6] per barrel.

151.    According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Belmetalnergo was $1,879,447.00, and

_____

[6] The premium varied on the amount of oil loaded.

Chevron was aware or deliberately avoided discovering that such kickbacks were paid on its behalf.

152.    Chevron also knew or deliberately avoided discovering that Belmetalnergo and Trustbank were closely tied to Saddam Hussein and other terrorist organizations. Trustbank, for example, brokered various contracts with Saddam Hussein for the provision of, among other things, military equipment and training for Iraqi armed forces in violation of relevant UN resolutions. In addition, Trustbank's board of directors' chairman, Victor Shevstov, had close ties with Saddam Hussein, and at one point, served as chairman of the Iraqi-Belarus Friendship Society. On August 28, 2004, the United States government designated Trustbank as a primary money laundering concern under Section 311 of the USA Patriot Act for its complicity in laundering funds for Saddam Hussein.

153.    As described in Paragraph 104, above, Fabrizio Loioli paid $45,000.00 into a secret Iraqi bank account in Jordan as a surcharge payment for oil purchased on behalf of Chevron. In a sworn statement to Italian prosecutors, Loioli stated that Chevron knew that illegal surcharge payments to Saddam Hussein were embedded in the "premiums" he charged Chevron.

154.    LADA- OMC is a Russian and Belarusian joint venture that distributes Lada cars in Belarus and operates a network of spare parts dealers. Chevron knew or deliberately avoided discovery that Lada OMC lacked any experience, reputation, or history in the oil trade. Between July and December 2000, Lada OMC purchased oil from Iraq on behalf of Chevron.  Chevron paid surcharges on contracts M/08/84, with a premium of $0.250, and M/09/49, with a premium of $0.490.

155.    According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Lada OMC was $149,980.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

156.    Zerich is a Swiss company with ties to extremist groups. According to a CIA report, Zerich served as a front for various groups that received oil allocations. Between July 2000 and December 2001, Zerich purchased oil from Iraq on behalf of Chevron.  Chevron paid surcharges on contracts M/08/87, with a premium of $0.250, M/09/86, with a premium of $0.400, and M/10/75, with a premium of $0.415 per barrel.

157.    According to the SOMO ledger of surcharges, Chevron paid over $2,339,251.00 in illegal surcharges to Saddam Hussein for oil purchases made by Zerich, and Chevron was aware or

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    deliberately avoided discovering that such kickbacks were being paid on its behalf.

2        158.    Erdem is a business broker company owned by Zeynel Abidin Erdem, a Turkish

3    businessman. Based in Istanbul, Turkey, the company purchased oil from Iraq on behalf of Mobil

4    Refining Company for the benefit of Chevron. Between January 2001 and June 2002, Erdem

5    purchased oil from Iraq on behalf of Chevron.  Chevron paid surcharges on contracts M/09/02, with a

6    premium of $0.360, M/10/65, with a premium of $0.480, and M/11/11, with a premium of $0.480.

7        159.    According to the SOMO ledger of surcharges, Erdem paid $2,687,984.00 in illegal

8    surcharges to Saddam Hussein on behalf of Chevron for its oil purchases, and Chevron was aware or

9    deliberately avoided discovering that such kickbacks were paid on its behalf.

10       160.    Fal Oil, based in Sharjah, United Arab Emirates. Between January 2001 and June 2001,

11   Fal Oil purchased oil on behalf of Chevron in Iraq. Chevron paid surcharges on contract M/09/51,

12   with a premium of $0.380 per barrel.

13       161.    According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid

14   to Saddam Hussein by Chevron for oil purchases made by Fal Oil was $1,213,146.00, and Chevron

15   was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

16       162.    Between January 2001 and June 2001, H.I.U. Ltd. purchased oil from Iraq on behalf of

17   Chevron. Chevron paid surcharges on contract M/09/111, with a premium of $0.470.

18       163.    According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid

19   to Saddam Hussein by Chevron for oil purchases made by H.I.U. Ltd. was $1,499,979.00, and

20   Chevron was aware or deliberately avoided discovering that such kickbacks were paid on its behalf.

21       164.    Between January 2001 and June 2001, Jewen Oil purchased oil from Iraq on behalf of

22   Chevron. Chevron paid surcharges on contract M/09/72, with a premium of $0.390.

23       165.    According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid

24   to Saddam Hussein by Chevron for oil purchases made by Jewen Oil was $1,220,834.00, and Chevron

25   was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

26       166.    Naftogaz is a national joint stock company of Ukraine involved in the production,

27   refinery, distribution, and transportation of oil and gas in Ukraine. Between July 2001 and December

28   2001, Naftogaz purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contract

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

M/10/41, with a premium of $0.480.

167.     According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Naftogaz was $601,266.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

168.     Tatnet is a Russian oil company with over 30 subsidiaries. Between July 2001 and December 2001, Tatneft purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contract M/10/05, with a premium of $0.410.

169.     According to the SOMO ledger of surcharges, the total sum of surcharges paid to Saddam Hussein by Chevron for oil purchases made by Tatneft was $1,468,281, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

170.     Machinoimport is a joint stock company and subsidiary of OOO New Resources Ltd. Between July 2001 and December 2002, Machinoimport purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contracts M/10/11, with a premium of $0.405, M/10/19, which the IIC found that $1,221,074.40 in surcharges were paid, M/11/17, with a premium of $0.450, M/11/79, with a premium of $0.440, and M/12/01, with a premium of $0.065.

171.     According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid to Saddam Hussein by Chevron for oil purchases made by Machinoimport was $4,517,979.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were paid on its behalf.

172.     AAS is a Syrian trading company headquartered in Damascus, Syria. Between January 2002 and June 2002, AAS purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contract M/11/32, with a premium of $0.460.

173.     According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid to Saddam Hussein by Chevron through AASG was $104,990.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

174.     Sinochem is a petroleum oil trading company and subsidiary of Sinochem Corporation. Between July 2002 and December 2002, Sinochem purchased oil from Iraq on behalf of Chevron. Chevron paid surcharges on contract M/12/38, with a premium of $0.40, and contract M/13/08, with a premium of $0.040.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

175.   According to the SOMO ledger of surcharges, the total sum of illegal surcharges paid by Chevron to Saddam Hussein for oil purchases made by Sinochem was $1,170,573.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

176.   Between January 2002 and June 2002, Kalmeftegaz purchased oil from Iraq on behalf of Chevron. The total sum of surcharges paid to Saddam Hussein by Chevron for oil purchases made by Kalmeftegaz was $620,296.00, and Chevron was aware or deliberately avoided discovering that such kickbacks were being paid on its behalf.

177.   Chevron knew  or should have known that at least some – if not all –  of these third party companies were a front or brass plate companies, with " no experience in the oil business, no real business operations, and had no known assets" and were established to evade the OFP.

178.   Nevertheless, over a period of over two years, and more than forty (40) contracts Chevron intentionally, purposefully and routinely continued to approve payments to third parties for underpriced Iraqi oil that included illegal payments, notwithstanding a purported corporate policy against paying such illegal surcharges. These purchases were nonetheless approved by corporate management in the United States.

179.   Chevron, from its headquarters in San Ramon California, intentionally and purposefully concealed these purchases and illegal payments made in violation of the OFP, and other US and international laws, by failing to fairly reflect the true nature of these bribes or kickbacks as illegal transactions, and instead designated them as "premiums."

**F.     With Funds From the Surcharge Scheme, Saddam Hussein Joined Forces with Other Terrorist Groups to Attack U.S. and Israeli Citizens**

180.   While Chevron was providing material financial support to Saddam Hussein through illegal OFP kickbacks, Saddam Hussein provided safe haven, training camps, office space, ammunition, explosives, weapons, espionage training, suicide bombing training, financial, operational, and logistical support for Palestinian terrorist groups and Palestinian terrorists, including Hamas, the PIJ, the AAMB, and his own Arab Liberation Front.

181.   Until his capture in late 2003, Saddam Hussein called upon an "irregular" arm of his Iraqi army known as the Arab Liberation Front ("ALF"), to carry out numerous acts of international

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

terrorism, including violent terrorist attacks perpetrated against U.S. and Israeli citizens. According to Rakad Mahmoud Salameh Salem ("Rakad Salem"), ALF General Secretary and Secretary of the Ba'ath Party Palestine Organization leadership in Ramallah, West Bank, ALF had a direct channel with the Iraqi leadership.  Saddam Hussein directed the ALF to specifically target civilian populations in its terrorist attacks.

182.    In addition to missions carried out by the ALF, Saddam Hussein sought to violently expel the U.S. from the Middle East by openly employing, directing, and supporting numerous "Palestinian Terrorist Groups," including Hamas, the PIJ, and the AAMB. According to the U.S. State Department report Patterns of Global Terrorism-2002: "Baghdad provided material assistance to other Palestinian terrorist groups that are in the forefront of the Intifada", including Hamas and the PIJ.

183.    Based on documents seized by U.S. military forces, Saddam Hussein funneled over $100 million to these terrorist groups for the purpose of planning and carrying out acts of international terrorism, including the suicide bombings and violent attacks that injured Plaintiffs herein.

184.    Hamas is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad," or holy war. Hamas is formally committed to the destruction of the State of Israel through violent acts of terrorism. Hamas was designated a "Specially Designated Terrorist" entity by the U.S. government in 1995, and then as a Foreign Terrorist Organization in 1997.  Since at least 1995, Hamas' status as a designated terrorist organization and then as an FTO since 1997, and its commitment to the violent destruction of Israel, have been widely known to the public and especially to the international business entities trading oil in the Middle East, like Chevron.

185.    From 2000 until approximately early 2003 Saddam and the Saddam Regime provided Hamas with offices in Iraq, training camps and funding and held high level meetings with Hamas military leaders, including Khalid Mishal and Mahmoud A1 Zahar.

186.    The Palestinian Islamic Jihad - Shiqaqi Faction is an international terrorist organization with "cells" or units located throughout the world. PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family." Similar to Hamas, PIJ is committed to the globalization of Islam through violent "jihad," or holy war. Like Hamas, PIJ is also formally committed to the destruction of the State of Israel through violent acts of terrorism. PIJ was designated

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

a "Specially Designated Terrorist" entity by the U.S. government in 1995, and then as a Foreign Terrorist Organization in 1997. Since at least 1995, PIJ's status as a designated terrorist organization, and its commitment to the violent destruction of Israel, have been widely known to the public and especially to the international business entities trading oil in the Middle East, like Chevron.

187.   From 2000 until approximately the end of 2002 Saddam and the Saddam Regime provided PIJ with military instructors and held high level meetings with senior PIJ military commanders, including Abu Tareq Ziyad Rashid Hussein.

188.   The Al-Aqsa Martyrs' Brigade is a paramilitary offshoot of the Palestinian Fatah movement. The AAMB is committed to the destruction of the State of Israel through violent acts of terrorism.   In March 2002, the U.S. government designated AAMB as a Foreign Terrorist Organization. While AAMB's terrorist acts were widely publicized prior to its designation as a Foreign Terrorist Organization, since at least March 2002, AAMB's status as a designated terrorist organization, and its commitment to the violent destruction of Israel, have been widely known to the public and especially to the international business entities trading oil in the Middle East, like Chevron.

189.   From about 2000 until approximately early 2003, Saddam Hussein openly provided funding, weapons, training, and military equipment to the AAMB. Special training bases were established for Palestinians at the Al Quds and Al Aziziyya special military bases. Saddam Hussein's Vice President, Taha Yassin Ramadan, issued hand-written instructions to contacts within the Palestinian territories to finance military activity, purchase weapons, elect those excelling in jihad, empower local commanders, and forward lists of "self-martyrs" (suicide bombers), martyrs and their political affiliations.

