UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARUCH YEHUDA ZIV BRILL, et al., <br> Plaintiffs, <br> v. <br> CHEVRON CORPORATION, <br> Defendant. | Case No.15-cv-04916-JD <br><br> **ORDER RE MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br> Re: Dkt. No. 75 |

Defendant Chevron moves to dismiss the second amended complaint ("SAC"), which is plaintiffs' third effort to allege claims for injuries and deaths suffered from terrorist attacks in Israel. The prior dismissal order provides the context for this order. Dkt. No. 50. As in the prior complaints, plaintiffs are more than 300 individuals consisting mainly of foreign nationals and 18 United States citizens. Dkt. No. 72. The claims are also largely the same. The United States citizens again sue under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and the foreign nationals under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The only change is a new count based on 18 U.S.C. Section 2339B, including aiding and abetting allegations made possible by a recent amendment of the ATA.

The ATA claims are dismissed. Although the SAC adequately alleges that Chevron paid illegal kickbacks to buy Iraqi oil while Saddam Hussein was actively supporting terrorism, it does not show that Chevron's conduct was a proximate cause of plaintiffs' injuries. The SAC also does not plausibly allege that Chevron aided and abetted the terrorists who injured plaintiffs.

The ATS claims are also dismissed. Like the prior complaint, the SAC does not adequately allege that Chevron acted with the requisite mental state.

## I. THE ANTI-TERRORISM ACT CLAIMS

Plaintiffs allege that Chevron violated the ATA directly, and by aiding and abetting others who committed acts of terrorism. The Court dismissed the prior direct violation claims because, among other reasons, the facts did not plausibly demonstrate that any portion of the $20 million in

kickbacks paid by Chevron was connected to the terrorism in Israel. Dkt. No. 50 at 5-8. Plaintiffs were given leave to amend specifically to address this issue. *Id.* at 11; 3/9/2016 Hr'g Tr. at 39:1-17. The new aiding and abetting claim is based on a 2016 amendment to the ATA, and is discussed here for the first time in this case.

### A. The Direct Liability Claims

To state a direct ATA claim, plaintiffs must plausibly allege that their injuries were "by reason of an act of international terrorism" involving Chevron. 18 U.S.C. § 2333(a). Plaintiffs have again not provided enough facts to satisfy this causal link, which bars all of their direct violation claims under the ATA.

At the time of the prior dismissal order, our circuit had yet to specify the causation required for an ATA claim. Dkt. No. 50 at 8. It has now determined that "by reason of" requires a showing of proximate cause. In defining what that entails for pleading purposes, our circuit rejected the contention, which plaintiffs make, that the complaint need only allege that defendant's acts "were a substantial factor in the sequence of responsible causation" or that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018) (internal quotation and citation omitted). The circuit concluded that a higher standard was appropriate in light of well-established case law construing the same "by reason of" language in the federal antitrust and civil racketeering statutes. Those statutes require a direct relation between the injury and the defendant's conduct, and the circuit determined that the proximate cause requirement in the ATA should be consistent with that precedent. Consequently, to establish proximate cause under the ATA, a plaintiff must make "a showing of at least some direct relationship between a defendant's acts and a plaintiff's injuries." *Id.* at 748.

The direct relationship requirement has important consequences for plaintiffs' ATA claims. It bars claims based on harm that is "too remote" from Chevron's actions, and limits recovery to harm that has a "sufficiently close connection" to the prohibited conduct. *Id.* at 745-46 (internal quotations and citations omitted). It also means that simply engaging in illegal financial dealings with Iraq or Hussein is not enough to establish proximate cause under the ATA. "Accepting the fungible nature of material support does not require a court to also hold that *any*

2

reckless contribution to a terrorist group or affiliate, no matter its attenuation, must result in civil liability." *Id*. at 749 (emphasis in original). There is no indication that Congress intended to provide a remedy for every person reached by the "ripples" of terrorism. *Id*. The ATA's remedies are reserved for those who plausibly allege a direct connection between their injuries and the defendant's conduct.

These principles require dismissal of the ATA direct violation claims. Without question, the pending complaint offers plausible, and at times even compelling, evidence that Chevron paid kickbacks in exchange for Iraqi oil while Hussein was in power. *See, e.g.*, Dkt. No. 72 ¶¶ 95-100, 102-07, 112-40, 147-79. It also presents substantial information documenting Hussein's record of despicable conduct and support of terrorism.