190.   From at least 2000 through 2003—while Chevron was providing financial support to Saddam Hussein through illegal OFP kickbacks—Saddam Hussein openly welcomed members of Hamas, the PIJ, and the AAMB to an army camp outside of Baghdad, where they were trained in the use of small arms, machine guns, hand grenades, and the use and production of explosives and detonation systems, including electrical, chemical and cellular detonators. During this time, Saddam Hussein provided the groups with safe haven, training camps, office space, ammunition, explosives, weapons, espionage training, suicide bombing training, financial, operational, and logistical support.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

191.    From at least 2000 through 2003—while Chevron was providing financial support to Saddam Hussein through illegal OFP kickbacks—Saddam Hussein openly joined forces with members of Hamas, the PIJ, and the AAMB for the purpose of jointly launching widespread and systematic attacks against unarmed American and Israeli citizens through suicide bombings and other shockingly egregious acts of international terrorism, including the attacks that injured Plaintiffs.

192.    Chevron knew that Saddam Hussein had a specific purpose for the illegal kickbacks it demanded from oil purchasers: to provide the funding, means and capacity to FTOs, including Hamas, PIJ and AAMB, to perpetrate a wave of suicide bombings directed at the Plaintiffs and other Americans and Israeli civilians, and Chevron was completely indifferent to the massive deaths and injuries its illegal provision of U.S. dollars would cause.

### 1.    Saddam Hussein Used Funds From the Illegal Kickback Scheme to Recruit and Compensate Suicide Bombers and Other Terrorists

193.    With the increased amount of money illegally paid by Chevron and others, Saddam Hussein could once again finance terrorist attacks targeting U.S. and Israeli interests in the Middle East, including the attacks against Plaintiffs herein.

194.    Beginning in 2000, Saddam Hussein made countless public announcements recruiting volunteers to become "martyrs" for the country. He publicly offered to pay suicide bombers a financial reward in consideration for carrying out his stated goal of displacing American interests in the Middle East and destroying the State of Israel. His commitment to financing such attacks was equally publicized, and Chevron knew that its illegal kickbacks would be used, at least in part, to fund Saddam Hussein's wave of suicide bombings and crimes against humanity, and his anti-American, anti-Israeli agenda. For example:

a.    On October 8, 2000, Saddam Hussein made a public speech, which was broadcast on Iraqi television, wherein he agreed to "open camps for volunteers for jihad to liberate Palestine so as to allow them to complete their *military training*;" "to donate 5 million euro for the martyrs of Palestine and in aid to the intifada;" and "to consider the martyrs of the valiant Palestinian intifada as martyrs of the Mother of Battles."

b.      In or about October 2000, Saddam Hussein publicly offered to provide financial rewards for Palestinians killed or wounded during violent confrontations and terrorist campaigns aimed at Israeli and United States citizens, including Plaintiffs. According to a February 2001 Washington Times article, Rakad Salem from Saddam Hussein's Arab Liberation Front reportedly offered a total of $4 million to the families of these "martyrs" over the course of less than one year.

c.      According to a report printed in the official Iraqi newspaper on November 20, 2000, the 48th session of the Iraqi ministers resolved to support the Palestinian intifada in all possible ways. On November 26, 2000, the newspaper quoted Saddam Hussein as calling on the Arab nations to be more cooperative in helping the Palestinians with their armed struggle.

d.      Also in 2000, Saddam Hussein urged "the people's masses to work relentlessly to expel the U.S. embassies and centers from the Arab countries as well as to uproot and expel any Zionist presence in these countries."

e.      Saddam Hussein celebrated anti-American and anti-Israeli suicide bombers in a March 4, 2002 speech: "We are glad about the spirit of the Palestinian people's spirit of self-martyrdom and heroism. . . . By Allah, what the Palestinian people have done surpasses my expectations."

f.      Saddam Hussein ordered a memorial to be erected in one of Baghdad's main squares to honor the first Palestinian female suicide bomber, who on January 27, 2002, detonated explosives in Jerusalem, killing herself and wounding dozens of people.

195.    In November 2004, the United States House of Representatives International Relations Committee investigated the money trail of the Oil for Food Program by Saddam Hussein. According to committee investigators, Saddam Hussein diverted money from the UN oil for food program to pay millions of dollars to families of Palestinian suicide bombers who carried out attacks on Israel.  The former Iraqi President tapped secret bank accounts – over 1,500 – in Jordan where he collected bribes from foreign companies and individuals and used the money to reward families of Anti-American and Anti-Israeli suicide bombers in Israel up to $25,000 each. Money from kickbacks on oil for food deals, were paid into accounts held by a Jordanian branch of the Iraqi government owned Rafidain Bank according to investigators.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

196.    Congressman Henry Hyde has publicly stated that according to employees of the Iraqi Central Bank and the Rafidain Bank, the former Iraqi ambassador to Jordan, Sabah Yassen, personally withdrew money from the accounts to make payments ranging from $15,000 ([euro]11,564) to $25,000 ([euro]19,274) to the families of Palestinian suicide bombers.

197.    The contractual terms favored suicide bombing over other types of attacks.  According to Rakad Salem, ALF General Secretary, Saddam Hussein determined that the allocation of sums and surviving family members of successful suicide bombers received $25,000 versus a $10,000 reward following other types of attacks. The financial rewards offered by Saddam Hussein played an important role in persuading Palestinians to become suicide bombers.  The amounts paid were equal to years of annual income for many Palestinian families.

198.    Commonly referred to as a "President Saddam Hussein's Grant," the payments to suicide bombers' families encouraged the frequent and widespread acts of terror against Israeli and U.S. citizens. Despite strict economic sanctions against Iraq, Saddam Hussein's payments to surviving family members far exceeded, for example, the $5,300 typically paid by the Saudis for similar acts of "self-martyrdom." Saddam Hussein was able to pay such large sums of money to suicide bombers because of the "slush fund" he amassed, in part, from illegal kickbacks paid by Chevron.

199.    Following a deadly attack, the perpetrator's family would be celebrated in a public ceremony, presented with a substantial financial payment, and awarded certificates of appreciation signed by Saddam Hussein. Participants in the ceremonies would wave Palestinian and Iraqi flags while standing in front of photos of Saddam Hussein, thanking Saddam Hussein for his generous financial aid. These elaborate public ceremonies occurred frequently, sometimes multiple times per month, and were heavily covered by Palestinian, European, American, and Iraqi electronic and print media.

/ / /

/ / /

/ / /

/ / /

/ / /



**Figure:  CNN World News Report on Public Ceremonies**

200.    While Saddam Hussein employed a variety of strategies and methods to direct, authorize, and incite Palestinian organizations to commit international terrorist acts, none were more effective that the willingness to pay financial rewards for human sacrifice. Saddam Hussein's ability to pay life-changing sums of money to poverty-stricken families of suicide bombers, and his ability to publicly broadcast their "noble sacrifice" with great fanfare, heavily influenced and motivated susceptible youths to join terrorist organizations and seek martyrdom.

201.    Numerous gratitude letters to Saddam Hussein from families of "martyrs" ("shahids") were published in Palestinian newspapers to incite, encourage and incentivize others to commit suicide bombings, acts of genocide, terrorism, torture, extrajudicial killing and crimes against humanity.

202.    The United States government affirmed the causal effectiveness of such payments in *inciting* acts of terror. In November 2001, a Federal Bureau of Investigation ("FBI") memorandum concerning Hamas funding noted that ***through financial support***, "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace."

203.    Chevron's payment of illegal surcharges and kickbacks provided, in part, the funding used by Saddam Hussein to incentivize and finance these terrorist attacks.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

### 2. Saddam Hussein's Army of Surcharge-Funded Suicide Bombers Committed Countless Acts of Terrorism Against U.S. and Israeli Citizens, Including the Heinous Attacks Against Plaintiffs

204.   The illegal kickbacks paid by Chevron were, in part, used by Saddam Hussein to finance international terrorist attacks and crimes against humanity. Chevron is, thus, responsible for the following crimes and acts of international terrorism committed by recruited terrorists with the intent to kill or injure American citizens and to destroy the State of Israel by the systematic murder of Jews and other Israelis, including the Plaintiffs.

205.   Saddam Hussein's agent, Rakad Salem, ALF General Secretary, was in charge of the distribution of Iraqi funds to the families of suicide bombers.

206.   Such funds were transferred from the Iraqi Rafidain Bank, Shreim Commercial Complex, Beat Seera St 4, Amman, Jordan, to the Palestinian Investment Bank in Amman, Jordan, and from there to the Palestinian Investment Bank in Ramallah, West Bank, for deposit into the account of Raked Salem, account number 040-04198515.

207.   Rakad Salem, who was arrested by the Israel Police in October 2002 and sentenced for his crimes, admitted that he distributed, from the beginning of the "Intifada," approximately $15,000,000.00 which he received from the government of Iraq.  The network distributing funds to suicide bombers, their families, and others who participated in attacks on civilians in Israel, included an agent responsible for distribution in Gaza, an agent who was responsible for distribution in the northern West Bank, and another agent of Iraq who was responsible for rewarding suicide bombings and other attacks in Bethlehem, in the southern West Bank.

208.   In his statement to the Israeli Police, Raked Salam admitted that the government of Iraq decided to transfer money to families of the casualties and the wounded in the violent incidents which broke out at the end of 2000.  In order to execute the plan, monies were transferred from Iraq, by bank transfer (via an Iraqi Bank in Amman Rafidain), to the bank account in Ramallah. Upon execution of the money transfer from Baghdad, Raked Salam would receive a notice. He would then draw checks from the account and deliver them to the families of casualties ("Shahids") and wounded, as well as to families whose houses were destroyed.

209.    According to the Israel Ministry of Foreign Affairs, based on documents captured by the Israel Defense Forces ("IDF") in the ALF and Iraqi Baath organization headquarters in Ramallah, the Palestinian Embassy in Jordan was an active component in the system that processes the requests for Saddam Hussein's financial aid for the families of terrorists and suicide terrorists residing in Jordan.  Requests were transferred from Amman to Rakad Salem in Ramallah in order for him to transfer them to Iraq.

210.    Congressman Hyde has also publically stated that according to employees of the Iraqi Central Bank and the Rafidain Bank, the former Iraqi ambassador to Jordan, Sabah Yassen, personally withdrew money from the accounts to make payments ranging from $15,000.00 to $25,000.00 to the families of Palestinian suicide bombers.

211.    Saddam Hussein caused reward and incentive payments to be made to each one of the terrorists and\or suicide bombers who perpetrated the attacks against the Plaintiffs, causing the murder or maiming of the Plaintiffs, The following payments were made to the terrorists families in order to incentivize and/or otherwise support and enable them to perpetrate the murder and maiming of the Plaintiffs:

a.    *November 22, 2000:  Hadera Bus Station*

212.    On November 22, 2000, a suicide bomber named Mahmud Sulayman Ahmad al-Madani, a member of Hamas, detonated an explosive device onboard a bus leaving Hadera bus station in the town of Hadera.

213.    The blast killed at least two people, including (21) Shoshana Ris, whose estate brings claims on her behalf. The blast also injured thirty-six others, including (26) Hana Segal, whose estate brings claims on her behalf, Plaintiff (28) Michal Ganon, and Plaintiff (30) Azanu Getaun [named as Getaun Azanu in original complaint].