But the essential element of a direct connection between Chevron's kickbacks and plaintiffs' injuries is missing. To start, there is no plausible allegation that money from Chevron ever reached the terrorists in Israel. Plaintiffs do not allege that Chevron's kickbacks were solicited or designated in any way to bankroll the terrorist activities that injured them. They say only that money extracted by the Iraqi regime in illegal oil sales "would not be used for any legitimate purpose" and would increase Hussein's "slush fund." Dkt. No. 72 ¶¶ 8, 142. That stops well short of plausibly alleging a direct relationship between Chevron's kickbacks and the terrorists in Israel who harmed plaintiffs. To say the slush fund would not be used for a legitimate purpose is not at all the same as, or even close to, saying Chevron financed terrorism in Israel, and it leaves the door wide open to a myriad of possible other misuses totally unrelated to plaintiffs' injuries. *See* 3/9/2016 Hr'g Tr. at 36:9-14.

The details in the SAC about the financial labyrinth Chevron's kickbacks were delivered into do not improve plaintiffs' position. Among other facts, plaintiffs allege that Chevron did not pay the kickbacks directly to the Iraqi government but to "third party companies." *See, e.g.,* Dkt. No. 72 ¶ 58. The kickbacks were then swept into a serpentine and often illegal flow of funds through businesses, banks, government institutions and terrorist groups throughout the Middle East. *See, e.g.*, Dkt. No. 72 ¶¶ 102-04, 113-22, 180-92, 204-09 (alleging involvement of oil traders; various banks in Jordan, Iraq and Lebanon; front companies in Jordan, Egypt, and the

United Arab Emirates; Iraqi central government officials; Iraqi and Jordanian embassies; paramilitary groups; Palestinian banks; and Palestinian terrorist groups). Plaintiffs offer no facts indicating that Chevron's money somehow retained its identity and cohesiveness as it traveled through the hands of these many intermediaries. It is certainly true that plaintiffs need not trace Chevron's dollars to the terrorists that harmed them with the precision of accountants, but they must allege more than that Chevron contributed funds to an evil empire. *Fields*, 881 F.3d at 749; *see also Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013). That is all plaintiffs have done, and holding Chevron liable under the ATA only for doing business, albeit illegally, with a rogue state would extend the scope of the statute far beyond Congress's mandate.

The plausibility of proximate causation is further undermined by facts showing that Chevron's money was a tiny portion of the "slush fund." Plaintiffs acknowledge that Chevron's kickbacks were less than 10% of the total "surcharges" for oil sales collected by the Iraqi regime. *See* Dkt. No. 72 ¶¶ 56 and 116 Fig. 1. Plaintiffs also cite the United Nation's Volker Report, *id*. ¶ 19, which estimated that Iraq and Hussein obtained billions of dollars through other sanctions violations. *See* Paul A. Volcker et al., Manipulation of the Oil-for-Food Programme by the Iraqi Regime 1 (2005). The sheer magnitude of the financial holdings available to Hussein and Iraq for misuse makes it implausible, and maybe even mathematically improbable, that Chevron's money was directly connected to a particular payment to a terrorist.

The amended complaint also repeats other problems affecting proximate cause that were discussed in the prior order. Dkt. No. 50. In sum, while plaintiffs plausibly allege two broad narratives of illegal kickbacks and state-sponsored terrorism, they do not connect the two in a way that adequately demonstrates Chevron's conduct was directly connected to plaintiffs' injuries. Consequently, the direct ATA claims are dismissed.

### B. The Aiding and Abetting Claim

Plaintiffs also allege that Chevron aided and abetted the perpetrators of the attacks that injured them. Dkt. No. 72 ¶ 300. This claim arises out of the Justice Against Sponsors of Terrorism Act ("JASTA"), which Congress enacted in 2016 to amend the ATA to impose liability on "any person who aids and abets, by knowingly providing substantial assistance, or who

4

conspires with the person who committed" an act of international terrorism. JASTA § 4, Pub. L. No. 114-222, 130 Stat. 852 (codified at 18 U.S.C. § 2333(d)). Before the amendment, the ATA made no reference to aiding and abetting liability. *See Owens v. BNP Paribas, S.A*, No. 17-7037, 2018 WL 3595950, at *8 (D.C. Cir. July 27, 2018).[1] The amendment applies only to injuries arising "on or after September 11, 2001." *Id*. at *9 (citing JASTA § 7(2), 130 Stat. at 855). Plaintiffs allege aiding and abetting only, not conspiracy. Dkt. No. 72 ¶ 300.