214.    Family members of the Plaintiffs who were killed or injured in the November 22, 2000 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Shoshana Ris's parents, (22) Tuvia Ris and (23) Tzvia Ris; Hana Segal's daughter, (27) Pnina Alterovich; Michal Ganon's mother, (29) Viviane Asraf; and Getaun Azanu's wife, (31) Habasta Getaun [named as Habasta Azanu in original complaint], and his children, (32) Simcha

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   Getaun [named as Simcha Azanu in original complaint], (33) Avital Getaun [named as Avital Azanu

2   in original complaint], (34) Eden Getaun [named as Eden Azanu in original complaint], and (35) Amir

3   Getaun [named as Amir Azanu in original complaint].

4       215.   According to records seized from the Saddam Regime's military intelligence, on or

5   about April 28, 2001, the suicide bomber's mother Nihad Madani received check no. 20000729 in the

6   amount of $10,000.00, signed by Rakad Salem and paid on behalf of Saddam Hussein with funds

7   acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

8       216.   Mahmoud al-Madani was a senior Hamas military leader in Nablus.  He was killed by

9   IDF on February 19, 2001.

10          **b.**     *January 1, 2001: Herzel and Dizengoff Street in Natanya. Israel*

11      217.   On January 1, 2001, a suicide bomber named Hamed Falah Mustafa Abu Hijla, a

12  member of Hamas, detonated a car bomb on the corner of Herzel and Dizengoff Street in Natanya,

13  Israel.

14      218.   At least thirty-six people were injured, including the Hershkovitz Family: Plaintiff (36)

15  Zehava Hershkovitz and her children, Plaintiffs (37) Sapir Hershkovitz and (38) Dor Hershkovitz, and

16  Plaintiffs (43) Perach Baruch [named as Baruch Perach in original complaint] and (47) Maayan

17  Furman.

18      219.   Family members of the Plaintiffs who were killed or injured in the January 1, 2001

19  bombing also bring claims for their own suffering relating to the attack and their family member's

20  serious injuries: Zehava Hershkovitz's husband and father to the Hershkovitz children, (39) Shimon

21  Hershkovitz, and her parents, (41) Elimelech Berkovitz and (42) Marcela Berkovitz; Perach Baruch's

22  mother, (44) Naima Baruch [named as Naima Shimon Baruch in original complaint], his sister, (45)

23  Nourit Garbe, and his son, (46) Guy Baruch; and Maayan Furman's mother, (48) Orit Furman.

24      220.   According to records seized from the Saddam Regime's military intelligence, on or

25  about June 18, 2001, the suicide bomber's mother Zuhayra Ahmad Faleh Abu Hijlah received check

26  no. 20000476 in the amount of $10,000.00, signed by Rakad Salem and paid on behalf of Saddam

27  Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the

28  OFP.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

### c.     *March 3, 2001: Main Street in Netanya, Israel*

221.     On March 4, 2001, a suicide bomber named Ahmad Umar Hamdan A'alian, a member of Hamas, detonated an explosive-laden case on the Main Street of Netanya, Israel, killing three people and wounding sixty-five people, including Plaintiffs (49) Bosmat Bella Dahan [named as Bosmat Glam in original complaint], (52) Ariel Mahfud and (57) Mazal Alevi.

222.     Family members of the Plaintiffs who were injured in the March 4, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Bosmat Bella Dahan's parents, (50) David Glam and (51) Rachel Glam; Ariel Mahfud's mother, (53) Sarah Mahfud, his wife, (54) Debora Mahfud, and his sons, (55) Roy Mahfud and (56) Yair Mahfud; and Mazal Alevi's children, (58) Yonatan Alevi, (59) Orly Ortal Halevi [named as Ortal Alevi in original complaint], and (60) Eyal Maliach [named as Eyal Alevi in original complaint].

223.     According to records seized from the Saddam Regime's military intelligence, on or about March 19, 2001, the suicide bomber's family received check no. 20000640, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

### d.     *March 27, 2001 Hagiva Hatzarftit Junction in Jerusalem*

224.     On March 27, 2001, a suicide bomber named Dihiya Al-Tawil, a member of Hamas, detonated an explosive device strapped to his body on a Jerusalem bus at the Hagiva Hatzarftit Junction in Jerusalem.

225.     The blast wounded twenty-eight people, including Plaintiff (61) Shmuel Shfaim. The suicide bomber's family is believed to have received substantial compensation, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

226.     Shmuel Shfaim's family members also bring claims for their own suffering relating to the March 27, 2001 attack and Shmuel's serious injuries: Shmuel's wife, (62) Iris Shfaim, and his children, (63) Roy Shfaim, (64) Dan Shfaim, (65) Yaakov Matan Shfaim [named as Matan Shfaim in original complaint], (66) Inbal Shfaim-Heber [named as Inbal Shfaim in original complaint], and (67) Neta Shfaim.

227.   According to records seized from the Saddam Regime's military intelligence, Yusra Muhammad al-Tawil, a member of the suicide bomber's family in the district of Ramallah, received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

                    e.   ***March 28, 2001: Neveh Yamin/Kfar Saba Junction, Israel***

228.   On March 28, 2001, a suicide bomber named Fadi Attallah Yususf A'mer, a member of Hamas, detonated an explosive device strapped to his body near a gas station at the Neveh Yamin/Kfar Saba Junction, killing two people, including Plaintiffs (68) Naftali Lanzkron and (80) Eliran Rozenberg, whose estates bring claims on their behalves. Four people were wounded, including Plaintiffs (87) Rafael Zommer [named as Rafael Sommer in original complaint] and (90) Hannanel Touitou.

229.   Family members of the Plaintiffs who were killed or injured in the March 28, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Naftali Lanzkron's parents, (69) Meir Lanzkron and (70) Hava Lanzkron, and siblings, (71) Yael Bracha Hershovitz [named as Brakha Hershkovitz in original complaint], (72) Oria Lanzkron, (73) Yechiel Moshe Binyamin Lanzkron [named as Yekhiel Lanzkron in original complaint], (74) Elisheva Lanzkron, (75) Netanel Lanzkron, (76) Yedidia Lanzkron, (77) Yehuda Lanzkron, (78) Shoshana Rotenberg, and (79) Merav Shamir; Eliran Rozenberg's mother, (81) Michal Zayat [named as Michal Zayat Rozenerg in original complaint], and siblings, (82) Hila Reichner [named as Hila Zayat in original complaint], (83) Shirin Zayat, (84) Noam Zayat, (85) Noga Zayat, and (86) Ziv Zayat; Rafael Zommer's parents, (88) Rochelle Zommer [named as  Rachel Sommer in original complaint] and (89) Israel Zommer [named as Israel Sommer in original complaint]; and Hannanel Touitou's parents, (91) Ester Touitou and (92) Haron Touitou.

230.   According to records seized from the Saddam Regime's military intelligence, a member of the suicide bomber's family Kamel Sa'id Abdullah Al-Zbeidi, received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

**f.**     *May 18, 2001: Hasharon Mall in Netanya, Israel*

231.     On May 18, 2001, a suicide bomber named Mahmud Ahma Mahmud Mirmash, a member of Hamas, detonated an explosive device strapped to his body at the entrance to the Hasharon Mall in Netanya, killing five people, including Plaintiff (93) Vladislav Sorokin, whose estate brings claims on his behalf. Eighty-six people were wounded, including Plaintiffs (94) Olesya Sorokin (Vladislav's wife) and (95) Alexander Sorokin (Vladislav's son), and Plaintiffs (96) Samina Hila Chen [named as Hila Chen in original complaint], (97) Moran Zak [named as Moran Rokach in original complaint], (98) Liat Margi [named as Liat Rokach in original complaint], (103) Hadad Dikla, (108) Inna Segal [named as Ina Segal in original complaint], (59) Orly Ortal Halevi, (112) Solange Azran, (113) Maxim Azulai, (114) Eliyahu Sarusi [named as Eli Sarusi in original complaint], (115) Lilian Peretz, (121) Meital Maymony, and (124) Yuri Abramov.

232.     Family members of the Plaintiffs who were killed or injured in the May 18, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Moran and Liat Margi's parents, (99) Yossef Rakach [named as Joseph Rokach in original complaint] and (100) Yaffa Rakach [named as Yaffa Rokach in original complaint], and sisters (101) Yahalomit Toledano [named as Yahalomit Rokach in original complaint] and (102) Rosi Eyal [named as Rosi Rokach in original complaint]; Hadad Dikla's parents, (104) Hadasah Hadad [named as Hadas Hadad in original complaint] and (105) Haim Hadad, and siblings, (106) Yogev Hadad and (107) Neama Hadad; Inna Segal's daughters, (109) Diana Abramov [named as Diana Segal in original complaint], (110) Christina Abramov [named as Christina Segal in original complaint], and (111) Sharon Segal; Orly Ortal Halevi's mother, (57) Mazal Alevi, and brothers, (60) Eyal Maliach and (58) Yonatan Alevi; Lilian Peretz's husband, (116) Meir Peretz, and children, (117) Dalya Peretz-Pancirer [named as Dalya Peretz in original complaint], (118) Oren Peretz, (119) Ely Peretz, and (120) Moshe Peretz; and Meital Maymony's parents, (122) Guy Maymony and (123) Kludin Maymony.

233.     According to records seized from Iraqi military intelligence, on May 29, 2001, a member of the suicide bomber's family Aesha 'Abd Al-Fatah 'Ali Mirmash received check no. 20000790 in the amount of $10,000.00, and then on and June 19, 2001, Ali Mirmash received check no. 20000806 in the amount of $5,000.00, totaling $15,000, paid on behalf of Saddam Hussein with

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

2             **g.    *May 25, 2001: Central Station in Hadera***

3        234.    On May 25, 2001, two suicide bombers Usama Nimer Darwish Abu Al-Hija and Ala

4  Hilal Sabah, both members of PIJ, drove an explosives-laden car into the side of a bus near the central

5  station in Hadera. Sixty-five people were wounded, including siblings Plaintiffs (125) Shay Amar,

6  (126) Tzachi Amar, and (127) Shir Gabay [named as Shir Amar in original complaint], and Plaintiff

7  (130) Carmela Litmanowitz.

8        235.    Family members of the Plaintiffs who were injured in the May 25, 2001 bombing also

9  bring claims for their own suffering relating to the attack and their family member's serious injuries:

10 the Amar siblings' parents, (128) Negba Amar and (129) Binyamin Amar; and Carmela Litmanovic's

11 sister, (131) Stella Maris Dos Santos [named as Stela-Maris DosSantos in original complaint].

12       236.    According to records seized from the Saddam Regime's military intelligence, on or

13 about June 18, 2001, Salima Najib 'Abd Al-Fatah Abu Al-Jiaja received check no. 20000804 in the

14 amount of $15,000.00, and Hilal Abd Al Satar Ali Sabah received check no. 20000803, also in the

15 amount of $15,000.00, paid on behalf of Saddam Hussein with funds acquired, in part, from

16 Chevron's payment of illegal kickbacks in violation of the OFP.

17          **h.    *June 1, 2001: Dolphinarium Dance Club in Tel Aviv, Israel***

18       237.    On June 1, 2001 a suicide bomber named Said Hutari, a member of Hamas, detonated

19 an explosive device strapped to his body at the entrance to the Dolphinarium Dance Club in Tel Aviv.

20 The majority of those killed or injured were girls between the ages of fourteen and eighteen

21 celebrating their high school graduation. The blast was so intense that it tore limbs from the victims'

22 bodies and scattered their flesh up to six blocks away. Twenty-two young people were killed,

23 including (132) Simona Rudin, whose estate brings claims on her behalf, and eighty-three others were

24 wounded, including Plaintiffs (134) Margarita Abramov, (135) Yakaterina (Kati) Peline [named as

25 Katerina Peline in original complaint], (139) Alexander Plotkin [named as Alexandera Plotkin in

26 original complaint], and (141) Andrey Tailakov. The suicide bomber's family received a check paid

27 on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

28 kickbacks in violation of the OFP.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

238.   Family members of the Plaintiffs who were killed or injured in the June 1, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Simona Rudin's father, (133) Mark Rudin; Yakaterina Peline's parents, (136) Victor Peline and (137) Galina Peline, and brother, (138) Alexander Peline; Alexander Plotkin's mother, (140) Olena Plotkin [named as Elena Plotkin in original complaint]; and Andrey Tailakov's mother, (142) Simona Kaufman, and brother, (143) Igor Kaufman.

239.   According to records seized from the Saddam Regime's military intelligence, a member of the suicide bomber's family, received a check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

### i.   *July 16, 2001:  Bus Stop in Binyamina, Israel*

240.   On July 16, 2001, a suicide bomber named Nidal Ibrahim Abu Shaduf, a member of PIJ, detonated an explosive device strapped to his body at a bus stop in Binyamina, killing two people and injuring eleven, including Plaintiff (144) Bentzion Avdaev.