Although the dates of the terrorist attacks that injured the ATA plaintiffs are not crystal clear, at least some appear to have occurred after September 11, 2001. *See, e.g.*, Dkt. No. 72 ¶¶ 259, 268. Even so, plaintiffs have not stated a claim for aiding and abetting terrorism. Congress identified *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "the proper legal framework" to analyze aiding and abetting liability under JASTA. JASTA § 2(a)(5); *see also Owens*, 2018 WL 3595950, at *8. *Halberstam* discusses a number of factors pertinent to aiding and abetting liability, but the dispositive element here is that the defendant must have knowingly and substantially assisted in the principal violation. *Halberstam*, 705 F.2d at 477. Our circuit has not had occasion to interpret this element in the JASTA context, but the Second Circuit has indicated that aiding and abetting "requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (quoting *Halberstam*, 705 F.2d at 477). Simply providing material support to a terrorist organization is not enough. *Id*. at 329-30. A district court has also concluded that JASTA requires a plausible allegation that the defendant knowingly supported or encouraged a terrorist in the commission of a terrorist act. *Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 574 (E.D. Mich. 2018).

These conclusions are perfectly consistent with the plain language of JASTA, and they doom plaintiffs' aiding and abetting claim. Plaintiffs do not plausibly allege that Chevron knowingly supported or encouraged terrorist attacks in Israel. At most, the amended complaint alleges that Chevron should have known that it was contributing to terrorism and chose to ignore

---

[1] *Owens* arguably applies a proximate cause standard at odds with the Ninth Circuit. *See Owens*, 2018 WL 3595950, at *5, n.8. The Court cites only the portion of *Owens* that discusses JASTA.

the possible consequences. *See, e.g.*, Dkt. No. 72 ¶¶ 28, 52-87, 95-100, 141-42. That is in effect an allegation of recklessness, but JASTA requires more. Although it is true that Congress referred in its statement of findings and purpose to those who "knowingly *or recklessly* contribute material support or resources" to terrorists, JASTA § 2(a)(6) (emphasis added), the plain language of Section 2333 reaches only those "knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2). This clear statutory text controls. *See Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016). The aiding and abetting claims are dismissed.

## II. THE ALIEN TORT STATUTE CLAIMS

The prior ATS claims were dismissed because they did not adequately allege the requisite mental state pointed to in *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014). Dkt. No. 50 at 8-11. Since the dismissal order, the Supreme Court published *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), which examined the viability of ATS claims against a Jordanian bank accused of helping to finance attacks by the Hamas terrorist group in the Middle East. *Jesner* is something of a patchwork decision in which a majority of the Court spoke in only some sections. In those sections, the majority highlighted the propriety of judicial deference to the "political branches" in foreign policy areas, and held that "foreign corporations may not be defendants in suits brought under the ATS." *Id*. at 1407 (quotation and citation omitted). The majority also noted that the question of corporate liability in general under the ATA is for Congress, and not the courts, to decide. *Id*. at 1403.

The Court took supplemental briefing from the parties on *Jesner*. Dkt. No. 97. The question of whether *Jesner*'s holding on foreign corporations should be extended to a domestic corporation such as Chevron, *see* Dkt. No. 72 ¶ 15, can be left for another day because the ATS claims again fail to plausibly allege the required *mens rea*. Plaintiffs still fall short of the purpose standard pointed to in *Doe I* for largely the same reasons discussed in the prior dismissal order. Dkt. No. 50 at 9-10. Plaintiffs now allege more clearly that Chevron knew it was paying kickbacks to Hussein, but acknowledge that it paid them to access underpriced oil. *See, e.g.*, Dkt. No. 72 ¶¶ 28, 52-87. These and similar allegations show that Chevron sought to gain a competitive advantage by dealing with the Iraqi regime, but they do not plausibly allege that it

purposefully supported the suicide bombers that injured plaintiffs. The same holds true under a lower standard of knowledge. Plaintiffs adequately allege only that Chevron knew it was paying illegal kickbacks, and not that it knew they were being used to support terrorism in Israel. These types of allegations were not enough to state a claim in the prior complaints, and they are no more efficacious this third time around.

## CONCLUSION

The last question is whether dismissal of the ATA claims should be with prejudice or leave to amend. Plaintiffs have now had three opportunities to state a claim, and the benefit of a substantial period of discovery while preparing the SAC. Dismissal with prejudice would be well within bounds. *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013). Nevertheless, an argument can be made that the clarification of the proximate cause standard in *Fields* warrants a final opportunity to state a plausible direct violation claim. The same can be said for the aiding and abetting claim, which is based on a recent statutory amendment and plaintiffs have attempted to plead only once. Plaintiffs may amend the ATA claims in a third amended complaint by **September 4, 2018**, or advise the Court by the same date that they will not amend. Failure to adhere to this deadline will result in dismissal with prejudice under Rule 41(b).

The ATS claims are dismissed with prejudice. The governing standards have not changed and plaintiffs have had ample opportunity to state an ATS claim.

**IT IS SO ORDERED.**

Dated: August 14, 2018

JAMES DONATO
United States District Judge