241.   Bentzion Avdaev's family members also bring claims for their own suffering relating to the July 16, 2001 attack and Bentzion's serious injuries: Bentzion's parents, (145) Ovadia Avdaev and (146) Avigail Avdaev, and siblings, (147) Ariel Avdaev, (148) Boris Avdaev, and (149) Sonia Haim [named as Sonia Avdaev in original complaint].

242.   According to records seized from the Saddam Regime's military intelligence, on or about August 20, 2001, the suicide bomber's father Ibrahim Mustafa Muhammad Abu Shaduf received check no. 20000846 in the amount of $15,000.00, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

### j.   *August 9, 2001:  Sbarro Restaurant in Jerusalem, Israel*

243.   On August 9, 2001, a suicide bomber named Izz al-Din Shuhail Ahamd al-Masri, a member of Hamas, detonated an explosive device strapped to his body at the Sbarro restaurant located on King George and Jaffa Streets in Jerusalem, killing 15 people and wounding 110 people, including the Amar Family: Plaintiff (150) Anat Amar, and her children, Plaintiffs (151) Eliad Amar, (152) Chagai Amar, (153) Noam Amar, and (154) Gafnit Amar. Anat's wife and the children's father, (155) David Michel Amar, brings claims for his own suffering from the attack and his family's injuries.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

244.   According to records seized from the Saddam Regime's military intelligence, on or about August 27, 2001, the suicide bomber's father Shuhail Ahamd Ismail Al-Masri received check no. 20000861 in the amount of $15,000.00, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

### k.   *October 4, 2001:  Bus Station Afula, Israel*

245.   On October 4, 2001, a gunman named Nazir Muhammad Mahmud Hamad, a member of AAMB, opened fire at the central bus station of Afula in north-central Israel, killing three people, including (156) Haim Ben Ezra, whose estate brings claims on his behalf. Haim's wife, (157) Sol Ben Ezra, and his children, (158) Yossef Ben Ezra, (159) Moshe Ben Ezra, (160) Mordechai Ben Ezra, (161) Ami Ben Ezra [named as Amram Ben Ezra in original complaint], and (162) Lea Ben Ezra, also bring claims for their own suffering relating to the attack and Haim's death.

246.   According to records seized from the Saddam Regime's military intelligence, on or about November 3, 2001, the gunman's mother Sawsan Samih Fayez Hamad received check no. 20000964, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

### l.   *November 4, 2001:  French Hill Intersection in Jerusalem*

247.   During rush hour on November 4, 2001, a gunman named Hatem Shweikeh, a member of PIJ, armed with M-16 automatic rifles, opened fire on Bus No. 25 at the French Hill intersection in Jerusalem. Two teenagers were killed, and forty-five others were injured in the attack. Among the casualties of the French Hill attack was 14-year-old (163) Menashe Regev, whose estate brings claims on his behalf. Those wounded in the attack included Plaintiffs (7) Shifra Markowitz aka Shifra Steindler, (10) Sarah Mordechai, (13) Ora Rubinoff, (18) Gila Schnall (165) Odelia Dahan [named as Odelia Abecassis in original complaint], (168) Tzuria Helman [named as Tzuria Amosi in original complaint], (171) Oshra Chai [named as Oshra Avitzur in original complaint], (174) Tzvi Yehuda Goldenberg, (177) Miriam Einhausen [named as Miriam Ishaki in original complaint], (182) Rivka Malka Tenenbaum [named as Ricky Kleinman in original complaint], (6) Yissachar Zvi Lebowitz, (187) Tamar Smith [named as Tamar Levenson in original complaint], (190) Tamar Oziel, and (193) Moriah Cohen [named as Moria Rabi in original complaint].

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

248.    Plaintiff (6) Yissachar Zvi Lebowitz is a United States citizen. Yissacher was eleven years old at the time of the November 4, 2001 French Hill Shooting. Yissacher suffered and continues to suffer from psychological injuries as a result of the shooting.

249.    Plaintiff (7) Shifra Markowitz is a United States citizen. Shifra was sixteen years old at the time of the November 4, 2001 French Hill Shooting. Shifra suffered physical and psychological injuries and emotional trauma as a result of the shooting, including witnessing the violent death of a close friend. Shifra had to have pieces of shattered glass removed from her neck and hands. Shifra's parents, Plaintiffs (8) Deborah Esther Markowitz [named as Devora Esther Markowitz in original complaint] and (9) Gerald Louis Markowitz, also bring claims for their suffering relating to the attack and Shifra's injuries.

250.    Plaintiff (10) Sarah Mordechai is a United States citizen. Sarah was fifteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Sarah suffered physical and psychological injuries, including witnessing the violent death of a close friend, and was required to seek medical attention following the attack to remove shattered pieces of glass from her body.

251.    Plaintiff (13) Ora Rubinoff is a United States citizen. Ora was sixteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Ora suffered serious psychological injuries, including an acute stress reaction. Ora also witnessed the violent death of a close friend.

252.    Plaintiff (18) Gila Schnall is a United States citizen. Gila was sixteen years old at the time of the November 4, 2001 French Hill Shooting. As a result of the shooting, Gila suffered psychological injuries, including witnessing the violent death of a close friend, and continues to suffer from anxiety stemming from the attack.

253.    Family members of the U.S. citizen Plaintiffs, who were killed or injured in the November 4, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries:  Shifra Markowitz's parents (8) Deborah Esther Markowitz [named as Devora Esther Markowitz in original complaint] and (9) Gerald Markowitz; Sarah Mordechai's mother, (11) Shirin Mordechai, a United States citizen, and Sarah's father, and (12) Shimon

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    Mordechai; Ora Rubinoff's parents, (14) Aviva Rubinoff and (15) Michael Jay Rubinoff [named as

2    Mitchell Jay Rubinoff in original complaint], and her siblings, (16) Yosef Rubinoff and (17) Chananel

3    Rubinoff [named as Hananel Rubinoff in original complaint]; and Gila Schnall's parents, (19)

4    Frances Nettie Schnall and (20) Ira Marvin Schnall.

5        254.    Family members of the foreign national Plaintiffs, , who were killed or injured in the

6    November 4, 2001 bombing also bring claims for their own suffering relating to the attack and their

7    family member's serious injuries: Menashe Regev's father, (164) Gidon Regev; Odelia Dahan's

8    parents, (166) Simi Abecassis and (167) Avraham Abecassis; Tzuria Helman's parents, (169) Rachel

9    Amosi and (170) Yaakov Amosi; Oshra Chai's parents, (172) Judith Avitzur and (173) Chaim

10   Avitzur; Tzvi Yehuda Goldenberg's parents, (175) David Malcom Goldenberg [named as David

11   Malcolm Mordechai Goldenberg in original complaint] and (176) Avital Goldenberg; Miriam

12   Einhausen's parents, (178) Moshe Ishaki and (179) Shimcha Ishaki; Naomi Kalfa's father, (181)

13   Yehezkel Kalfa [named as Heski Kalfa in original complaint]; Rivka Malka Tenenbaum's mother,

14   (183) Pnina Kleinman, and sisters, (184) Avivit Cohen [named as Avivit Kleinman-Chen in original

15   complaint], (185) Naomi Kleinman-Brening, and (186) Ester Liberman [named as Esti Kleinman-

16   Liberman in original complaint]; Tamar Smith's father (189) Stephen Levenson; Shifra Markowitz's

17   parents, Sarah Mordechai's parents, (12) Shimon Mordechai and (11) Shirin Mordechai; Tamar

18   Oziel's parents, (191) Miriam Oziel and (192) Jacquez Oziel; Moriah Cohen's mother (194) Iris Rabi.

19       255.    According to records seized from the Saddam Regime's military intelligence, the

20   assailant's mother Kuthar Hussien Khalil was given a check, paid on behalf of Saddam Hussein with

21   funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

22              **m.    *November 27, 2001: Central Bus Station in Afula, Israel***

23       256.    On November 27, 2001, Mustafa Abu Siriyah and Abd al-Karim Abu Na'isa, members

24   of PIJ, both armed with Kalashnikov assault rifles, opened fire at the Afula central bus station, killing

25   two people and injuring fifty others, including Plaintiffs (196) Dimitry Gantovnik, (197) Shula Gaon,

26   (199) Ezra Sharabi, and (200) Simon Shoshana [named as Soshana Simon in original complaint].

27       257.    Shula Gaon's husband, (198) Shmuel Gaon, also brings claims for his own suffering

28   relating to the November 27, 2001 attack and Shula's injuries.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

258.     According to records seized from the Saddam Regime's military intelligence, on or about June 18, 2002, Abu Nasia's family received check no. 1057 and Abu Sarya's family received check no. 1058, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.  The names of the terrorists and the checks' numbers appear in a list of "martyrs" whose families' received payments from the ALF on behalf of Saddam Hussein.

### n.     *December 1, 2001: Ben Yehudah Street in Jerusalem, Israel*

259.     On December 1, 2001, two suicide bombers, Usama Muhammad 'Id Baher and Nabil Mahmud Jamil Halbiyrh, both members of Hamas, detonated explosive devices, which were concealed in bags and strapped to their bodies with belts, on Ben Yehudah Street in Jerusalem. Minutes later, a car bomb exploded on the crowded street. At least 10 were killed and 150 were wounded in the bombing. Among the casualties of the Ben Yehudah Street attack were (201) Yossi Elezra and (206) Golan Turgeman, whose estates bring claims on their behalf. Those wounded in the attack included Plaintiffs (213) Efraim Aroas, (1) Baruch Yehuda Ziv Brill, (222) Omer Eliav, (223) Ortal Ganon Zargari [named as Ortal Ganon in original complaint], (231) Adi Peretz [named as Adi Hoja in original complaint], (234) Hila Levi, (240) Dana Kaduri [named as Dana Mizrachi in original complaint], and (243) Avraham Hadida [named as Avi Zino in original complaint].

260.     Plaintiff (1) Baruch Yehuda Ziv Brill is a United States citizen. As a result of the Ben Yehuda Street bombing, Baruch suffered serious physical and psychological pain, including multiple shrapnel wounds to his arms, back, and legs, a perforated left eardrum, and lacerations to his scalp, neck, and torso. Sharp nails attached to the bomb (so as to maximize injury) penetrated through the skin of Baruch's left wrist and left lower leg. Baruch underwent painful and complex surgery and debridement following his injuries. At the time of the attack, Baruch was seventeen years old, but to this day, he has yet to regain the full utility of his left hand.

261.     Family members of the U.S. citizen Plaintiffs, who were killed or injured in the December 1, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Baruch Brill's mother, (2) Chaya Beili, a United States citizen, and Baruch's father, (3) Shabtai Brill.

262.   Family members of the foreign national Plaintiffs, who were killed or injured in the December 1, 2001 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Yossi Elezra's parents, (202) Mordechai Elezra and (203) Yael Elezra, and siblings, (204) Shirley Avrahami [named as Shirly Elezra in original complaint] and (205) Omer Elezra; Golan Turgeman's mother, (207) Edna Turgeman, and siblings (208) Ester Ifat Sultan, (209) Amira Turgeman, (210) Moshe Turgeman, (211) Avi Turgeman, and (212) Orly Turgeman Goldshmit; Plaintiff Efraim Aroas's parents, (214) Yitzhak Aroas [named as Izak Aroas in original complaint] and (215) Yaffa Aroas, and his siblings, (216) Yossi Aroas, (217) Avi Aroas, (218) Netanel Aroas, (219) Ben-Israel Aroas, (220) Or Aroas, and (221) Zehava Levi; Ortal Ganon Zargari's father, (224) Robert Ganon, and siblings (225) Lihi Ganon and (226) Benyamin Ganon [named as Ben Ganon in original complaint]; Adi Peretz's mother, (232) Malka Nisim, and sister, (233) Moran Hoja; Hila Levi's parents, (235) Shimon Levi and (236) Aviva Levi, and siblings, (237) Hayim Levi, (238) Itzhak Levi, and (239) Yotam Levi; Dana Kaduri's mother (241) Lihi Leah Mizrachi [named as Lia Lihi Mizrachi in original complaint]; Avraham Hadida's's mother, (244) Viki Zino, and siblings, (245) Yosef Haim Hadida [named as Yosef Zino in original complaint], (246) Meir Shimon Hadida [named as Meir Zino in original complaint], (247) Israel Netanel Hadida [named as Israel Zino in original complaint], (248) Moshe Michael Zino [named as Moshe Zino in original complaint], (249) Yinon Ahron Zino [named as Yinon Zino in original complaint], (250) Yohai Hananel Zino [named as Yohi Zino in original complaint], (251) Aliza Mishelian [named as Aliza Zino in original complaint], (252) Sarah Azarzar [named as Sarah Zino in original complaint], and (253) Ruhama Zino.

263.   According to records seized from the Saddam Regime's military intelligence, on or about January 22, 2002, Baher's father received check no. 20000078 and Halbiyrh's father received check no. 20000077, each in the amount of $15,000.00, signed by Rakad Salem and paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

**o.   *March 2, 2002:  Beit Israel Neighborhood in Jerusalem, Israel***

264.   On March 2, 2002, Muhammad Ahmad Daraghmeh al-Shaw'ani, a member of AAMB, detonated a bomb near a yeshiva in the Beit Israel neighborhood of Jerusalem, where people were

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

gathered for a bar mitzvah celebration. The blast killed four people and injured fifty-seven, including the Nechmad Family: Plaintiffs (254) Chen Nechmad, (255) Yaakov Nechmad, (256) Sigalit Nechmad, and (257) Elior Nechmad, and Plaintiff (258) Yehiel Bornstein. Yehiel's wife, (259) Nechama Bornstein, and children, (261) Nachman Mordechai Bornstein, (262) Natan Bornstein, and (263) Naftali Bornstein, also bring claims for their own suffering relating to the attack and Yehiel's injuries.

265.   According to records seized from the Saddam Regime's military intelligence, the bomber's father Ahmad 'Abd Al-Rahman Subh Daraghmeh received payment Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

**p.   *March 5, 2002: Egged No. 823 Bus at Bus Station in Afula, Israel***

266.   On March 5, 2002, a suicide bomber named Abd al-Karim Tahayne, a member of PIJ, h boarded an Egged No. 823 bus and detonated an explosive device at the Afula bus station, killing one person and injuring eleven others, including Plaintiff (264) David Elisha-Sherf. David's wife, (265) Ziva Elisha-Sherf, and children, (266) Michal Sharet [named as Michal Elisha-Sherf in original complaint], (267) Maor Elisha-Sherf, and (268) Ze'ev Elisha Neyman [named as Zeevik Elisha-Sherf in original complaint], also bring claims for their own suffering relating to the attack and to David's injuries.

267.   According to records seized from the Saddam Regime's military intelligence, on or about May 6, 2002, the suicide bomber's mother Malika Tawfeeq Nimr Abd al-Qadr Tahainah received check no. 1051, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

**q.   *March 9, 2002: Café Moment in Jerusalem, Israel***

268.   On March 9, 2002, a suicide bomber named Fuad Hurani, a member of Hamas, detonated an explosive device at the entrance to Café Moment in Jerusalem. The force of the blast completely destroyed the crowded café, killing eleven and injuring more than fifty people. Among the casualties of the Café Moment attack were Nethanel Kochavi, whose sister, (269) Efrat Bar Dagan, brings claims on his behalf, and (270) Nir Borochov [named as Nir Borocov in original complaint], whose estate brings claims on his behalf. Among the many wounded in the Café Moment attack were

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   Plaintiffs (4) Yoseff Cohen, (5) Asael Anicca aka Asael Friedmann-Anicca [named as Asael Anicca

2   also known as Asael Friedman-Anicca and Asael Friedman in original], (276) Maimon Am-Salem

3   [named as Maimon Amsalem in original complaint], (282) Roy Gordon, (283) Roi Biton, (284) Mati

4   Lev, (288) Assaf Myara, and (289) Sinai Zaken.

5       269.    Plaintiff (4) Joseph Cohen [named as Yossef Cohen in original complaint] is a United

6   States citizen. As a result of the Café Moment bombing, Yossef suffered serious physical and

7   psychological injuries including broken bones, a torn spleen, chest and face wounds, a perforated ear

8   drum resulting in permanent hearing loss, torn corneas in both eyes resulting in permanent vision

9   impairments, permanent scarring to his face, and debilitating anxiety.

10       270.    Plaintiff (5) Asael Anicca, also known as Asael Friedman-Anicca and Asael Friedman,

11   is a United States citizen. Friedman was twenty-two years old at the time of the Café Moment

12   bombing. Asael suffered serious psychological injuries in the attack, including the death of a close

13   friend. Asael was diagnosed with post-traumatic stress disorder, which has required and will continue

14   to require medication and psychotherapy. Asael also suffers from related accommodative spasm to the

15   eye, also known as ciliary spasm, causing severe eye and body muscle pain and pressure and vision

16   impairment, as well as anxiety, chronic depression, and other somatic injuries relating to the attack.

17       271.    Family members of the foreign national Plaintiffs, who were killed or injured in the

18   March 9, 2002 bombing also bring claims for their own suffering relating to the attack and their

19   family member's serious injuries: Nethanel Kochavi's sister, (269) Efrat Bar Dagain; Nir Borochov's

20   parents, (271) Mordechai Borochov [named as Mordechai Borocov in original complaint] and (272)

21   Kochava Borocov, and siblings (273) Dorit Yadid, (274) Doron Borocov, (62) Iris Shfaim, (275)

22   Yocheved David [named as Yocheved Borocov in original complaint]; Maimon Am-Salem's mother,

23   (277) Parcha Amsalem [named as Fanny Amsalem in original complaint], and siblings, (278) Shlomo

24   Amsalem, (279) Galit Dror, (280) Meir Harel, and (281) Ilana Hayat; Mati Lev's mother, (285) Etti

25   Frenchi [named as Etti Frenchi Lev in original complaint], and siblings, (286) Ziv Lev and (287)

26   Kineret Lev; and Assaf Myara's mother and Sinai Zaken's wife, (290) Alisa Jane Myara [named as

27   Lisa Myara in original complaint]; and Assaf Myara's sister and Sinai Zaken's daughter, (291)

28   Melody Myara.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

272.    In a public ceremony held on or about June 23, 2002, the Café Moment bomber's mother Khaldia Ismail Abd Al-Aziz was given check no. 20000399 in the amount of $25,000.00, signed by Rakad Salem and paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

<strong><em>r.      March 20, 2002:  Egged No. 823 Bus in Wadi Ara, Israel</em></strong>

273.    On March 20, 2002, a suicide bomber named Rafet Salim Abu Diyak, a member of PIJ, boarded an Egged No. 823 bus and detonated an explosive device strapped to his body in Wadi Ara, near Afula, killing seven people and injuring thirty. Among the casualties were (292) Meir Fahima, whose estate brings claims on her behalf. Those wounded in the attack include Plaintiff (302) Yunis Zeid.

274.    Meir Fahima's family members also bring claims for their own suffering relating to the March 20, 2002 attack that killed Meir: his parents, (293) Shalom Fahima and (294) Etoile Vaknin [named as Kokhava Fahima in original complaint]; his siblings (295) Mazal Fahima, (296) Rachel Asraf Fahima, and (297) Daniel Navon; his wife, (298) Ester Fahima; and his children (299) Lidor Fahima, (300) Natali Cohen [named as Natali Fahima in original complaint], and (301) Ortal Sabag Fahima [named as Ortal Fahima in original complaint].

275.    According to records seized from the Saddam Regime's military intelligence, on or about May 6, 2002, the suicide bomber's father Salim Najib Salim Abu Diak check no. 1053, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal kickbacks in violation of the OFP.

<strong><em>s.      March 31, 2002: Matza Restaurant in Haifa, Israel</em></strong>

276.    On March 31, 2002, a suicide bomber named Shadi Tubasi, a member of Hamas, detonated an explosive device strapped to his body in Matza Restaurant in Haifa. The blast killed fifteen and injured over forty people, including Plaintiffs (303) Paul Drimmer, (304) Rachel Drimmer [named as Rahel Drimmer in original complaint], and (305) Baruch Naim.

277.    Family members of the Plaintiffs who were killed or injured in the March 31, 2002 bombing also bring claims for their own suffering relating to the attack and their family member's serious injuries: Paul Drimmer's wife and Rachel Drimmer's mother, (306) Pnina Drimmer, and

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   Paul's children (also Rachel's siblings), (307) Hani Drimmer, (308) Illana Drimmer, and (309) Asher

2   Drimmer.

3       278.    According to records seized from the Saddam Regime's military intelligence, on or

4   about May 6, 2002, the suicide bomber's father Zakaria Rida Yusuf Tubasi received check no. 1054,

5   paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

6   kickbacks in violation of the OFP.

7                  **t.    *April 10, 2002:  Egged No. 960 Bus***

8       279.    On April 10, 2002, a suicide bomber named Ra'gheb Ahmad 'Izat Jaradat, a member of

9   PIJ, detonated an explosive device strapped to his body while on an Egged No. 960 bus en route from

10  Haifa to Jerusalem. The explosion occurred near Kibbutz Yagur, east of Haifa, and killed seven

11  people, including (310) Zeev Hanik, whose estate brings claims herein. Zeev's father, (311) Boris

12  Hanik, and siblings (312) Lior Hanik and (313) Ilana Vaknin also bring claims for their own suffering

13  relating to the attack and Zeev's death.

14      280.    According to records seized from the Saddam Regime's military intelligence, on or

15  about May 6, 2002, the suicide bomber's father Ahmed Izzat Sadeq Jaradat received check no. 1055,

16  paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of illegal

17  kickbacks in violation of the OFP.

18                 **u.    *April 12, 2002:  Bus Stop on Jaffa Road in Jerusalem, Israel***

19      281.    On April 12, 2002, a suicide bomber named Andalib Taqatqa, a member of AAMB,

20  detonated an explosive device strapped to her body at a bus stop on Jaffa Road at the entrance to

21  Jerusalem's Mahane Yehuda open-air market, killing six people and injuring 104, including Plaintiffs

22  (314) Zila Cohen, (316) Yaakov Shfaym, (317) Nahima Shfaym [named as Naomi Shfaym in original

23  complaint], (323) Rahamim Hasan [named as Rahmim Hason in original complaint], and (325)

24  Kineret Abecassis [named as Kineret Rahamim in original complaint].

25      282.    Family members of the Plaintiffs who were injured in the April 12, 2002 bombing also

26  bring claims for their own suffering relating to the attack and their family member's serious injuries:

27  Yaakov and Nahima's Shfaym's children, (318) Yael Gidoni [named as Yael Raviva Gideoni in

28  original complaint], (319) Yardena Malkiel, (320) Azriel Shfaym, (61) Shmuel Shfaim, (321) Yoram

1    Shfaym, and (322) Eliyahu Shfaym; Rahamim Hasan's mother, (324) Carmela Hason; and Kineret

2    Abecassis's mother, (326) Haia Kiria Rahamin [named as Haia Rahmim in original complaint], and

3    siblings, (327) Yinon Rahamim, (328) Yair Rahamin [named as Yair Rahamim in original complaint],

4    and (329) Elia Rahamin [named as Elia Rahamim in original complaint].

5        283.    According to records seized from the Saddam Regime's military intelligence, on or

6    about June 14, 2002, the father of the suicide bomber Khalil Muhammad Hussain Taqatqa received a

7    check, paid on behalf of Saddam Hussein with funds acquired, in part, from Chevron's payment of

8    illegal kickbacks in violation of the OFP.

9        284.    Due, in part, to Chevron's payment of at least $20 million into his "slush" fund,

10   Saddam Hussein had the means to finance and direct these violent acts of terrorism, and Plaintiffs

11   have suffered death, disfigurement, and lasting psychological trauma and pain as a result.

**FIRST CLAIM FOR RELIEF**
**Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A**

(Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili, (3) Shabtai
brill, (4) Joseph Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz, (7) Shifra Steindler, (8),
Deborah Esther Markowitz, (9) Gerald Louis Markowitz, (10) Sarah Mordechai, (11) Shirin
Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff, (14) Aviva Rubinoff, (15) Michael Jay
Rubinoff, (16) Yosef Rubinoff, (17) Chananel Rubinoff, (18) Gila Schnall, (19) Frances Netti
Schnall, and (20) Ira Marvin Schnall)

17       285.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in

18   Paragraphs 1 through 284, as if fully set forth herein.

19       286.    Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Joseph Cohen, Asael

20   Anicca, Yissachar Zvi Lebowitz, Shifra Steindler, Deborah Esther Markowitz, Gerald Louis

21   Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff, Aviva Rubinoff,

22   Michael Jay Rubinoff, Yosef Rubinoff, Chananel Rubinoff, Gila Schnall, Frances Netti Schnall, and

23   Ira Marvin Schnall bring this cause of action against Defendants Chevron Corporation and DOES 1

24   through 9, inclusive.

25       287.    Plaintiffs are nationals of the United States who were seriously injured or killed, or are

26   the estates, heirs, or survivors of U.S. nationals who were killed or injured, as a result of the suicide

27   bombings and unprovoked attacks detailed, *supra*, at Paragraphs 247 through 253, 259 through 261,

28   and 268 through 270.  These acts constituted acts of international terrorism, as that term is defined in

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

19 U.S.C. § 2331(1), and were ordered, funded, and directed by Saddam Hussein.

288.    The acts of international terrorism alleged herein occurred primarily outside the territorial jurisdiction of the United States, involved the use, without lawful authority, of a destructive device constituting a "weapon of mass destruction" under 18 U.S.C. § 2332a(c)(2)(A) and the detonation of an "explosive" under 18 U.S.C. § 2332f(e)(8), in a place of public use or a public transportation system, with the intent to cause death or serious bodily injury.

289.    At all relevant times, Chevron knew or deliberately avoided discovering that Saddam Hussein was engaged in acts of international terrorism, and that any funds provided to Saddam Hussein could and would be used in preparation for or in carrying out such acts in violation of 18 U.S.C. §§ 2332, 2332a, 2332b, and 2332f.

290.    At all relevant times, Chevron knowingly provided substantial material support and resources to Saddam Hussein in the form of illegal kickbacks and surcharges in violation of the UN Oil-for-Food Program. Chevron knew or deliberately avoided discovering that its payments of illegal kickbacks to Saddam Hussein would be and were used to finance international terrorism, including indiscriminate suicide bombings and other murderous attacks against Plaintiffs and other American residents and visitors in Israel.

291.    Furthermore, Chevron, a multinational oil company regularly engaged in business with the international business community, knew or deliberately avoided discovering that Saddam Hussein was designated as a state sponsor of terrorism and that he and his regime supported designated Foreign Terrorist Organizations including Hamas, PIJ and AAMB, and directed, and executed acts of international terrorism against U.S. nationals (including civilians) such as those alleged herein. As such, Chevron knew and it was obvious that paying illegal surcharges to Saddam Hussein constituted material support of terrorism.

292.    Knowing the UN Oil-for-Food Program and U.S. federal law prohibited payments, either directly or indirectly, to Saddam Hussein and the Iraqi government, Chevron disguised the nature and source of the illegal surcharges it paid to Saddam Hussein.

293.    Chevron itself committed acts of international terrorism when it paid illegal kickbacks it knew were intended to be and were paid to Saddam Hussein, in knowing violation of strict rules set

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

for transacting business with Iraq, a state sponsor of terrorism. This provision of material support was an act dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. § 2339A.

294.    Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

295.    Chevron's knowing provision of material support to Saddam Hussein was a proximate cause of and a substantial factor in causing the injuries to Plaintiffs, and each of them, in their person, property, or business by reason of acts of international terrorism. Plaintiffs therefore seek treble damages, according to proof, and to recover the cost of suit, including attorney's fees, pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**
**Providing Material Support or Resources to Known Sponsors of Terrorism in Violation of 18 U.S.C. §2339B**

(Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili, (3) Shabtai brill, (4) Joseph Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz, (7) Shifra Steindler, (8), Deborah Esther Markowitz, (9) Gerald Louis Markowitz, (10) Sarah Mordechai, (11) Shirin Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff, (14) Aviva Rubinoff, (15) Michael Jay Rubinoff, (16) Yosef Rubinoff, (17) Chananel Rubinoff, (18) Gila Schnall, (19) Frances Netti Schnall, and (20) Ira Marvin Schnall)

296.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 284 and Paragraphs 286 through 295, as if fully set forth herein.

297.    Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Joseph Cohen, Asael Anicca, Yissachar Zvi Lebowitz, Shifra Steindler, Deborah Esther Markowitz, Gerald Louis Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff, Aviva Rubinoff,

1    Michael Jay Rubinoff, Yosef Rubinoff, Chananel Rubinoff, Gila Schnall, Frances Netti Schnall, and

2    Ira Marvin Schnall bring this cause of action against Defendants Chevron Corporation and DOES 1

3    through 9, inclusive.

4         298.    Saddam Hussein used the funds collected from the surcharge scheme for to provide the

5    funding, means and capacity to FTOs, including Hamas and PIJ, to perpetrate a wave of suicide

6    bombings directed at the Plaintiffs and other Americans and Israeli civilians

7         299.    Chevron associated itself with Saddam Hussein and participated in his scheme to

8    collect financial resources, which Chevron knew would be used to pay families of suicide bombers, all

9    of whom were members of Hamas and PIJ, designated FTOs.  Under the provisions of 18 U.S.C. §2,

10   anyone who counsels, procures, aids, or abets a violation of Section 2339B or any other federal crime

11   is punishable as though he had committed the offense himself.

12        300.    In knowingly agreeing to provide, and providing, material financial support to Iraq in

13   an illegal manner, and knowing that Saddam Hussein intended to use those financial resources to

14   provide material support to FTOs, Chevron aided and abetted Saddam Hussein's § 2339B's express

15   prohibition against knowingly, attempting or conspiring to provide material support.

16        301.    Chevron knew, or had reasonable cause to know, to the fact that Hamas, PIJ, and

17   AAMB were designated as FTOs at all times relevant to this action. Chevron also knew, or had

18   reasonable cause to know, that Hamas and PIJ engaged in terrorist activities (8 U.S.C. §

19   1183(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. §

20   2331).

21        302.    Chevron knew or was deliberately indifferent to the fact that their agreement to provide

22   Iraq material financial support in an illegal manner, unlawfully evaded U.S. sanctions and regulations

23   directed at mitigating the risk that Iraq would carry out, support, fund, plan for, prepare, conspire with,

24   or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated

25   by Iraq's proxy, agent, and strategic partners, Hamas and PIJ.

26        303.    Chevron's payment of illegal kickbacks with the knowledge that the funds would be

27   used to commit acts of terror as well as the acts of international terrorism that injured the Plaintiffs

28   constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

304.   Having agreed to and participated in a scheme to provide Iraq material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iraq's sponsorship of terrorism and terrorist organizations, Chevron knew that its payments of illegal kickbacks would foreseeably result in Iraq transferring millions of dollars to Hamas and PIJ, all designated FTOs during the relevant time period.

305.   The financial support leading to the material support that Saddam Hussein knowingly provided to Hamas and PIJ constituted substantial assistance to Hamas and PIJ, thereby facilitating acts of terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

306.   Chevron's agreement to knowingly provide Iraq – a known and designated State Sponsor of Terrorism – material financial support in an illegal manner – brought about acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

307.   Chevron's agreement to pay illegal kickbacks to a known and designated State Sponsor of Terrorism in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hamas' and PIJ's role in killing and injuring hundreds of innocent civilians.

308.   Chevron's financial payments to Saddam Hussein and his material support of FTOs was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hamas' and PIJ's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism under the definition set forth in 18 U.S.C. § 2331.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

309.    Each Plaintiff's injuries constitutes a harm falling within the risk contemplated by Chevron's violations, including each its knowing agreement to enter pay illegal kickbacks to Saddam Hussein with the knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and use of those illicit funds was to provide material support to Hamas and PIJ. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hamas and PIJ are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hamas' and PIJ's sponsor, principal, and strategic partner – Iraq – had restricted access to U.S. dollars.

310.    The material support provided by Saddam Hussein to occurred outside the territorial jurisdiction of the United States.  *See* 18 U.S.C. § 2339B(d)(2).

311.    Through its conduct as described above, by violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Chevron committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF
### Engaging in Financial Transactions with a Known State Sponsor of Terrorism in Violation of 18 U.S.C. §2332d

(Against all Defendants by Plaintiffs (1) Baruch Yehuda Ziv Brill, (2) Chaya Beili, (3) Shabtai brill, (4) Joseph Cohen, (5) Asael Anicca, (6) Yissachar Zvi Lebowitz, (7) Shifra Steindler, (8), Deborah Esther Markowit, (9) Gerald Louis Markowitz, (10) Sarah Mordechai, (11) Shirin Mordechai, (12) Shimon Mordechai, (13) Ora Rubinoff, (14) Aviva Rubinoff, (15) Michael Jay Rubinoff, (16) Yosef Rubinoff, (17) Chananel Rubinoff, (18) Gila Schnall, (19) Frances Netti Schnall, and (20) Ira Marvin Schnall)

312.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 284, Paragraphs 286 through 295, and Paragraphs 297 through 311, as if fully set forth herein.

313.    Plaintiffs Baruch Yehuda Ziv Brill, Chaya Beili, Shabtai Brill, Joseph Cohen, Asael Anicca, Yissachar Zvi Lebowitz, Shifra Steindler, Deborah Esther Markowitz, Gerald Louis Markowitz, Sarah Mordechai, Shirin Mordechai, Shimon Mordechai, Ora Rubinoff, Aviva Rubinoff, Michael Jay Rubinoff, Yosef Rubinoff, Chananel Rubinoff, Gila Schnall, Frances Netti Schnall, and Ira Marvin Schnall bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

314. Chevron is a juridical person organized under the laws of the United States, as defined in 18 U.S.C. § 2332d(b)(2)(C).

315. At all relevant times, Chevron knew or had reasonable cause to know that since 1990 Iraq and its then-President Saddam Hussein were designated under section 6(j) of the Export Administration Act of 1979 as a state sponsor of terrorism. Despite such knowledge, Chevron knowingly and intentionally engaged in hundreds (if not thousands) of illegal financial transactions with Saddam Hussein in the form of illegal surcharge and kickback payments amounting to over $20 million.

316. Chevron's payment of illegal kickbacks to Saddam Hussein constituted "financial transactions" as that term is defined in 18 U.S.C. § 1956(c)(4), in that Chevron moved funds by wire or other means, or involved monetary instruments, to effectuate a gift, transfer, delivery, or other disposition affecting interstate or foreign commerce.

317. The financial transactions at issue do not fall within the safe harbor provisions of the regulations issued by the Secretary of the Treasury and therefore violated the criminal provisions of 18 U.S.C. § 2332d(a). In fact, the transactions at issue explicitly violated 31 C.F.R. §§ 575.201; 575.203; 575.210; 575.211; 575.523(e); and 575.526(b).

318. Chevron itself committed acts of international terrorism when it paid illegal kickbacks it knew were intended to be and were paid to Saddam Hussein, in knowing violation of strict rules set for transacting business with Iraq, a state sponsor of terrorism. These financial transactions were themselves acts dangerous to human life that violated the criminal laws of the United States, including 18 U.S.C. § 2332d.

319. Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or would, at the very least, free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through third parties, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  families of individual terrorists as financial consideration for engaging in terrorist acts such as those

2  that injured Plaintiffs herein.

3      320.    Chevron's financial transactions with Saddam Hussein, which provided millions of

4  dollars to a state sponsor of terrorism, were a proximate cause of and a substantial factor in causing

5  the injuries to Plaintiffs, and each of them, in their person, property, or business by reason of acts of

6  international terrorism. Plaintiffs therefore seek treble damages, according to proof, and to recover the

7  cost of suit, including attorney's fees, pursuant to 18 U.S.C. § 2333(a).

8  **FOURTH CLAIM FOR RELIEF**
**Financing Terrorism in Violation of the Law of Nations**

9
10  (Against all Defendants by Plaintiffs (3), (8) through (9), (12), (14) through (17), (19) through (23), (26) through (39), (41) through (179), (181) through (187), (189) through (194), (196 through (226), (231) through (241), (243) through (259), (261) through (314), and (316) through (329))

11

12      321.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in

13  Paragraphs 1 through 284, Paragraphs 286 through 295, Paragraphs 297 through 311, and Paragraphs

14  313 through 320, as if fully set forth herein.

15      322.    Plaintiffs (3), (8) through (9), (12), (14) through (17), (19) through (23), (26) through

16  (39), (41) through (179), (181) through (187), (189) through (194), (196 through (226), (231) through

17  (241), (243) through (259), (261) through (314), and (316) through (329) bring this cause of action

18  against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

19      323.    Chevron's acts, as alleged herein, occurred within the U.S., were directed from its

20  corporate headquarters in the U.S., and/or were committed for the benefit of Chevron Corporation, a

21  U.S. citizen, all with intent to defeat U.S. and international laws prohibiting funding international

22  terrorism and prohibiting transfer of funds to Saddam Hussein, a known state sponsor of terrorism

23  with a well-publicized anti-American and anti-Israeli agenda. The millions of dollars in U.S. currency

24  Chevron illegally transferred to Saddam Hussein via the U.S. federal wire system compromised vital

25  U.S. national security interests, both at home and abroad, and provided Saddam Hussein with the

26  means to carry out deadly attacks in Israel, a nation that is closely allied with the U.S., is home to

27  hundreds of thousands of U.S.-citizen residents, and is a popular destination for millions of U.S.-

28  citizen tourists.

324.   Chevron's illegal transfer of millions of dollars to Saddam Hussein was intentional and purposeful. Chevron knew or deliberately avoided discovering that the millions of dollars in illegal kickbacks it paid to Saddam Hussein were to be used in part for the purpose of supporting Palestinian genocidal murders and terrorist attacks, or, at the very least, would free up money otherwise needed for different purposes and made it available to fund Saddam Hussein's well-known and well-publicized attacks against Israel and American citizens in the Middle East. Chevron, either directly or indirectly through sham contracts with so-called *third party* front companies, routed these deposits into bank accounts created and maintained by Saddam Hussein. These funds were then disbursed to, among others, Palestinian terrorist groups and families of individual terrorists as financial consideration for engaging in terrorist acts such as those that injured Plaintiffs herein.

325.   Chevron's acts, as alleged herein, constitute torts in violation of a United States treaty under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron violated UN Security Council resolutions that prohibited U.S. citizens and corporate entities, such as Chevron, from transferring or causing to be transferred any funds to Iraq or its citizens other than through the Oil-for-Food Program. As with treaties, Security Council resolutions are mandatory and binding against the United States, who is obligated to implement their terms pursuant to Articles 25 and 48 of the UN Charter. The UN Security Council expressly stated in its resolutions that States were to act in strict accordance with the provisions of the embargo against transfer of funds or trade with Iraq, and required States to report on their compliance. See, e.g., Resolutions 661 (1990), para. 5; 670 (1990), para. 3; and 687 (1991), para. 25. To carry out its obligations under the UN Charter, the United States designated Iraq as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, and expressly and completely prohibited financial transactions with Iraq and its then-president Saddam Hussein.

326.   Chevron's acts, as alleged herein, also constitute torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron violated clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit the provision of funds or other material support to individuals, groups, or governments who may use the funds to commit a violent act against innocent civilians for purposes of intimidation or to persuade a government to do or abstain from doing an act. These international laws are outlined in, for

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   example:

2        a.      the International Convention for the Suppression of the Financing of Terrorism,

3   G.A. Res. 54/109, U.N. Doc. A/Res/53/108 (Dec. 9, 1999) ("Financing Convention"), which has been

4   ratified by over 130 countries, including the United States (18 U.S.C. § 2339C). The Financing

5   Convention punishes willful and knowing direct or indirect provision of funds with knowledge that the

6   funds may be used, at least in part, to finance acts of international terrorism such as suicide bombings

7   and mass shootings, and states that the financing of such acts "is a matter of grave concern to the

8   international community as a whole."

9        b.      the International Convention for Suppression of Terrorist Bombings, G.A. Res.

10  52/164, U.N. Doc. A/Res/52/164 (Dec. 15, 1997) ("Bombing Convention"), which has been ratified

11  by more than 150 member states, including the United States (18 U.S.C. § 2332f). The Bombing

12  Convention prohibits unlawful and intentional discharge or detonation of an explosive or lethal device

13  in a place of public use with intent to cause death or serious bodily injury. The Bombing Convention

14  states that terrorist attacks by means of explosives and other lethal devices is a matter of grave concern

15  to the international community as a whole, and imposes accomplice liability on anyone who

16  intentionally contributes to the sponsoring group with knowledge of the intention of the group to

17  commit the bombings;

18       c.      UN General Assembly Resolution on Measures to Eliminate International

19  Terrorism, G.A. Res. 49/50, U.N. Doc. A/Res/49/60 (Dec. 9, 1994), which urges members states to

20  proscribe the financing of terrorism;

21       d.      UN General Assembly Resolution on Measures to Eliminate International

22  Terrorism, G.A. Res. 51/210, U.N. Doc. A/Res/51/210 (Dec. 17, 1996), which notes the need to

23  specifically address the international problem of terrorist attacks carried out by bombs, explosives, and

24  other lethal devices; calls for enactment of domestic laws preventing financing of terrorists or

25  movement of funds intended for terrorist purposes; and condemns the financings of terrorist acts;

26       e.      UN Security Council Resolution 1269 (1999), calling upon states to take steps

27  to deny those who finance terrorist acts safe haven;

28       f.      UN Security Council Resolution 1373 (2001), unanimously adopted under

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Chapter VII of the UN Charter making it legally binding on all states,  based "on  the threats to international peace and security caused by terrorist acts" requires all States to prevent and suppress the financing of terrorist acts and mandating the formation of the Counter-terrorism Committee; and

g.   Various resolutions calling states to implement Resolution 1373 and "bring to justice those who finance terrorist acts" including Resolutions 1377 (2001); 1456 (2003); 1526 (2004); 1535 (2004).

327.   World condemnation of terrorist financing is equally reflected in the various regional conventions, which prohibit the financing of terrorist acts. See Annex to Resolution No: 59/26P; 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism, Art. 3; 1999 Organization of African Unity Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3; Inter-American Convention against Terrorism (Bridgetown, July 2003); South Asian Association for Regional Cooperation's Regional Convention on Suppression of Terrorism (Kathmandu, November 1987).

328.   Chevron systematically, knowingly, and illegally paid concealed premiums (also referred to as illegal payments, kickbacks, and surcharges) to Saddam Hussein, and/or his third party agents, directly and indirectly, to ensure access to and the delivery of low-cost Iraqi oil allocations made by Saddam Hussein, and/or his third party agents, to Chevron under the otherwise legal protocol of the OFP.

329.   Chevron made these additional unmonitored payments in connection with its purchases of Iraqi oil under the UN's OFP, knowing that these payments were illegal, and in violation of the terms of the UN's OFP, as administered by UN officials present in the United States.

330.   Chevron knew that most, if not all, of the money illegally transferred to Saddam Hussein, and/or his third party agents, would come under the discretion, direction and control of Saddam Hussein, circumventing the OFP and sanctions imposed against Saddam Hussein.

331.   Chevron, knew that the money Chevron illegally transferred in the United States to Saddam Hussein, and/or his agents, would be ultimately be used, in substantial part, to help finance Saddam Hussein's well-publicized terror agenda against  Israel, and the United States, using

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    contracted, known US designated terrorist entities (ALF, HAMAS, PIJ and AAMB).

2        332.    Chevron purposefully made these illegal payments in the United States, knowing and/or

3    willfully ignoring that they were at the instigation and demand, directly or indirectly, of Saddam

4    Hussein, and that the monies paid would benefit Saddam Hussein, so that Chevron could procure

5    allocations of below market value oil for resale with the highest available profit-margin, and obtain an

6    economic benefit in the United States, notwithstanding Chevron's knowledge of Saddam Hussein's

7    well-publicized direct financial support for suicide bombings in Israel and attacks on US citizens and

8    Saddam Hussein's other universally acknowledged violations of law the of nations .

9        333.    Chevron knew that during the period of time that Chevron made these illegal payments,

10   it was reasonably foreseeable or probable that Saddam Hussein would intentionally assist, support, and

11   financially reward terrorism, including suicide bombings, and other murderous attacks on innocent

12   civilians, in Israel, in order to kill, injure, intimidate and/or coerce the civilian population of Israel, with

13   this money and that, in fact, Saddam Hussein was paying millions of dollars to the families of suicide

14   bombers in public ceremonies intended to incite and recruit additional suicide bombers to carry out

15   massive, widespread and system suicide bombing attacks.

16       334.    Thus, by paying unmonitored, illegal funds to Saddam Hussein, and/or his agents,

17   Defendants purposefully provided knowing, substantial, and practical funding and assistance to

18   Saddam Hussein in direct opposition to the national interests and stated policies of the United States.

19       335.    Chevron knowingly and intentionally made these illegal payments in violation of the

20   established law of nations which prohibits financing terrorism, which includes any act that embodies

21   the unlawful use of violence and intimidation, to intimidate or coerce a civilian population, including

22   but not limited to suicide bombings.

23       336.    Chevron knew that by providing Saddam Hussein with increased discretionary funds

24   the foreseeable and probable effect would be, and indeed there was,  a continuation and an increase of

25   systematic targeted suicide bombings, extra-judicial killings, and crimes against humanity which

26   killed and injured innocent civilians in Israel, including Plaintiffs.

27       337.    Chevron was a direct actor and was also complicit in and aided and abetted the

28   aforementioned acts of financing terrorism, which proximately caused and were a substantial factor in

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

the injuries to Plaintiffs, and each of them, alleged herein.

338.    Chevron was a direct actor and knowingly contributed to the funding of international terrorism by a group of persons acting with a common purpose. At all times relevant, Chevron knew that such group intended to and was committing and funding international terrorism, widespread and systematic murder and mayhem and other inhumane acts committed as part of a widespread or systematic attack directed against a civilian population

339.    Plaintiffs seek compensatory damages, according to proof, and costs of suit, including attorney's fees, as allowed by law.

340.    In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and make an example of Chevron.

## FIFTH CLAIM FOR RELIEF
### Crimes Against Humanity in Violation of the Law of Nations

(Against all Defendants by Plaintiffs (3), (8) through (9), (12), (14) through (17), (19) through (23), (26) through (39), (41) through (179), (181) through (187), (189) through (194), (196 through (226), (231) through (241), (243) through (259), (261) through (314), and (316) through (329))

341.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 284, Paragraphs 286 through 295, Paragraphs 297 through 311, Paragraphs 313 through 320, and Paragraphs 322 through 340, as if fully set forth herein.

342.    Plaintiffs (3), (8) through (9), (12), (14) through (17), (19) through (23), (26) through (39), (41) through (179), (181) through (187), (189) through (194), (196 through (226), (231) through (241), (243) through (259), (261) through (314), and (316) through (329) bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

343.    Chevron's acts, as alleged herein, constitute torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron was complicit in and aided and abetted violations of clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit crimes against humanity and extrajudicial killings of the type suffered by Plaintiffs. Strong condemnation of crimes against humanity and aiding and abetting such crimes rest on a clear accepted sources of international law, for example:

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

a.      Article 2 of the Statute of the Special Court for Sierra Leone, adopted by UN Security Council Resolution 1315 on August 14, 2000, which defines a "crime against humanity" as murder, persecution, or other inhumane acts committed as part of a widespread or systematic attack directed against any civilian population;

b.      Article 6 of the Statute of the Special Court for Sierra Leone, which provides individual responsibility for those who aid and abet in the planning, preparation or execution of a crime;

c.      Chapter II, Articles 2 and 18 of the Draft Code of Crimes Against the Peace and Security of Mankind, adopted on July 26, 1996 by the UN's International Law Commission, U.N. Doc. A/CN.4/L.532, corr.1, corr.3 (1996); which defines "crimes against humanity" as murder and other inhumane acts which severely damage physical or mental integrity, health or human dignity against a civilian population.  And incorporates individual responsibility for knowingly aiding and abetting or otherwise assisting in such crimes;

d.      Article 6 of the Charter of the International Military Tribunal, issued August 8, 1945, which describes crimes against humanity in part as, murder, extermination and other inhumane acts committed against a civilian population  … or persecutions on political, racial and religious grounds, and holds accomplices for these crimes responsible;

e.      Article 3 of the statute of the International Criminal Tribunal for the former Yugoslavia ("ICTY"), enacted by the UN Security Council in 1993, which defines a "crime against humanity" as murder, persecution, or other inhumane acts committed as part of a widespread or systematic attack directed against any civilian population;

f.      Article 7 of the ICTY Statute which provides for individual criminal responsibility for aiding and abetting such crimes;

g.      Article 3 of the Statute of the International Tribunal for Rwanda enacted by the UN Security Council in 1994 which defines crimes against humanity to include:  murder; imprisonment; torture, persecution on political, racial and religious grounds and other inhumane acts against a civilian population and Article 6 of the Statute which provides for individual criminal responsibility for aiding and abetting such crimes;

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1    h.    Article 6 of the ICTR Statute which provides for individual criminal

2  responsibility for aiding and abetting such crimes; and

3    i.    Common Article 3 of the Geneva Conventions of 1949, which has been ratified

4  by more than 180 countries, including the United States (18 U.S.C. § 2441) and prohibits the

5  deliberate attack of civilians;

6    344.   Plaintiffs are victims, or family members of the victims, of a program of suicide

7  bombings, extrajudicial killings and other inhumane acts of murder and maiming that occurred in

8  Israel in a systematic course of conduct committed as crimes against humanity, targeting a civilian

9  population, in violation of the law of nations,

10    345.   Organized, murderous attacks on innocent civilians intended to intimidate or coerce a

11  civilian population are universally condemned, and violate norms of international law,

12    346.   Chevron perpetrated acts that constitute crimes against humanity by knowingly,

13  unlawfully, and willfully, directly or indirectly, assisting, encouraging, and supporting the financing

14  of suicide bombings and other murderous attacks on innocent civilians which were intended to kill,

15  injure, intimidate or coerce the civilian population of Israel and US policy.

16    347.   Chevron systematically, knowingly, and illegally paid concealed premiums (also

17  referred to as illegal payments, kickbacks, and surcharges) to Saddam Hussein, and/or his third party

18  agents, directly or indirectly, to ensure access to and the delivery of low-cost Iraqi oil allocations

19  made by Saddam Hussein, and/or his agents, to Chevron under the otherwise legal protocol of the

20  OFP.

21    348.   Chevron, by and through its headquarters, and/or other Chevron offices in the

22  United States, knowingly and willfully approved, planned, managed, and made illegal payments,

23  directly or indirectly, to Saddam Hussein and/or to his designated agents, through use of the United

24  States banking system, while in the United States.

25    349.   Chevron made these unmonitored payments in connection with its purchases of Iraqi oil

26  under the UN's OFP, knowing that these payments were illegal, and in violation of the terms of the

27  UN's OFP, as administered by UN officials present in the United States and purposefully concealing

28  the true nature of the additional payments.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

350.   Chevron knew that most, if not all, of the money illegally transferred to Saddam Hussein, and/or his designated agents, would come under the sole discretion, direction and control of Saddam Hussein, circumventing the OFP and sanctions imposed against Saddam Hussein.

351.   Chevron, knew that the money Chevron illegally transferred in the United States to Saddam Hussein, and/or his third party agents, many of whom were "brass plated" companies, would be ultimately be used, in substantial part, to help finance Saddam Hussein's well-publicized direct financial support for worldwide terror against the U.S. and its allies, including support for suicide bombings and murderous attacks on civilians in Israel, among other universally acknowledged violations of definite norms of international law including  crimes against humanity.

352.   Chevron purposefully made these illegal payments in the United States, knowing and/or willfully ignoring that they were at the instigation and demand, directly or indirectly, of Saddam Hussein, and that the monies paid would benefit Saddam Hussein, so that Chevron could procure allocations of low-cost oil for resale with the highest available profit-margin, and obtain an economic benefit in the United States, notwithstanding Chevron's knowledge of Saddam Hussein's well-publicized direct financial support for suicide bombings and other murderous attacks in Israel and attacks on US citizens and Saddam Hussein's other universally acknowledged violations of law the of nations .

353.   Chevron knew that during the period of time that Chevron made these illegal payments, it was reasonably foreseeable or probable that Saddam Hussein would intentionally assist, support, and financially reward suicide bombings, and other murderous attacks on innocent civilians, including American civilians, in Israel, in order to kill, injure, intimidate and/or coerce the civilian population of Israel, with this money.

354.   Thus, by paying unmonitored, illegal funds to Saddam Hussein, and/or his third party agents, Defendants purposefully provided knowing, substantial, and practical assistance to Saddam Hussein's well-publicized campaign of paying incentives and rewards to the families of the suicide bombers and those who committed other murderous attacks in Israel in violation of international law, and in direct opposition to the national interests and stated policies of the United States.

355.   By making these unmonitored, illegal payments to Saddam Hussein, and/or his third

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

party agents, Chevron also provided significant tacit approval, assistance and encouragement to Saddam Hussein's well-publicized campaign in support of suicide bombing, extrajudicial killings, murder through use of use of explosive devices in public places, maiming and other inhumane acts in Israel and his practice of paying incentives and rewards to the families of the suicide bombers in Israel in violation of international law; and by doing so, Chevron substantially encouraged others similarly situated to Chevron to do the same.

356.   Chevron knowingly and intentionally made these illegal payments in violation of the established law of nations which prohibits aiding and abetting crimes against humanity, such as murder, suicide bombings, extrajudicial killings, persecution on political, racial, ethnic or religious grounds and other inhumane acts on civilians because, among other reasons, Chevron knew that by providing Saddam Hussein with increased discretionary funds the foreseeable and probable effect would be, and indeed there was,  a continuation and an increase of systematic targeted suicide bombings and other murderous attacks  which killed and injured innocent civilians in Israel, including Plaintiffs.

357.   Chevron was a direct actor and contributed to the commission of crimes against humanity and international terrorism by a group of persons acting with a common purpose. At all times relevant, Chevron knew that such group intended to and was committing crimes against humanity, international terrorism, widespread and systematic murder and mayhem and other inhumane acts committed as part of a widespread or systematic attack directed against a civilian population.

358.   Chevron's aiding and abetting the crimes against humanity committed by Saddam Hussein and Iraq proximately caused and were a substantial factor in the injuries to Plaintiffs, and each of them, alleged herein. Plaintiffs seek compensatory damages, according to proof, and costs of suit, including attorney's fees, as allowed by law.

359.   In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and make an example of Chevron.

## SIXTH CLAIM FOR RELIEF

**Extrajudicial Killings in Violation of the Law of Nations**

(Against all Defendants by Plaintiffs (21) Estate of Shoshana Ris, (68) Estate of Naftali Lanzkron, (80) Estate of Eliran Rozenberg, (93) Estate of Vladislav Sorokin, (156) Estate of Haim Ben Ezra, (132) Estate of Simona Rudin,  (162) Estate of Lea Ben Ezra, (163) Estate of Menashe Regev, (201) Estate of Yossi Elezra, (206) Estate of Golan Turgeman, (269) Efrat Bar Dagan, as successor-in-interest to Nethanel Kochavi, deceased, (270) Estate of Nir Borocov, (292) Estate of Meir Fahima, (310) Estate of Zeev Hanik, and (316) Estate of Yaakov Shfaym)

360.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in Paragraphs 1 through 284, Paragraphs 286 through 295, and Paragraphs 297 through 311, and Paragraphs 313 through 320, Paragraphs 322 through 340, and Paragraphs 342 through 359, as if fully set forth herein.

361.    Plaintiffs (21) Estate of Shoshana Ris, (68) Estate of Naftali Lanzkron, (80) Estate of Eliran Rozenberg, (93) Estate of Vladislav Sorokin, (156) Estate of Haim Ben Ezra, (132) Estate of Simona Rudin,  (162) Estate of Lea Ben Ezra, (163) Estate of Menashe Regev, (201) Estate of Yossi Elezra, (206) Estate of Golan Turgeman, (269) Efrat Bar Dagan, as successor-in-interest to Nethanel Kochavi, deceased, (270) Estate of Nir Borocov, (292) Estate of Meir Fahima, (310) Estate of Zeev Hanik, and (316) Estate of Yaakov Shfaym, bring this cause of action against Defendants Chevron Corporation and DOES 1 through 9, inclusive.

362.    Chevron's conduct, alleged herein, constituted torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that Chevron was complicit in and aided and abetted violations of clear and definite norms of international law, universally accepted by the civilized world as mutual legal obligations, which prohibit crimes against humanity of the type suffered by Plaintiffs. These international laws are outlined in, for example, article 5 of the Universal Declaration on Human Rights and article 7 of the International Covenant on Civil and Political Rights.

363.    As a proximate and foreseeable result of Chevron's conduct, Plaintiffs were deliberately killed under color of law by agents of Saddam Hussein without the authority of a previous judgment of a regularly constituted court and were not afforded any of the judicial processes which are recognized as indispensable to civilized peoples. Plaintiffs seek compensatory damages, according to proof, and costs of suit, including attorney's fees, as allowed by law.

364.    In doing the acts alleged herein, Chevron has been guilty of oppression, fraud, or

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  malice, sufficient to justify an award of punitive damages in an amount sufficient to punish and make

2  an example of Chevron.

3                                                    **VI.**

4                                       **PRAYER FOR RELIEF**

5          **WHEREFORE**, Plaintiffs pray for judgment against Defendant Chevron as follows:

6          a.         As to the first and second claims for relief, for an award of treble damages, according

7  to proof;

8          b.         As to the third, fourth, and fifth claims for relief, for an award of compensatory

9  damages, according to proof;

10         c.         As to the third, fourth, and fifth claims for relief, for an award of punitive damages, in

11  an amount sufficient to punish and make an example of Chevron;

12         d.         For an award of attorney's fees and costs, as allowed by law;

13         e.         For pre-judgment and post-judgment interest to the extent allowed by law; and

14         f.         For such other and further relief as the Court deems appropriate.

15  DATED:  March 27, 2017                    Respectfully submitted,

16                                                    BOUCHER LLP

17                                                    By:        */s/ Raymond P. Boucher*
                                                          _____
18                                                           Raymond P. Boucher
                                                           Maria L. Weitz
19                                                           Hermez Moreno
                                                           Milin Chun
20                                                    MM-LAW LLC
21                                                           Gavriel Mairone
                                                           Bena N. Ochs
22                                                    GERAGOS & GERAGOS
23                                                           Mark J. Geragos
                                                           Ben Meiselas
24                                                    *Attorneys for Plaintiffs*

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  March 27, 2017          Respectfully submitted,

BOUCHER LLP


By:  _____/s/ Raymond P. Boucher_____
     Raymond P. Boucher
     Maria L. Weitz
     Hermez Moreno
     Milin Chun

MM-LAW LLC
     Gavriel Mairone
     Bena Ochs

GERAGOS & GERAGOS
     Mark J. Geragos
     Ben Meiselas

*Attorneys for Plaintiffs*

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Case No. 15-cv-04916-JD
**FIRST AMENDED COMPLAINT**